# Docket No. 20-1281

===========================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

===========================================================

GREGORY MAYER,

Plaintiff-Appellant,

v.

RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN AND
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

Defendants-Appellees.

_____

ON APPEAL FROM A FINAL JUDGMENT OF
THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

Sat Below: Honorable Vincent L. Briccetti, U.S.D.J.

_____

**BRIEF AND SPECIAL APPENDIX (SA1-20) OF APPELLANT**

_____

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
(800) 790-1550; (888) 963-8864 (facsimile); mc@heggelaw.com

Of Counsel and On the Brief

# TABLE OF CONTENTS

TABLE OF APPENDIX ............................................................................. ii

TABLE OF AUTHORITIES ..................................................................... iii

CORPORATE DISCLOSURE STATEMENT…………………………………1

DECISION UNDER REVIEW………………… ………………… ......................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.... 1

STATEMENT OF THE ISSUE............................................................... 1

STATEMENT OF THE CASE................................................................ 1

STATEMENT OF FACTS ...................................................................2

STATEMENT OF RELATED CASES...................................................16

STANDARD OF REVIEW ..................................................................16

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT ......................................................................................18

I.     THE COURT SHOULD REVERSE THE DISTRICT COURT'S IMPROPER DENIAL TO MR. MAYER OF THE PROPER AMOUNT OF LONG TERM DISABILITY BENEFITS HE PROVED HE IS OWED.

     A. The District Court erred by applying an arbitrary and capricious standard of review rather than the presumptive *de novo* review.    18

     B. Applying the correct *de novo* standard, Mr. Mayer proved by a preponderance of the evidence that he was entitled to benefits based on the full income paid to him under Scarsdale's amended W-2 plus the amount of his SEP-IRA contributions, and based on a finding that premium payments were paid by him on a post-tax contributory basis.    40

i

C. Even if the arbitrary and capricious standard was proper to apply, the plan administrator exceeded his discretion by misconstruing the plain language of the Plan's provisions in calculating the amount of long-term disability benefits owed to Mr. Mayer, and by disregarding record evidence confirming the proper calculation of benefits.        49

II.     THE COURT SHOULD AWARD MR. MAYER HIS CORRECT BENEFIT, AWARD INTEREST TO HIM, AND GRANT HIM ATTORNEYS' FEES  IN THIS MATTER (IN THE DISTRICT COURT AND IN THIS APPEAL).        58

CONCLUSION ..................................................................................60

CERTIFICATES OF COMPLIANCE........................................... attached

## TABLE OF APPENDIX

### Special Appendix (bound with Brief, SA1-20)

Notice of Appeal        SA1

Judgment of District Court, 3/27/20        SA2

Opinion of District Court, 3/26/20        SA3

### Appendix Vol. I (A1-160, bound separately)

District Court Docket Sheet        A1

Complaint        A7

Answer        A24

Plaintiff's Notice of Motion for Summary Judgment        A36

Plaintiff's Proposed Findings of Fact/Conclusions of Law        A38

Defendant's Proposed Findings of Fact/Conclusions of Law        A111

Letter to court from defendant's counsel (6/21/19)          A155

Stipulation and Order (6/3/19) re: Administrative Record     A156

Privilege Log from Hartford                                  A159

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Aitken v. Aetna Life Ins. Co.,
  No. 16 CIV. 4606 (PGG), 2018 WL 4608217 (S.D.N.Y. Sept. 25, 2018)...........32
Am. Fed'n of Musicians v. Atl. Recording Corp.,
  203 F. Supp. 3d 301 (S.D.N.Y. 2016)...................................................43
Arnone v. Aetna Life Ins. Co.,
  860 F.3d 97 (2d Cir. 2017)..............................................................19
Barnes v. Am. Int'l Life Assur. Co. of New York,
  681 F. Supp. 2d 513 (S.D.N.Y. 2010)..................................................19
Bussian v. RJR Nabisco, Inc.,
  223 F.3d 286 (5th Cir. 2000).......................................................... 31, 32
Cherene v. First Am. Fin. Corp. Long-Term Disability Plan,
  303 F. Supp. 2d 1030 (N.D. Cal. 2004) ...............................................57
Collins v. Liberty Life Assur. Co. of Bos.,
  988 F. Supp. 2d 1105 (C.D. Cal. 2013) ......................................... 55, 57
Donachie v. Liberty Life Assur. Co. of Bos.,
  745 F.3d 41 (2d Cir. 2014)..............................................................58
Fairbaugh v. Life Ins. Co. of N. Am.,
  737 F. Supp. 2d 68 (D. Conn. 2010)..................................................58
Fay v. Oxford Health Plan,
  287 F.3d 96 (2d Cir. 2002)......................................................... 41, 46
Flanigan v. Gen. Elec. Co.,
  242 F.3d 78 (2d Cir. 2001)..............................................................31
Gallo v. Madera,
  136 F.3d 326 (2d Cir. 1998)....................................................... 43, 51
Glenn v. MetLife,
  461 F.3d 660 (6th Cir. 2006)...........................................................56

Grossmuller v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of
    Am., UAW, Local 813,
    715 F.2d 853 (3d Cir. 1983)......................................................................28
Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.,
    819 F.3d 42 (2d Cir. 2016).............................................. 17, 21, 22
Halpin v. W.W. Grainger, Inc.,
    962 F.2d 685 (7th Cir. 1992)..................................................................28
Hardt v. Reliance Standard Life Ins. Co.,
    560 U.S. 242, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010)....................................58
Hughes v. Hartford Life & Accident Ins. Co.,
    368 F. Supp. 3d 386 (D. Conn. 2019)............................................ 25, 28
Kinstler v. First Reliance Standard Life Ins. Co.,
    181 F.3d 243 (2d Cir. 1999)....................................................................40
Locher v. Unum Life Ins. Co. of Am.,
    389 F.3d 288 (2d Cir. 2004)....................................................................40
MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia,
    32 F. Supp. 2d 600 (W.D.N.Y. 1999) ......................................................52
Masella v. Blue Cross & Blue Shield of Connecticut, Inc.,
    936 F.2d 98 (2d Cir. 1991).....................................................................41
McCauley v. First Unum Life Ins. Co.,
    551 F.3d 126 (2d Cir. 2008)....................................................................16
McDonnell v. First Unum Life Ins. Co.,
    No. 10 CV 8140 RPP, 2013 WL 3975941 (S.D.N.Y. Aug. 5, 2013) ..................41
Metro. Life Ins. Co. v. Glenn,
    554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008)....................... 55, 57
Miles v. Principal Life Ins. Co.,
    720 F.3d 472 (2d Cir. 2013)............................................................ 18, 49
Miller v. United Welfare Fund,
    72 F.3d 1066 (2d Cir. 1995)....................................................................49
Muller v. First Unum Life Ins. Co.,
    341 F.3d 119 (2d Cir. 2003)....................................................................27
Okuno v. Reliance Standard Life Ins. Co.,
    836 F.3d 600 (6th Cir. 2016)...................................................................54
Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625,
    856 F.3d 686 (9th Cir. 2017)...................................................................19
Paese v. Hartford Life & Acc. Ins. Co.,
    449 F.3d 435 (2d Cir. 2006)....................................................................40
Pagan v. NYNEX Pension Plan,
    52 F.3d 438 (2d Cir. 1995).....................................................................16

Ricciardi v. Metro. Life Ins. Co.,
No. 16-CV-3805(CM), 2019 WL 652883 (S.D.N.Y. Feb. 15, 2019)...................51

Schewitz v. Aetna Life Ins. Co.,
No. 18-CV-6119, 2019 WL 2189263 (N.D. Ill. May 21, 2019).........................48

Schuman v. Aetna Life Ins. Co.,
2017 WL 1053853 (D. Conn. Mar. 20, 2017) .............................................. 32, 36

Shakhnes v. Berlin,
689 F.3d 244 (2d Cir. 2012)....................................................................28

Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.),
70 F.3d 226 (2d Cir. 1995)....................................................................22

Slupinski v. First Unum Life Ins. Co.,
554 F.3d 38 (2d Cir. 2009)....................................................................58

Thoma v. Fox Long Term Disability Plan, No.,
17 CIV. 4389, 2018 WL 6514757 (S.D.N.Y. Dec. 11, 2018) ...........................32

Wilkinson v. Sun Life & Health Ins. Co.,
127 F. Supp. 3d 545 (W.D.N.C. 2015) ...............................................55

Yancy v. United of Omaha Life Ins. Co.,
No. CV14-9803 PSG (PJWX), 2015 WL 9311729 (C.D. Cal. Dec. 18, 2015)....56

Zervos v. Verizon New York, Inc.,
277 F.3d 635 (2d Cir. 2002)........................................................ 51, 58

Zuckerbrod v. Phoenix Mut. Life Ins. Co.,
78 F.3d 46 (2d Cir. 1996)........................................................ 49, 58, 60

**Statutes**

28 U.S.C. § 1291 ..........................................................................................1
28 U.S.C. § 1331 ..........................................................................................1
29 U.S.C. § 1132(a)(1)(B) ...........................................................................1
Cal. Ins. Code § 10110.6(a) .......................................................................19
Cal. Ins. Code § 10110.6(c) .......................................................................19
Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 .................45

**Regulations**

29 C.F.R. § 2560.503-1........................................................................ 17, 21
29 C.F.R. § 2560.503-1(g)...........................................................................28
29 C.F.R. § 2560.503-1(h)(2)(iv)................................................................31

## CORPORATE DISCLOSURE STATEMENT

Not applicable.

## DECISION UNDER REVIEW

March 26, 2020 Opinion and Order, and March 27, 2020 Judgment, by

Vincent L. Briccetti, U.S.D.J. SA2, 3.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §

1331 and 29 U.S.C. § 1132(a)(1)(B). SA2. Th is Court has appellate jurisdiction

of the March 27, 2020 final judgment (SA2) under 28 U.S.C. § 1291 per plaintiff's

April 15, 2020 Notice of Appeal (SA1).

## STATEMENT OF THE ISSUE

Did the District Court err in granting judgment for defendants on plaintiff's

claim that defendants wrongfully calculated his long-term disability benefits and

determined that his benefits are fully taxable?

## STATEMENT OF THE CASE

Plaintiff Gregory Mayer filed this action in the District Court under the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001

*et seq.*, alleging defendants Ringler Associates Inc. and Affiliates Long Term

Disability Plan and Hartford Life and Accident Insurance Company wrongfully

calculated his long-term disability benefits and determined that his benefits are

fully taxable. Plaintiff sought reassessment of the benefits, payment of unpaid benefits owed to him, and payment of attorneys' fees and costs he had incurred. A7. Defendant filed an Answer denying the claims. A24.

The parties agreed to a bench trial on a stipulated record. SA2; A156. The District Court ruled that defendants were entitled to judgment in their favor dismissing Plaintiff's Complaint, entering a March 26, 2020 Opinion and Order and March 27, 2020 Judgment in defendants' favor. SA2, 3. Plaintiff filed a Notice of Appeal on April 15, 2020. SA1.

## STATEMENT OF FACTS

Plaintiff is an Attorney admitted to the State and Federal courts of New York, and a Certified Financial Planner (CFP®) and Certified Structured Settlement Consultant licensed to sell annuities in all 50 states. From 2001 until the onset of his disability in September 2015, plaintiff was engaged in the sale of annuities to fund personal injury and other settlements as a full time employee of Ringler Associates Scarsdale, Inc. ("Scarsdale"). Scarsdale was an independent contractor and an affiliate of a nationwide company called Ringler Associates, Incorporated (RAI). SA4.

Ringler Associates, Incorporated ("RAI") is a California corporation with its principal place of business in California. A7, 24; Administrative Record ("AR")

31-32, 68-69, 105-106.[1] RAI is an insurance agency that collects and distributes commissions back to its more than 50 affiliated companies for work done by the employees of the affiliated independent contractor companies, who sell structured settlement annuities nationwide. AR1405. Most of RAI's employees are located in California; most of the affiliated companies (like Scarsdale) are located outside of California. AR1478-79.

Scarsdale is an independent contractor, affiliated with RAI and located in New York. SA4; AR537 [Scarsdale Earnings Statement payments]; AR539 [Scarsdale 1099]; AR1404-05; AR1571; AR1234; AR395-96 [07-27-2017 Internal Hartford Emails: "Ringler brokers own their own brokerage firm under the Ringler name"].

The record showed that plaintiff was wholly employed by Scarsdale and compensated solely through Scarsdale. AR1126; AR955, 1118, 1139 [Corrected 2013 W-2]; AR 1119-20 [Corrected 2014 W-2]; AR1224; AR588-91; AR1404-05; AR1473 [RAI Job Description showing Mr. Mayer's "Job Title" as "Associate – Greg J. Mayer – R.A. Scarsdale, Inc."]; AR1487-90, 1522-23, 1530, 1539-40,

---

[1] The administrative record was filed in hard copy below and referenced by the District Court in its decision. It has not been filed as an Appendix because of confidentiality and HIPPA concerns. A motion to file the administrative record under seal (to the extent the Court deems separate filing necessary) has been filed. "AR" citations refer to the bates stamped page numbers of the administrative record (AR0001-1763).

1557-58 [2013-14 W-2, 1099, and Payroll Stubs showing Scarsdale as the Employer/Payor]; AR700-771; AR1571.  All plaintiff's W-2s and Payroll Stubs were paid under Scarsdale's Employer Tax Identification Number.  AR955, 1118, 1139; AR1119-20; AR1487-90, 1522-23, 1530, 1539-40, 1557-58.  All tax documents concerning Mr. Mayer's compensation where issued by Scarsdale under its tax-id number; Mr. Mayer did not receive a W2 or any form of income from RAI – he worked solely for and was paid solely by Scarsdale.[2]

**Plaintiff's Application for Long-Term Disability Benefits**

Plaintiff became disabled on September 15, 2015 following his third major spinal surgery and five major knee surgeries.  Plaintiff attempted intermittent work activities from October through December 2015 but could no longer work.  SA5-6.  Thus, on December 16, 2015, he applied for long-term disability benefits under the Plan.  SA5-6.  Mr. Mayer has subsequently been declared totally disabled by the Social Security Administration, which has reduced the amount Hartford is paying Mr. Mayer under the Plan.  AR 1622-25.

---

[2] As discussed below, whether RAI or Scarsdale was plaintiff's "Employer" for purposes of the disability benefits calculation ultimately was the primary dispute between Mr. Mayer and Hartford.

**The Benefits Plan**

The "Ringler Associates Incorporated and Affiliates Long Term Disability Plan" ("the Plan") offered coverage to RAI and its affiliated companies and their employees – which included affiliate Scarsdale and its employee, plaintiff. SA4-6; AR1-37, 38-74, 75-111. The Plan designates Hartford as the claim fiduciary and grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." AR 31, 68, 105. The Plan documents consist of three booklets that constitute three distinct policies to cover separate classes of employees. "Employer" is defined as the Policyholder (AR21 [LTD Booklet-Certificate 2.27]; AR58 [LTD Booklet-Certificate 4.5]; and AR95 [LTD Booklet-Certificate 1.32]), and "Policyholder" is defined and identified as RAI "and Affiliates" (id. at ¶¶16-17). The insurance provides 66 2/3 percent of the disabled employee's compensation including salary, bonus, commissions and deferred compensation paid by RAI to its employees or by one of the affiliated companies to its employees. SA5-6.

**Hartford's Initial Determinations**

On May 13, 2016, Hartford denied plaintiff's claim in its entirety. SA6-8. Plaintiff appealed Hartford's decision, however, and, on January 4, 2017, Hartford overturned its decision, advising plaintiff that he was disabled and entitled to benefits and that Hartford would determine the amount payable. AR254.

**The Amount of Benefits Payable to Mr. Mayer under the Plan**

This became the primary dispute and is the primary issue before this Court.

As noted, plaintiff contended that Scarsdale, not RAI, was his employer, and that Hartford disregarded this in insisting that RAI was the "employer" for purposes of calculating Mr. Mayer's pre-disability earnings and, consequently, the benefits payable. Plaintiff provided to Hartford the documents showing that plaintiff was compensated solely through Scarsdale (as noted above at pages 3-4).

Hartford, however, insisted on relying on the false information that RAI and its Operations Manager, Carol Ferrari, were providing (SA6), while ignoring the correct information provided by Mr. Mayer and his counsel, and emanating from the actual employer, Scarsdale. The inaccurate, misleading, and at times false information that Ferrari provided led to Hartford's improper claim determinations.

For instance, with regard to the physical requirements of Mr. Mayer's job, Ferrari provided to Hartford a completed Physical Demands Analysis ("PDA") form (AR1471-72), telling Hartford that Mr. Mayer worked a 40 hour day, an 8-5 shift, and did not lift or carry anything. This was false in fact and contrary to the Job Description submitted at the same time. AR1519-1520. Mr. Mayer requested that Ms. Ferrari correct the form and send it back to the Hartford. Mr. Mayer told Ms. Ferrari on January 15, 2016, "I have a problem with you submitting this at all… you are not the employer and you have to change and sign … Your financial

submission is wrong as well." AR1741. Ferrari refused to sign a corrected form, however, only sending Mr. Mayer's version to Hartford. Only after Mr. Mayer's claim was denied did Ms. Ferrari sign a corrected PDA form. AR0878-80. Ms. Ferrari also submitted an insurance application which falsely stated Mr. Mayer did not have to lift or carry anything. AR1519-1520. Ferrari interfered with Hartford's assessment of the claim, for instance stating in a February 9, 2016 email to Mr. Mayer that RAI as "the plan administrator" was being "copied/apprised of any claim activity. Hartford has given us copies of your claim form. On the physical demands sections of the claim form you indicated that your briefcase/suitcase weighs 70 plus pounds. Based on **our experience** it seems this weight is very unusual" (emphasis added). Ms. Ferrari argued about the weight, while refusing to change her falsely submitted forms which stated Mr. Mayer did not have to lift or carry anything and contained false financial information.

Hartford's reliance on false information from RAI caused Mr. Mayer grave concern that his claim was not being correctly assessed. He hired an ERISA attorney and, per counsel, submitted a corrected PDA on behalf of his actual employer, Scarsdale, showing his true work hours and job requirements (8 to 18 hour days, 5 + days per week, with lifting and carrying requirements for computers and suitcases up to 70 pounds). AR1471-72.

Hartford nonetheless continued to turn to and rely on whatever RAI and operations manager Ferrari stated and provided – despite Hartford being told that RAI was not Mr. Mayer's employer and was providing wrong information.[3]

With regard to whether the benefits were fully taxable, Ferrari told Hartford that it was "100% taxable" to Mr. Mayer because RAI "contribute[d] towards the cost of the LTD premium … 100%"; in response to the question "Does the employee contribute towards the cost of the LTD premium?," Ferrari answered "No." AR1554. In a series of emails in late December 2015 and early January 2016, Tonya Martinez, Hartford's Ability Analyst, asked Ferrari for clarification. AR1504-14. Ferrari responded, "Greg is a Producer who did NOT pay his LTD premiums, which means that his benefits ARE 100% taxable." AR1508. This was incorrect. In fact, RAI collected premiums from the affiliated companies' segregated accounts held at RAI, then forward the premiums for all the affiliated companies, in bulk, to Hartford. AR0137. RAI did not pay the premiums for the affiliated companies' employees. AR0772-0774. RAI only paid the premiums for employees of RAI. While RAI collected the premium money, the premiums were paid by Scarsdale, as the employer of Mr. Mayer, and the premium costs were

---

[3] The PDA form itself states is to be completed by the supervisor of the employee and faxed to Hartford. AR0879. Ms. Ferrari is an employee of another company - - not the supervisor of Mr. Mayer.

charged back to Mr. Mayer, who ultimately bore the cost. RAI did not pay the premium cost as RAI's Ferrari told Hartford. AR1401-06; AR489 [RAI Ledger Summary showing LTD Plan premiums deducted by RAI from commissions paid to Scarsdale].

Yet Hartford continued to rely on Ferrari and ignore what the beneficiary and his employer were advising. With regard to W-2s, Ferrari provided to Hartford a 2013 Scarsdale W-2 "showing [Mr. Mayer's] total salary of $150,000.16," a 2014 Scarsdale W-2 "showing his total salary of $100,000.16," and told Hartford that the "general ledger … do[es] not show any contributions to a SEP Account or pension contributions." Ferrari stated, "[i]f he has made any of these contributions, … [h]e will have provide this to you himself." AR1506-07; AR1490; AR1448; AR1504-05. Ms. Ferrari told Mr. Mayer on the eve of Hartford's benefit determination, "I spoke to with Tonya Martinez at the Hartford regarding your LTD claim on Jan 5, 2017 at 1:00 PST. She asked me for your pay statements for the timeframe January 2013- Sept 2015. I sent those to her this morning. I also told her that she would need to contact you directly for any additional information regarding your wages. Our records only show what was paid to you through our Ringler ADP Payroll service." AR1718. RAI did not confirm Mr. Mayer's wages, and Hartford never contacted Mr. Mayer before determining the benefits payable to him.

Plaintiff and his counsel repeatedly told Hartford that the information RAI was providing was wrong, and that RAI did not control the compensation of Mr. Mayer or the books and records of Scarsdale, as evidenced by RAI's lack of knowledge of Mr. Mayer's SEP Plan and 1099 income. Plaintiff explained and provided documents to Hartford showing his correct earnings, including a commission detail report from RAI showing direct commission of $463,255.54 for 2013 and $448,499.51 for 2014 paid to Scarsdale, Corrected W2's (for 2013 and 2014), and Tax Returns for 2013 and 2014 filed with the IRS showing, for instance, that Mr. Mayer's Monthly Rate of Basic Earnings under the Plan (without consideration of deferred compensation) was $22,977.33, i.e., ($151,842.01 (2013) + $399,614.01 (2014)) /24 = $22,977.33.

Plaintiff explained to Hartford that Scarsdale, not RAI, was his employer, and that Hartford should not rely on what RAI was providing as they simply did not have the information. Though RAI had provided to Hartford ADP-issued W-2s indicating income to Mr. Mayer from Scarsdale in the amount of $150,000.16 in 2013 and $100,000.16 for 2014 (AR1490, AR1558), plaintiff advised that Mr. Mayer's earning were greater than that. Plaintiff and his counsel explained to Hartford that Scarsdale's accountants had mistakenly classified the balance of Scarsdale's compensation to Mr. Mayer as 1099 compensation, rather than W2 income as it should have been classified. AR1224; AR1465-66; AR1489. This

mistake was corrected. Scarsdale's accountants reviewed the corporation's filings after plaintiff questioned the classification of this income, and the accountants determined that the 1099 characterization was erroneous, and that the 1099's should have been classified as W-2 income for Mr. Mayer, as Mr. Mayer was employed by Scarsdale and Scarsdale paid his expenses. Amended W-2 forms were filed reflecting the correct W-2 compensation for plaintiff of $151,842.01 in 2013 and $399,614.01 in 2014. The corrected W-2s were provided to Hartford along with Mr. and Mrs. Mayer's confidential personal tax information filed with the IRS. AR864-65; AR955, 1118, 1139 [Corrected 2013 W-2]; AR1119-20 [Corrected 2014 W-2]. Hartford was thus aware, well before it made its determination, that the W2s that RAI's Ferrari had provided were invalid.

With regard to the SEP-IRA contributions, plaintiff told Hartford that Scarsdale made contributions on his behalf to a SEP-IRA in 2013 and 2014 of $50,000 each year. AR416, AR940-42. Plaintiff contended that Scarsdale's contributions should be included in his Monthly Rate of Basic Earnings calculation.

As to taxability, plaintiff told Hartford that RAI had provided incorrect information – that Mr. Mayer was a producer who chose to pay his own disability insurance premiums and was covered under Plan Certificate 1.32. AR82. Plaintiff

advised Hartford that the benefits award was not fully taxable as RAI had incorrectly advised.  SA6-8.

**Hartford's Determination on the Amount of Benefits Payable**

On January 6, 2017, despite the information that plaintiff and his counsel had provided, Hartford calculated plaintiff's monthly Pre-Disability Earnings as $10,416.68 – less than half what plaintiff contended it was – relying on the inaccurate information that RAI provided.  SA8.  Hartford determined that RAI, not Scarsdale, was plaintiff's "Employer" under the Plan.  Hartford calculated plaintiff's earnings based solely on the W-2s and earnings information that RAI had provided to Hartford – despite plaintiff having told Hartford that (1) RAI was not his employer and all compensation was paid under Scarsdale's Tax-ID, and (2) the wage earnings that RAI provided were incorrect and no longer valid with the IRS.  Hartford said that the pay statements provided by RAI showed that plaintiff "received a bi-weekly payroll in the amount of $3,846.16 for the time period 01/01/2013–12/31/2014.  He received one bonus in the amount of $50,000 on 12/20/2016.  There was no other bonuses or commissions paid during this time period." AR 251.  "The total pay for the 2 calendar years prior to your Disability was $250,000.32.  The Monthly Rate of Basic Earnings is calculated as $250,000.32 / 24 = $10,416.68."  Upon determining plaintiff's Pre-Disability

Earnings as $10,416.68, Hartford calculated plaintiff's gross monthly disability benefit as $6,944.45. Id.

Plaintiff appealed the benefits calculation per Hartford's internal appeal process, stressing again that he worked solely for, and was paid solely by, Scarsdale, and that his benefits should be calculated based on his total compensation from Scarsdale shown by the corrected W-2s, and the $100,000 in SEP-IRA contributions, amounting to earnings in 2013 and 2014 of $651,456, not the $250,000 that Hartford determined based on the incorrect information from RAI. SA9.

On November 9, 2017, Hartford upheld its determination. Hartford stated that the Plan is self-administered not by Scarsdale, but by RAI, and that RAI was responsible for keeping enrollment documents and administering the Plan. Hartford said that it had correctly adjudicated plaintiff's claim based on the information that RAI provided. SA9-10. Hartford said that plaintiff's SEP-IRA contributions were disregarded from the Pre-Disability Earnings calculation because a "SEP-IRA is considered a 408(k) plan," and was not a salary-reduction or other agreement within the Plan's definition of "Monthly Rate of Basic Earnings." AR 237. Hartford said that Booklet 4.5, not Booklet 1.32, governed plaintiff's benefits claim, and that plaintiff's benefit was fully taxable. Even if

RAI reallocated premium costs to Scarsdale or to plaintiff, RAI was responsible for, and paid premiums to, Hartford for plaintiff's disability coverage.  SA10.

**The District Court Proceeding and Decision**

Plaintiff charged that Hartford wrongfully calculated his benefits by disregarding the Plan's plain language and the record evidence showing the proper calculation of pre-disability earnings.  A7-23.  But the District Court upheld Hartford's determination.  SA3.

The court rejected application of the *de novo* standard of review to Hartford's determination.  SA11-16.  California law did not apply because plaintiff was a resident of New York.  Hartford "substantially complied" with ERISA because Hartford considered plaintiff's submissions in support of his claim and "timely informed plaintiff" of its decision making process "in accordance with ERISA law."  Plaintiff "does not reasonably claim he was deprived of a meaningful opportunity to respond to documentation or information developed on administrative appeal by Hartford Life which affected the outcome of the appeal." Id.

The District Court then "conclude[d] Hartford Life's decision respecting plaintiff's long-term disability benefits was neither arbitrary nor capricious." SA16-19.  The court rejected plaintiff's contention that "Hartford Life should have considered [Scarsdale] to be plaintiff's Employer under the Plan, and thus should

have accorded more weight to documents generated by [Scarsdale] (including plaintiff's corrected W-2s and a general ledger showing certain commissions paid to plaintiff by [Scarsdale])… the Court finds it was reasonable for Hartford Life to rely on documentation and information provided by RAI. Specifically, it was reasonable for Hartford Life to determine RAI was the Employer, Plan Administrator, and Policyholder under the Plan, and thus to rely on information provided by RAI concerning plaintiff's earnings." SA17-18.

> Second, it was reasonable for Hartford Life to disregard plaintiff's SEP-IRA contributions for purposes of calculating plaintiff's Pre-Disability Earnings. As noted above, Hartford Life informed plaintiff such contributions were made toward a 408(k) plan, and thus not to any salary-reduction or other agreement within the Plan's definition of Monthly Rate of Basic Earnings.

> Third, it was reasonable for Hartford Life to determine plaintiff's long-term disability benefit was fully taxable. Although plaintiff provided Hartford Life a letter from his accountant noting "the company" paid plaintiff's premiums (AR943), RAI confirmed that it paid Hartford Life premiums for plaintiff's coverage under the Plan. Hartford Life noted that, even if RAI first paid plaintiff's premiums, and then reassigned those costs to [Scarsdale], any dispute respecting whether plaintiff effectively paid his own premium would need to be resolved by plaintiff and RAI, not plaintiff and Hartford Life, "since employees do not have the option to pay premiums back to their Employer in order to make a non-contributory benefit a contributory benefit." (AR237).

> Fourth, although plaintiff contends it was arbitrary or capricious for Hartford Life to determine Booklet 4.5 governed plaintiff's coverage, the administrative record supports this determination. As noted above, Hartford Life first sent plaintiff a copy of Booklet 1.32, which applies to producers choosing to pay their own premium, but later produced to

plaintiff Booklet 4.5, which covers producers who do not pay their premiums. The administrative record confirms RAI administered the Plan, including on behalf of plaintiff, and paid to Hartford Life the premiums associated with plaintiff's coverage. Therefore, it was reasonable for Hartford Life to determine Booklet 4.5 governed plaintiff's claim, and that his gross benefit was taxable accordingly. [SA16-19]

The court rejected plaintiff's contention that Hartford had a "financial self-interest" as "both claim administrator and benefits payor, and because the benefits decision was marred by procedural and substantive defects." SA19. "[E]ven assuming Hartford Life was operating under a conflict of interest, there is no credible evidence in the administrative record to suggest the conflict affected Hartford Life's decision or was otherwise outcome-determinative." SA19-20.

## STATEMENT OF RELATED CASES

None.

## STANDARD OF REVIEW

The Court of Appeals reviews *de novo* a district court's decision granting judgment for a defendant in an ERISA action based on the administrative record. Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995); McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 130 (2d Cir. 2008).

## SUMMARY OF THE ARGUMENT

The District court erred in applying an arbitrary and capricious standard of review rather than the presumptive *de novo* review ERISA prescribes. The Plan

was implemented by a California company, covered California residents, and contained a choice of law provision providing that it was governed by California law. California law should have applied and California law compelled *de novo* review.

*De novo* review applied, separately, under this Court's governing precedent of <u>Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.</u>, 819 F.3d 42 (2d Cir. 2016). Hartford was required to show it "strictly adhere[d] to the regulation to obtain the more deferential arbitrary and capricious standard of review," otherwise the presumptive *de novo* review applied. <u>Id.</u> at 56. The District Court misapplied <u>Halo</u> by ruling that arbitrary and capricious review applied as long as the administrator "substantially complied with ERISA's claims-procedure regulations." <u>Halo</u> requires "strict" not "substantial" compliance. Hartford did not satisfy ERISA's requirements (29 C.F.R. § 2560.503-1) by (i) failing to decide plaintiff's claim and subsequent appeals within 45 days or within a proper time extension; (ii) failing to provide requested documentation concerning plaintiff's appeal before it was decided, and (iii) disregarding evidence showing the proper determination of plaintiff's earnings and the identity of his "Employer" under the Plan. Hartford did not carry its burden to prove that its deviations from ERISA were "inadvertent and harmless."

Applying *de novo* review shows that Hartford misconstrued the plain language of the Plan in calculating the amount of plaintiff's Pre-Disability Earnings, in concluding that RAI was plaintiff's "Employer," in excluding from the calculation of plaintiff's Monthly Rate of Basic Earnings the SEP-IRA contributions made, and in determining that the benefits award was fully taxable. Even under an arbitrary and capricious standard of review, Hartford's decision is "without reason, unsupported by substantial evidence" and "erroneous as a matter of law." Miles v. Principal Life Ins. Co., 720 F.3d 472, 487 (2d Cir. 2013).

## ARGUMENT

## POINT I

**THE COURT SHOULD REVERSE THE DISTRICT COURT'S IMPROPER DENIAL TO MR. MAYER OF THE PROPER AMOUNT OF LONG TERM DISABILITY BENEFITS HE PROVED HE IS OWED.**

**A. THE DISTRICT COURT ERRED BY APPLYING AN ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW RATHER THAN THE PRESUMPTIVE *DE NOVO* REVIEW.**

**1. California law compelled *de novo* review.**

The Policy's "place of delivery" was California.  AR112.  The Plan covers California residents.  AR121-22; AR6, 15, 23; AR43, 52, 60; AR80, 89, 97.  And the Policy contains a choice of law provision providing for application of California law:  "Jurisdiction: This policy is governed by the laws of the state

where it is delivered." AR120. Choice of law provisions in ERISA benefit plans

are enforced. See Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017)

("Contractual choice of law provisions are generally enforceable under both New

York law and federal common law"); Barnes v. Am. Int'l Life Assur. Co. of New

York, 681 F. Supp. 2d 513, 520 (S.D.N.Y. 2010) (choice of law provision controls

"unless it would be unreasonable and unfair to apply state law"). Nothing in the

record showed that it was "unreasonable and unfair" to apply California law

providing for *de novo* review of Hartford's determination. California law should

have been applied, and California's Insurance Code compels *de novo* review:

> If a policy, certificate, or agreement offered, issued, delivered, or
> renewed, whether or not in California, that provides or funds . . .
> disability insurance coverage for any California resident contains a
> provision that reserves discretionary authority to the insurer, or an
> agent of the insurer, to determine eligibility for benefits or coverage,
> to interpret the terms of the policy, contract, certificate, or agreement,
> or to provide standards of interpretation or review that are inconsistent
> with the laws of this state, that provision is void and unenforceable.
>
> [Cal. Ins. Code § 10110.6(a)]
>
> For purposes of this section, the term "discretionary authority" means
> a policy provision that has the effect of conferring discretion on an
> insurer or other claim administrator to determine entitlement to
> benefits or interpret policy language that, in turn, could lead to a
> deferential standard of review by any reviewing court.
>
> [Cal. Ins. Code § 10110.6(c)]

Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625,

856 F.3d 686, 695 (9th Cir. 2017).

The District Court declined to apply California law because plaintiff "is, and at all relevant times was, a resident of New York, not California"; the California statute thus "does not govern Hartford Life's determination." SA10-11. But the choice of law provision provides for California law to apply. The District court erred in not enforcing the provision. Beyond the provision, the California statute dictates that California law applied because this was a "policy, certificate, or agreement" "offered, issued, delivered, or renewed" and "provides or funds . . . disability insurance coverage for any California resident…" AR112; AR121-22; AR6, 15, 23; AR80, 89, 97.[4] Hartford's own Claim Notes identify the Plan's "situs" as California. AR202. Hartford's decision letters direct disgruntled claimants to "have the matter reviewed by the California Department of Insurance." AR233-238; AR250-52; AR269-72. That plaintiff himself is not a California resident does not render the California statute inapplicable to this California plan delivered in California covering California residents (and that contains a choice of law provision to boot).

---

[4] Among the California residents covered by this Plan are RAI Operations Manager Ferrari (AR1552), and Paula Woodruff (AR1568).

**2. This Court's governing precedent in <u>Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.</u>, 819 F.3d 42 (2d Cir. 2016), requiring strict compliance with ERISA regulations, compelled *de novo* review.**

The District Court said that the arbitrary and capricious standard of review applies unless "the administrator fails to establish it substantially complied with ERISA's claims-procedure regulations…" SA10. This misapplies the Court's governing precedent in <u>Halo</u>, 819 F.3d 42, where the Court rejected the rule that it is sufficient for claim administrators to substantially comply with ERISA regulations and held that "strict adherence" was required. Respondent's own lawyer, Mr. Begos, authored an article in 2016 noting that this Court in <u>Halo</u> "rejects 'substantial compliance' rule" and "held that, unless there is strict compliance with the regulations, courts will ordinarily conduct a *de novo* review of claim determinations…" <u>https://www.erisaclaimdefense.com/court-rejects-substantial-compliance-rule-requires-plan-prove-non-compliance-regulations-inadvertent-harmless</u>.[5] Hartford did not strictly comply with ERISA.

---

[5] Mr. Begos noted in his article that <u>Halo</u> provided a "path for administrators to retain the arbitrary and capricious standard of review." This path is the "inadvertent and harmless" error standard. The <u>Halo</u> Court said that deviations from ERISA regulations "should not be tolerated lightly. Accordingly, we hold that, when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the

**Hartford Missed ERISA Deadlines**

The following communications demonstrate that Hartford failed to provide a

decision within the timeframe ERISA requires:

- Hartford confirmed a properly filed claim for benefits was completed on January 12, 2016 (AR 306, 1165)

- On January 13, Hartford requested medical records, stating, "It is your responsibility to ensure that this information is sent to us by 01/26/2016." The letter states, "We will make a claim decision no later than 45 days from 01/12/2016 unless we notify you before then that we need more time due to matters beyond our control." (AR 306, 1165)

- On February 12, 2016, Dr. Cammisa's office faxed 32 pages of records complying with Hartford's January 28, 2016 request (AR1407-1444)

- On February 8, 2016, Dr. Lee faxed records complying with Hartford's February 5, 2016 request (AR1146-1460)

- On February 22, 2016, Tonya Martinez of Hartford wrote to Mr. Mayer stating, "(ERISA) allows us 45 days from receipt of a properly filed claim to make a benefit determination. However, if we are unable to make a decision within that time frame due to matters beyond our control, we may elect to extend that time frame for up to two 30-day periods." "We currently expect to make our decision by 3/27/2016" (AR295-296). Significantly, Hartford did not request further information from Mr. Mayer or his providers. Hartford implied that the records provided were sufficient: "Therefore, as part of our claim review, we have asked our internal clinical staff to clarify

---

processing of a particular claim was inadvertent and harmless. Moreover, the plan 'bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it.'" <u>Halo</u>, 819 F.3d at 58 (quoting <u>Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.)</u>, 70 F.3d 226, 230 (2d Cir. 1995)). Hartford did not carry its burden to prove that its deviations from ERISA were "inadvertent and harmless." <u>Id.</u>

the medical information in your claim file so that we can determine if you satisfy the policy provision(s) set forth above. Specifically, if the restrictions and limitations are supported by the medical records throughout and beyond the elimination period." Hartford had all the information it requested 10 days prior to its letter – its only reason for delay was internal review.

- Instead of a decision by the March 27, 2016 deadline, Mr. Mayer received a letter from Hartford dated March 28, 2016 (AR285), stating the need for yet a second extension of time. March 28, 2016 was 76 days beyond the filing of the claim -- one day beyond the 75 day limit allowed for an extension of time request. Hartford's letter requested medical records: "We will allow you until 4/11/2016 to provide this information. We expect to make our decision within 30 days of the earlier date we receive any of the requested information or 5/11/2016 unless we notify you of the need to extend the decision a second time." AR285. Hartford stated it was not able to determine if Mr. Mayer was disabled under the following provision: "Total Disability or Totally disabled: means during the elimination period and the next 24 month(s) as a result of injury or sickness, you are unable to perform… your occupation in the usual or customary way." This provision is not in any of the policies Hartford advised covered Mr. Mayer's claim yet was cited in Hartford's May 13, 2016 denial letter as a main reason for denial.

- Mr. Mayer did not receive a decision within the 30 day extension time, which would have been April 26, 2016, or even the later date set forth by Hartford of May 11, 2016. Mr. Mayer received his decision from Hartford on May 13, 2016. Mr. Mayer's claim was filed on December 16, 2015, and deemed properly filed on January 12, 2016 by the Hartford. The denial letter was dated May 13, 2016 -- 122 days later and 17 days beyond the 105 days allowed by ERISA. This is not strict compliance within Halo.

Hartford did not "strictly adhere" to the deadlines for Mr. Mayer's first

internal appeal either. Mr. Mayer's appeal was filed November 7, 2016 (AR 963).

The District Court erred in finding that Hartford overturned its appeal decision on

December 6, 2017. The record shows that Hartford did not approve an award until January 4, 2017 -- 58 days after filing of his appeal. AR0254. Defendants admit that January 4, 2017 is the approval date in Defendants' Opening Memorandum of Law for Bench Trial on Stipulated Record (Page 8). Hartford did not request an extension of time and violated ERISA's 45 day time limit. AR0254.

With regard to Mr. Mayer's second internal appeal, while Hartford arguably gave plaintiff notice within 45 days (his appeal was filed July 5, 2017 but the District Court is correct that plaintiff submitted additional materials in support on July 13, 2017), the identified reason for an extension was already responded to and was not beyond the control of the administrator or a special circumstance. The August 24, 2017 letter stated that Hartford was unable to make a decision on plaintiff's appeal during the initial 45 day period because it was awaiting information from RAI needed to fully investigate. The administrative record's notes and emails show that Hartford was awaiting confirmation about Mr. Mayer's enrollment records from RAI. AR1440, AR406. **Hartford was seeking enrollment records almost two years into the claim and after they issued a claim denial, a claim reversal and a decision on the benefit and taxability of Mr. Mayer's claim**. It turns out RAI and the Broker allegedly lost all their records, which was told to Hartford on August 1, 2017. Hartford's delay was another ERISA violation. AR406.

**RAI and Hartford did not provide plan documents to Mr. Mayer.**

Counsel for Mr. Mayer repeatedly requested that Hartford provide – prior to its final decision – any information developed in Hartford's investigation of Mr. Mayer's employment, plan enrollments, sources of compensation, etc. AR482-84 [09-14-2017 M. Scherzer New Evidence Demand Letter]. Hartford's Appeal Specialist, Mr. Solem, had developed additional information – principally from communications between an underwriter and broker for the plan, Tom Farr (AR407 [08-01-2017 H. van Buren Email to B. Johnson: "[T]his employee enrolled maybe 20 years ago they do not have anything on file because the group switched from paper to online a couple of years back"]), and from Hartford's Practices/Strategy Department (AR405 [08-01-2017 E. Solem Email to J. O'Polka]); AR402-04 [08-02-2017 E. Solem Email to J. O'Polka]. **None of this information was provided to Mr. Mayer or his attorney prior to Hartford's appeal determination**. This constitutes an ERISA violation requiring *de novo* review. Cf. Hughes v. Hartford Life & Accident Ins. Co., 368 F. Supp. 3d 386, 392–403 (D. Conn. 2019) (failure to provide medical report, developed during appeal and requested by claimant prior to appeal determination, compels *de novo* review).

The Plan provides that "Hartford Life will give the Policyholder an individual Booklet-certificate for each insured employee." AR120 [LTD Policy].

Mr. Mayer was never given a Booklet-certificate upon enrollment; when he was, it was with Hartford's determination denying his claim.  See AR1739 (May 13, 2016 response from Ability Analyst Martinez, "Please find the Ringler Policy attached" while at same time transmitting Hartford's 05-13-2016 Denial Letter).  The attached Plan document that Hartford provided to plaintiff, moreover, was LTD Booklet-Certificate 1.32.  AR1619.  Policy 1.32 has a signature section to be executed by the new enrollee as proof of delivery of the policy.  Neither Hartford nor RAI produced that signature page executed by Mr. Mayer.  AR0497.  On July 27, 2018, when Hartford produced a copy of the administrative record for purposes of the District Court lawsuit, Hartford finally, for the first time, produced a copy of the Group LTD Policy document itself (AR112-122 [Group LTD Policy, as Amended 08-27-2013]).  AR1620.  Hartford still has not produced the application, which is part of the contract pursuant to the entire contract definition.  AR0119.

**The questionable, purported participating employer amendment cited by Hartford below (AR112) should have been stricken from the record.**

This document was first provided by Hartford after all decisions on internal appeals were completed, a violation of ERISA.  AR1620.

The purported amendment is suspicious.  First, it is suspicious that this document was not produced until the trial record in a case where the file went through two internal appeals and was examined by a claims person, her supervisor,

two separate internal appeal adjustors, Hartford's internal legal counsel, and two underwriters. Second, it was purportedly signed by Ronald Gendreau in August 2013, yet Gendreau left Hartford in October 2012. The policy form has a space for it to be countersigned, yet countersignatures stopped being used at least since 2007 (Insurance Journal, November 30, 2005, Counter Signature Laws now history in 50 States, https://www.insurancejournal.com/news/midwest/2005/11/30/62599.htm).

Under the premium section, the amendment states:

Change in Monthly Rates Initial Monthly Premium rates are guaranteed as follows:

| | |
|---|---|
| Life Insurance | Until May 1, 2006 |
| Accidental Death, Dismemberment and Loss of Sight Benefit | Until May 1, 2006 |
| Long Term Disability Benefits | Until May 1, 2001 |

Dates of until May 1, 2006 and until May 1, 2001 would not be on a form for an amendment added in August 2013.

The document states that Hartford will keep a list of accepted participant employers and the effective dates of coverage for each. Hartford states in its claim notes that Scarsdale was not listed -- "the subsidiaries do not list 'Scarsdale'" (AR164). The claimed subsidiaries list was never produced. Further, in an ERISA case, review is generally based on the record that was before the claims administrator at the time the decision was rendered. Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir. 2003). This purported amendment was never cited

in any claim determination or notes.  There is no evidence it was before the administrator who decided plaintiff's claim.

**Hartford denied plaintiff's claim under one policy then cited and provided a different policy on which Hartford decided plaintiff's appeal.**

A "core requirement" of the full and fair review ERISA mandates includes "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."  Hughes, 368 F. Supp. 3d at 393, *citing* Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir. 1992), Grossmuller v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, Local 813, 715 F.2d 853, 858 n.5 (3d Cir. 1983), Shakhnes v. Berlin, 689 F.3d 244, 256 n.8 (2d Cir. 2012).  The denial letter must "reference [the] specific plan provisions on which the determination is based."  29 C.F.R. § 2560.503-1(g);(j).  Referencing specific plan provisions necessarily requires an insurer to cite the correct insurance policy.  Hartford did not do this.

As noted, the first time Mr. Mayer was provided plan documents was when he was provided the insurance contract form 1.32 at the same time that Hartford gave him its denial letter on May 13, 2016.  The insurance contract for 1.32 was the document that Hartford referred to in its initial denial.  Hartford determined the

first appeal, in which it reversed its disability finding and proceeded to determine the benefits payable, under Contract 1.32 as well. AR1619-20.

Then, when Mr. Mayer received records in response to his attorney's request for the claim file and all relevant documents for the appeal of Hartford's benefits calculation, Hartford included a different contract – "Certificate 216897(GLT) 4.5" that was transmitted by Tonya Martinez with the administrative record produced to Mr. Mayer's counsel under her letter dated February 10, 2017. AR1619.[6] Mr. Mayer had never seen this Certificate before. He questioned Hartford about it and requested that Hartford tell him which contract, 1.32 or 4.5, Hartford was

---

6 The Plan's coverage is provided through Group Policy No. GLT-216897, issued by Hartford, and amended as of August 27, 2013. AR112-122. The Policy incorporates Booklet-Certificates 216897(GL) 3.5, 216897(GLT) 1.32, 216897(GLT) 2.27, and 216897(GLT) 4.5. AR114. Booklet Certificates 1.32, 2.27, and 4.5 (the "LTD Booklet-Certificates") provide long-term disability benefits pursuant to the LTD Plan. AR115 [Group Policy]; AR1-37, 38- 74, and 75-111 [respectively, Booklet-Certificates 1.32, 2.27, and 4.5]. Each LTD Booklet-Certificate is a stand alone insurance contract/policy which provides coverage for a specific eligible class of LTD Plan participant.

    a. LTD Booklet-Certificate 1.32 covers "All Active Full-time Producers, Managers, or Officers who are choosing to pay their premium who receive a W2 who are U.S. citizens or U.S. residents, excluding temporary and seasonal employees." (AR82 [LTD Booklet-Certificate 1.32 Schedule of Insurance].)

    b. LTD Booklet-Certificate 4.5 covers "All Active Full-time Employees who are producers, managers, or officers not paying their premium who receive a W2, who are U.S. citizens or U.S. residents, excluding temporary and seasonal employees." AR45 [LTD Booklet-Certificate 4.5 Schedule of Insurance].

contending covered his claim. Mr. Mayer's attorney wrote letters to Hartford on May 2 (AR432-434), June 20 (AR435), June 27 (AR436, also noting a phone call to Hartford adjuster Daniel Maxwell), and September 14, 2017 (AR437), requesting information on contract 4.5. Mr. Mayer and his attorney requested to know which contract Hartford considered to apply. Hartford never replied. Further, Hartford did not supply the office notes it used to make the determination on benefits until after its decision on Mr. Mayer's appeal, which Hartford then decided under "Certificate 216897(GLT) 4.5" – a different insurance contract than Hartford used (contract 1.32) in its initial denial and first appeal. Hartford's disregard for production of plan documents and non-production of the policies and policy documents and claim notes is admitted to by Hartford in the stipulation for the trial record. AR1620. Hartford's lack of communication to the beneficiary about which certificate actually applied to determine his claim caused plaintiff and his counsel to have to prepare his appeal of Hartford's benefit calculation without knowing which insurance contract – 1.32 or 4.5 – even applied. As the District Court said, "Finally, on appeal, Hartford Life determined Booklet 4.5, not Booklet 1.32, governed plaintiffs claim." This warranted *de novo* review as well.

**Hartford failed to consider sufficiently – or simply disregarded -- plaintiff's submissions and arguments showing the identity of his "Employer" and the proper determination of his pre-disability earnings under the Plan.**

ERISA required Hartford to provide a review that "takes into account all comments, documents, records, and other information submitted by the claimant." 29 C.F.R. § 2560.503-1(h)(2)(iv). The fiduciary must conduct a "thorough, impartial investigation" and make a decision that the fiduciary has reasonably concluded is best for the beneficiary. <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 86 (2d Cir. 2001); <u>Bussian v. RJR Nabisco, Inc.</u>, 223 F.3d 286, 300 (5th Cir. 2000).

The District Court said that "the administrative record contradicts plaintiff's assertion" that Hartford failed to consider plaintiff's evidence and arguments. SA13. The record shows that exactly – that Hartford, in its initial denial and appeal reviews, ignored Mr. Mayer's arguments and evidence showing the proper determination of his benefits claim.

*The Initial Denial of Benefits*

In denying that Mr. Mayer was disabled, Hartford disregarded a treating doctor's examination report and discredited the corrected occupational duties statement. AR1741-43. On April 26, 2016, Mr. Mayer faxed and emailed to Hartford an 8-page medical evaluation report prepared by Leonard R. Harrison, M.D., Jr. (Orthopaedic Surgery), based on his review of records and examination of Mr. Mayer on February 18 and March 24, 2016. AR1371-78, 1361-68. Dr.

Harrison concluded that "[t]he patient has significant disability of the low back" and that "there is no conceivable way that he can continue frequent and massive travel as his job demands." Id. The administrative record contains no evidence that Hartford asked the medical evaluator upon whom it was relying, Dr. Kalen, to review Dr. Harrison's report or to issue a supplemental report before Hartford denied Mr. Mayer's claim. Hartford was forced to acknowledge that its outright denial was unfounded only when Mr. Mayer pursued his appeal rights.

_Hartford's Earnings Computations_

Hartford ignored the records that plaintiff and his attorney provided showing that Mr. Mayer was employed by Scarsdale, not RAI. Instead of resolving the discrepancy between the W-2's, Hartford robotically asserted that RAI was the employer whose word and records solely governed. This also warranted _de novo_ review. Thoma v. Fox Long Term Disability Plan, No. 17 CIV. 4389, 2018 WL 6514757 (S.D.N.Y. Dec. 11, 2018); Aitken v. Aetna Life Ins. Co., No. 16 CIV. 4606 (PGG), 2018 WL 4608217 (S.D.N.Y. Sept. 25, 2018); Schuman v. Aetna Life Ins. Co., No. 3:15-CV-1006 (SRU), 2017 WL 1053853 (D. Conn. Mar. 20, 2017).

Hartford ignored the documentation that plaintiff and his counsel provided showing that Scarsdale was plaintiff's employer for calculating his pre-disability

earnings.[7]  On December 21, 2015, Mr. Mayer faxed (AR1517, 1529) additional

information in support of his claim, including the materials previously faxed by

Ms. Ferrari on December 17th (AR1519-23), his own previously submitted initial

Application (AR1524-28), a 2014 Form 1099-MISC showing $125,000.00 paid to

Mr. Mayer by Scarsdale (AR1530), and Fidelity Investments Activity reports

reflecting SEP-IRA contributions of $52,000 (2015), $50,000 (2014) and $50,000

(2013) by Scarsdale in Mr. Mayer's behalf (AR1531-34).  In a cover note, Mr.

Mayer explained, "As per my previous submissions annexed hereto please find my

1099 from Ringler Associates Scarsdale Inc for 2014 for $125,000 Bonus in

addition to W2 already forwarded." AR1529.  Yet Hartford continued to ask RAI

for "clarification" -- disregarding what the beneficiary himself provided.  AR1504-

14.

On December 31, 2015, Mr. Mayer spoke with Ability Analyst Martinez and

explained that he was "the owner of Ringler Associates of Scarsdale" and "as the

owner he uses the payroll for only his draw and not all of his bonuses/

commission." AR201-02.  The next month, on January 28, 2016, Mr. Mayer again

wrote to Hartford that Scarsdale was  the employer; that Scarsdale should complete

---

[7] The following is a brief summary of the multitude of materials provided to and
communications with Hartford; a complete recitation is contained in Plaintiff's
Proposed Findings of Fact at A38-110 and in the administrative record.

the employer section of the claim forms, including the PDA; that Mr. Mayer was

the sole employee of Scarsdale; and that Scarsdale had, itself, received

$463,256.00 in direct commissions in 2013 from RAI and $448,491.00 in 2014

from RAI.  AR1465-66.  Among the materials submitted to Hartford were

additional Fidelity Statements documenting the SEP-IRA contributions by

Scarsdale on behalf of plaintiff for 2013, 2014, and 2015 (AR1475-78, AR940-42),

and the 2013 W-2 for $150,000.16 (AR1490), the 2014 Form 1099-MISC for

$125,000.00 (AR1489), and the 2014 W-2 for $100,000.16 (AR1488).  On

February 12, 2016, Mr. Mayer again wrote Hartford to underscore that "[RAI] are

not the accountants for me or [Scarsdale] and do not control the finances of

[Scarsdale]" and to explain that he "run[s] expenses through [Scarsdale] which

[RAI] sees but I also recover many of these expenses back from other sources

which [RAI] may or may not be aware." AR1403-04.

Even after Hartford acknowledged its mistaken initial denial of Mr. Mayer's

claim and turned to the calculation of benefits, Hartford continued to disregard the

records reflecting Mr. Mayer's proper earnings.  On January 4, 2017, Mr. Mayer's

attorney again protested Hartford's apparent misunderstanding that RAI, not

Scarsdale, was plaintiff's employer:

> The associate with whom I spoke yesterday advised me that the
> payment delay resulted from your difficulty in reaching personnel at
> Ringler Associates to ascertain the income base from which to

compute benefits due. This gives me grave concern that **Hartford still does not understand that Mr. Mayer's employer is one of Ringler Associates' affiliated companies covered under the policy: Ringler Associates Scarsdale, Inc. Mr. Mayer is employed by Ringler Associates Scarsdale, Inc., of which he is the President and sole shareholder. Ringler Associates does not control, manage or oversee the compensation paid by Ringler Associates Scarsdale, Inc. nor does Ringler Associates have access to its financial records or filings of Ringler Associates Scarsdale, Inc. You have Mr. Mayer's W2's and Tax Returns for the relevant years as well as clear proof of his SEP Contributions for the relevant years, all representing his income from Ringler Associates Scarsdale, Inc. That is the basis on which his compensation should be determined**. [AR775-77 (emphasis added)]

Yet, in its January 4, 2017 letter, Hartford set forth its benefit calculation (AR254-60), repeatedly stating that RAI was plaintiff's "Employer." Hartford acknowledged "[t]here are discrepancies between the information regarding the Pre-disability Earnings reported by you and the Employer," casting RAI as the "Employer," and Mr. Mayer/Scarsdale as the "Employee." AR255. Hartford reported that "[w]e have received the following information from your Employer: 2013 W2 $150,000.16, 2014 W2 $100.000.15" – referring to the W2's received from RAI but ignoring the corrected W2's and tax returns submitted to Hartford by Mr. Mayer. AR256. Hartford had the corrected W2's and Mr. Mayer's tax returns by this time. Hartford was told that the W2's provided by RAI were no longer valid with the IRS. Yet Hartford ignored this.

Hartford's formal determination letter, dated January 6, 2017 (AR250-52), followed the same flawed rationale. Hartford offered no explanation why only the Scarsdale compensation to Mr. Mayer from the ADP payroll setup by RAI was counted under the definition of Monthly Rate of Basic Earnings, while the Scarsdale compensation to Mr. Mayer distributed directly by Scarsdale was excluded (whether documented by W2 or otherwise). Id.

Hartford was aware, also, that plaintiff tried to correct the incorrect benefit information RAI had provided to Hartford. On January 12, 2017, plaintiff emailed RAI Operations Manager Ferrari seeking to enlist her cooperation in correcting Hartford's Ability Analyst Martinez's misunderstanding regarding the relationship between RAI and Scarsdale. Mr. Mayer wrote,

> Throughout this claim Ms. Martinez keeps referring to [RAI] as the Employer.
>
> She refers to me and [Scarsdale] as the employee – It is simply wrong. [Scarsdale] is an independent contractor of [RAI]. [Scarsdale] is the employer of Gregory J. Mayer. Further, [Scarsdale] is solely responsible the payment of Gregory J. Mayer and all financial records and taxation issues regarding same.
>
> [Scarsdale] is a named insured under the policy and is a separate and distinct company to [RAI].… I would respectfully request that you send the following to the Hartford …:
>
> "You have asked whether Mr. Mayer was covered for NYS statutory benefits, about the taxability of his benefit, contributions to a retirement program, and monthly payroll records. Mr. Mayer was not an employee of ours, but was rather employed by our affiliated company, [Scarsdale].

Accordingly, we did not cover him for NY Statutory benefits and did not contribute to a retirement program for him. The details of any New York statutory coverage and retirement contributions would have to be obtained from [Scarsdale]. As to taxability of benefits, Ringler billed [Scarsdale] for the premiums paid to Hartford for Mr. Mayer's coverage.

How [Scarsdale] treated those payments for tax purposes is something only [Scarsdale] can answer. As to payment of compensation, as Mr. Mayer was an employee of [Scarsdale], that information would have to be obtained from [Scarsdale] as well." [AR528]

Then the broker, Tom Farr, began interfering. Farr advised Ferrari not to send the above explanation to Hartford -- not because it was inaccurate but because it would be "Editorializing." Farr told Ferrari, "[t]he carrier has not asked you to explain or comment on the relationship between Ringler Associates and Ringler Associates Scarsdale, Inc. This unsolicited commentary could have an unknown impact on his claim. What if it actually hurts his case. Ringler need not be involved in taking that chance." AR0679. Farr copied Hartford's Martinez on this email and asked Ms. Martinez to confirm this recommendation. Martinez followed with a June 13 email: "Tom is correct. Any additional editorializing would have an unknown impact on this claim." AR0678. Yet Ferrari's false information given to Hartford, and now the broker Farr's bizarre interference with the disability claim, had already "impacted" Mr. Mayer's claim – to his great detriment. As plaintiff contended below, the records show that for whatever reasons, the broker Farr, RAI's operations manager Ferrari, and even Hartford's Martinez were

working in concert to accept false information, not correct it, and then decide Mr. Mayer's claim on the falsehoods.

The broker Farr's involvement is, frankly, bizarre and suspicious. Farr told Hartford that Mr. Mayer started 20 years ago working for a company called RAI-Manhattan, and that all records were lost – all of which was false. Mr. Mayer started in 2007, his company is Scarsdale, and paperless records were already being used.

Farr stated throughout the claim process to everyone involved that Mr. Mayer was employed by RAI or contracted by RAI to sell annuities for RAI but that he also was allowed to have a side business – Scarsdale - which also allowed him to earn money. AR0395. Again, this was completely false – yet this falsehood persisted so much in Hartford's assessment of Mr. Mayer's claim that it even wound up in Hartford's Memorandum of Law filed in the District Court below. The truth is that Mr. Mayer and all the affiliates bought insurance as a group to cover their individual businesses separate and distinct from RAI, which is exactly what the Plan does. Mr. Mayer could not work for RAI because RAI is an insurance agency which has no brokers. Brokers like Mr. Mayer work for the affiliated independent contractor companies like Scarsdale that are annuity brokerages. RAI has an independent contractor arrangement with Scarsdale, not with Mr. Mayer. RAI collects commissions and does marketing. It does not sell

annuities.  Mr. Mayer sells annuities.  His client, an insurance company settling a personal injury suit on behalf of a defendant (for example), sends a check to Mr. Mayer made out to the annuity company.  Mr. Mayer sends the check to the annuity company.  The Annuity Insurance Company then sends a commission to RAI, the agency with which Mr. Mayer is affiliated.  RAI puts money in an account for Scarsdale, and Scarsdale pays Mr. Mayer.  Scarsdale pays the premium for LTD from the commission money received by RAI.  This explains why RAI does not have a W2, 1099, or any tax document for Mr. Mayer.  RAI only paid Scarsdale, with which it had a contractual relationship.

Significantly, the Plan does not contain any statement that only funds from this one RAI payroll system setup by RAI, can be considered in determining benefits under the Plan or that the benefits are derivative of RAI.

Ferrari's involvement in providing documentation to Hartford followed by her unwillingness to execute corrected documents, along with the broker Farr's bizarre involvement, raise suspicion as to what motivated RAI's Ferrari and the broker Farr.  Ferrari's submissions make it appear as though RAI applied for the Plan on the false ground that all covered employees were light duty workers working in an office every day, and that the covered beneficiaries were all employees of RAI rather than RAI or one of the 50 independent contractor affiliates.   Why was the broker involved at all in a beneficiary's claim?  Was Farr

worried about a premium audit for misclassification of employees as office workers, not traveling salesmen, and for underpaying affiliate premiums? Why was Farr making numerous calls to claims people and directing actions -- even calling Hartford's appeal analyst, Mr. Solem. Farr is copied on every email and had numerous telephone conferences about plaintiff's claim. Why was the broker trying to deny coverage or reduce benefits? Hartford's lack of underwriting or the broker Farr's negligent or intentional failure to establish a proper plan, or Ferrari's mishandling of plan administration, cannot be visited on the beneficiary, Mr. Mayer, by denying outright (as Hartford initially did) or reducing improperly his benefits claim (as Hartford now insists).

**B. APPLYING THE CORRECT *DE NOVO* STANDARD, MR. MAYER PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT HE WAS ENTITLED TO BENEFITS BASED ON THE FULL INCOME PAID TO HIM UNDER SCARSDALE'S AMENDED W-2 PLUS THE AMOUNT OF HIS SEP-IRA CONTRIBUTIONS, AND BASED ON A FINDING THAT PREMIUM PAYMENTS WERE PAID BY HIM ON A POST-TAX CONTRIBUTORY BASIS.**

On *de novo* review, the Court does not defer to Hartford's evaluation of the evidence. Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 296 (2d Cir. 2004). Mr. Mayer bears the burden to demonstrate his entitlement to the Plan benefits by a preponderance of the evidence. Paese v. Hartford Life & Acc. Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006). *De novo* review "applies to all aspects of the denial of an ERISA claim, including fact issues…." Kinstler v. First Reliance Standard Life

Ins. Co., 181 F.3d 243, 245 (2d Cir. 1999). "[T]he Court … interprets the terms of the benefits plan, … and reaches its own conclusion about whether the plaintiff has shown … that [he] is entitled to benefits under the plan." McDonnell v. First Unum Life Ins. Co., No. 10 CV 8140 RPP, 2013 WL 3975941 (S.D.N.Y. Aug. 5, 2013). Where there are ambiguities in an ERISA plan, the ambiguities are construed in favor of the beneficiary. Masella v. Blue Cross & Blue Shield of Connecticut, Inc., 936 F.2d 98, 107 (2d Cir. 1991); Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002).

Mr. Mayer proved by a preponderance of the evidence that his Rate of Basic Monthly Earnings, as defined by the Plan, includes the average of his prior 2 years of earnings from Scarsdale ($151,842 in 2013, and $399,614.01 in 2014), and of his prior 2 years of SEP-IRA contributions ($50,000 in 2013, and $50,000 in 2014); and that he personally bore the cost of the premiums paid to Hartford on a post-tax basis, rendering the disability benefit payments tax-free.

1. **The plain language of the insurance contract provides coverage for Mr. Mayer to the full extent of his earnings from Scarsdale.**

When looking at coverage under a policy one looks to see who are the named insured(s), then whether the employee of the named insured qualifies under the insuring agreement, and, lastly, the benefit amount payable. The amount of Mr. Mayer's benefit is determined on his "Monthly Rate of Basic Earnings," *i.e.*, Mr.

Mayer's "average monthly rate of pay, including Bonuses and Commissions, from the Employer for the 2 calendar year(s) ending just prior to the date [he] bec[a]me Disabled." AR97 [LTD Booklet-Certificate 1.32]; AR23 [LTD Booklet-Certificate 2.27]; AR60 [LTD Booklet-Certificate 4.5]. No employee of an affiliate company who is solely hired and compensated by an affiliate would interpret the Employer in the above sentence to be RAI. The Plan identifies both the "Employer" and "Plan Administrator" as "Ringler Associates Incorporated and Affiliates." Scarsdale was an RAI Affiliate. AR1401-06 [02-09-2016 C. Ferrari Email]. Scarsdale was Mr. Mayer's sole employer. AR1126 [10-26-2016 Marglo Assocs. Accountant Statement]; AR955, 1118, 1139 [Corrected 2013 W-2]; AR 1119-20 [Corrected 2014 W-2]; AR1224 [11-01-2016 G. Mayer Statement]; AR588-91 [07-13-2017 G. Mayer Statement]; AR1404-05 [02-09-2016 RAI Email from C. Ferrari]; AR1473 [RAI Job Description showing Mr. Mayer's "Job Title" as "Associate – Greg J. Mayer – R.A. Scarsdale, Inc."]; AR1487-90, 1522-23, 1530, 1539-40, 1557-58 [2013-14 W-2, 1099, and Payroll Stubs showing Scarsdale as the Employer/Payor]; AR700-771 [2013-15 Scarsdale Earnings Statements to G. Mayer]; AR1571 [12-16-2015 G Mayer Fax to Hartford]. Scarsdale is included as a "Policyholder" and "Employer" by use of the phrase "and Affiliates" under the Plan. AR112-122 [LTD Policy]; AR1-111 [LTD Booklet-Certificates 1.32, 2.27,

and 4.5].  RAI confirmed that Scarsdale is an Affiliate.  AR1401-06 [02-09-2016

C. Ferrari Email].

By treating RAI as Mr. Mayer's employer, Hartford rendered the inclusion

of "Affiliates" as insured parties and administrators meaningless, violating a

cardinal rule of contract and ERISA plan interpretation.  Cf. Gallo v. Madera, 136

F.3d 326, 330–31 (2d Cir. 1998) ("[W]here the trustees of a plan impose a standard

not required by the plan's provisions, or interpret the plan in a manner inconsistent

with its plain words, or by their interpretation render some provisions of the plan

superfluous, their actions may well be found to be arbitrary and capricious"); Am.

Fed'n of Musicians v. Atl. Recording Corp., 203 F. Supp. 3d 301, 310 (S.D.N.Y.

2016) ("'[A]n interpretation of a contract that has the effect of rendering at least

one clause superfluous or meaningless is not preferred and will be avoided if

possible'").

All Mr. Mayer's income was paid only by Scarsdale under its own tax ID

number -- whether distributed as draw through the ADP payroll system or paid

directly by Scarsdale.  AR955, 1118, 1139 [Corrected 2013 W-2]; AR1119-20

[Corrected 2014 W-2], and AR1487-90, 1522-23, 1530, 1539-40, 1557-58 [2013-

14 W-2, 1099, Payroll Stubs].  The record contains no W-2 or 1099 issued by RAI

under its tax-id number to Mr. Mayer with respect to any relevant time period.

Although Hartford initially asserted it could only consider compensation paid under RAI's tax ID (AR669-70 [12-23-2016 Hartford Email to Farr/Ferrari re: Outstanding Earnings/Taxability Issues]), Hartford abandoned that position when it recognized Mr. Mayer as a plan participant and computed benefits based on his Affiliate Scarsdale payroll (albeit, only that portion administered through the ADP payroll system). AR412–14.

Thus, the Plan dictates, and Hartford implicitly determined, that Mr. Mayer's compensation from Scarsdale must be included in his Monthly Rate of Basic Earnings. Hartford offered no basis for accepting the 2013 and 2014 W-2's provided by RAI under Scarsdale's name and Tax-id, but excluding the corrected W-2s issued by Scarsdale. The corrected W-2s issued by Scarsdale established that Mr. Mayer's 2013-2014 Scarsdale compensation was $151,842.01 and $399,614.01, respectively. AR855-68; AR955, AR118-20. This record evidence that Hartford was provided but disregarded showed that Mr. Mayer's Monthly Rate of Basic Earnings, without consideration of retirement contribution adjustments, was $22,977.33.

## 2. Mr. Mayer's Monthly Rate of Basic Earnings Should Include His SEP-IRA Contributions as well.

It is undisputed that Mr. Mayer was never provided a booklet upon enrollment as required by the Plan. Mr. Mayer was told that the policy covers 2/3

of his salary including bonuses, commissions and deferred compensation. In a plan that covers the employees of some 50 independent contractor small businesses, it would be reasonable for Mr. Mayer to assume the plan covered SEP plans, which are the most popular deferral plans for solo and small businesses. By not covering SEP plans, Hartford and RAI as creator of the plan, created a situation where employees in the same class covered by the same plans would not be treated equally. RAI employees' deferred compensation would be covered as the business has many employees and would not use a SEP Plan, while the affiliated companies' employees would not be covered because they would most likely have SEP Plans. Such a construction is against the basic tenets of ERISA. The definition of Monthly Rate of Basic Earnings includes "contributions you make through a salary reduction agreement with the Employer to: an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement; an executive non qualified deferred compensation arrangement; or a salary reduction arrangement under an IRC Section 125 plan." AR97 [LTD Booklet-Certificate 1.32]; AR23 [LTD Booklet-Certificate 2.27]; AR60 [LTD Booklet-Certificate 4.5]. Again, the term Employer must be interpreted to include Scarsdale as Ringler did not compensate Mr. Mayer and therefore could not make a deferred compensation agreement with Mr. Mayer. Further, Mr. Mayer has submitted undisputed evidence that Scarsdale paid commissions to a deferred compensation

arrangement, *i.e.*, a SEP-IRA to which he contributed $50,000 in both 2013 and

2014. AR416; AR940-42. "Non-qualified deferred compensation arrangement" is

not a defined term, but the list of arrangements is not defined as exclusive, and the

purpose of the provision -- to include deferred compensation through IRS-

recognized retirement vehicles -- would be served by including his SEP-IRA

contributions in income per this provision. Any ambiguity in this regard should be

resolved in the beneficiary's favor. Fay, 287 F.3d at 104. RAI's own statement to

Hartford identified Mr. Mayer as participating in a pension plan, the vehicle of

which was "other – individual account." AR1554-55. Scarsdale's contributions to

Mr. Mayer's SEP-IRA, therefore, should be included in his Monthly Rate of Basic

Earnings, resulting in an additional $100,000.00 in earnings.

### 3. Mr. Mayer Should be Recognized as a Contributory Participant in the Plan.

LTD Booklet-Certificate 1.32 (Class 2), which Hartford first provided to Mr.

Mayer as the contract under which his benefits were decided, covers participants

who contribute to the cost of their premiums: "All Active Full-time Producers …

who are choosing to pay their premium." AR82. LTD Booklet-Certificate 4.5

(Class 1), which Hartford produced during the benefit calculation appeal, covers

participants who are "producers … not paying their premium." AR45. Even if

Hartford was permitted to switch the contracts that apply midstream, LTD

Booklet-Certificate 4.5 states that "[t]he Employer … may allocate part of the cost to the employee."  The evidence establishes that RAI processed premium payments for Scarsdale on behalf of Mr. Mayer to Scarsdale, and that Scarsdale in turn allocated all of the premium cost to Mr. Mayer as income, hence paid post-tax. AR1401-06; AR489.

Hartford said that Mr. Mayer was a non-contributory enrollee in the Plan based solely on the representations of Operations Manager Ferrari, and the broker Farr who sold the policy.  Hartford's reliance on the broker was unfounded.  Farr said he had no independent memory of the enrollment, asserting that there must have been an election form (now lost) in which Mr. Mayer opted for non-contributory coverage.  AR407.  The Plan itself says that a participant is "enrolled automatically by the Employer," implying that no further enrollment action is required of the participant.  The broker's story of a lost enrollment form was premised on the erroneous assumption that Mr. Mayer joined the Plan at a time of paper recordkeeping, 20 years earlier.  AR407.  This assumption was incorrect. Mr. Mayer became a plan participant in 2007.  The broker incorrectly identified Mr. Mayer as owning an Affiliate called "RAI Manhattan."  AR407.  Operations Manager Ferrari based her statement on her inaccurate understanding that RAI paid the premiums for Mr. Mayer's coverage.  RAI only processed the payments for Scarsdale and the affiliate companies.  Each Affiliate company paid the premium

for their employees (bore the cost) and RAI paid the premium for its employees (bore the cost).  It is unclear from the record whether RAI collected the premium from the affiliates before, after or simultaneous to the payment to Hartford. However, Mr. Mayer accountant's statement is very clear: "Mr. Mayer's long term disability policy was paid by the company, however, the premium payments were added to Mr. Mayer's W2 as a taxable fringe benefit to him. So accordingly, he has been personally paying for the premiums with after tax dollars and has paid tax on the premium payments for at least the last three years." Further, tax law allows such a structure:  "The IRS ruled that employees whose LTD coverage is paid for by the employer but included in taxable wages are to be treated as having paid for the LTD coverage, therefore, benefit payments to those employees are excludable from income." (Rev. Rul. 2004-55, 2004-34 I.R.B 343).  Hartford could not reasonably base its decision on that evidence to determine that the benefits were fully taxable to plaintiff.  Schewitz v. Aetna Life Ins. Co., No. 18-CV-6119, 2019 WL 2189263, at *5 (N.D. Ill. May 21, 2019) (rejecting Aetna's argument that its pre-disability earnings "figure is correct merely because [employer] NorthShore said so").  Whether enrolled in Class 1 or Class 2, Mr. Mayer was a contributory participant:  RAI collected premium payments from Scarsdale (and the other affiliate companies and sent them in bulk to the Hartford), which in turn included the premiums in Mr. Mayer's W-2 compensation.  Mr. Mayer bore the post-tax

cost of the premium payments.  Without enrollment records, which RAI and

Hartford bore the burden to maintain, the parties' conduct should control.

### C. EVEN IF THE ARBITRARY AND CAPRICIOUS STANDARD WAS PROPER TO APPLY, THE PLAN ADMINISTRATOR EXCEEDED HIS DISCRETION BY MISCONSTRUING THE PLAIN LANGUAGE OF THE PLAN'S PROVISIONS IN CALCULATING THE AMOUNT OF LONG-TERM DISABILITY BENEFITS OWED TO MR. MAYER, AND BY DISREGARDING RECORD EVIDENCE CONFIRMING THE PROPER CALCULATION OF BENEFITS.

Even under the arbitrary and capricious standard, Hartford's decision should

be overturned if it is "without reason, unsupported by substantial evidence or

erroneous as a matter of law." Miles, 720 F.3d at 487.  Substantial evidence "is

such evidence that a reasonable mind might accept as adequate to support the

conclusion reached" and "requires more than a scintilla but less than a

preponderance." Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir.

1995).  The Court determines whether Hartford's "decision was based on a

consideration of the relevant factors and whether there has been a clear error of

judgment." Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 49 (2d Cir.

1996).

Hartford determined that the Plan's Monthly Rate of Basic Earnings

included amounts distributed by the RAI payroll system to Mr. Mayer, but

excluded compensation distributed directly by Scarsdale to Mr. Mayer.  Hartford

acted arbitrarily and capriciously in that it (i) interpreted Monthly Rate of Basic

Earnings in a manner that abrogated the plain meaning of the provision; (ii) accepted facts reported by RAI as binding despite conflicting evidence in the record and Hartford's duty to independently assess the facts, and (iii) failed to reconcile manifest inconsistencies in its handling of Mr. Mayer's claim.

The plain language of the Plan provisions defining Mr. Mayer's "Employer," and designating Scarsdale as a named insured, shows there is no reasonable construction of the Plan provisions supporting Hartford's determination of the benefits payable to Mr. Mayer. The Plan identifies the Employer and Plan Administrator as "Ringler Associates Incorporated and Affiliates." AR31, 68, 105. Therefore, the "Monthly Rate of Basic Earnings," *i.e.*, the "average monthly rate of pay, including Bonuses and Commissions, from the Employer" (AR96, AR22, AR59), must be deemed to include pay received from any of the Affiliates – plaintiff's employer, Scarsdale. The Plan thus plainly covers Mr. Mayer's pay from Scarsdale, which is conceded to be an Affiliate of RAI.

To avoid that straightforward construction, Hartford personnel interpreted and applied the Plan's terms to mean RAI only, crediting information from RAI but not from Scarsdale, and considering only payments paid through the ADP payroll administratively setup by RAI. That determination by Hartford effectively excludes "Affiliates" from the plain language of the Plan;, or Hartford's interpretation may be viewed as inserting a requirement into the Plan that is not

actually in the Plan -- that a plan participant's pay must be paid through this ADP payroll in order to be counted in the Monthly Rate of Basic Earnings calculation. The Plan does not say this. Hartford's interpretation of the Plan is arbitrary and unreasonable. Gallo, 136 F.3d at 330 (ignoring plain terms arbitrary and capricious); Zervos v. Verizon New York, Inc., 277 F.3d 635, 647 (2d Cir. 2002) (denial of coverage arbitrary and capricious where administrator "in effect added additional language to the policy").

Hartford also disregarded the evidence provided to it showing that Mr. Mayer was employed by Scarsdale; received all income (draw and commissions) from Scarsdale; that his earnings from Scarsdale were $151,842 in 2013, and $399,614.01 in 2014; and that SEP-IRA contributions were made by Scarsdale of $50,000 in 2013, and $50,000 in 2014. As stated above, Hartford disregarded this evidence and chose to rely solely on statements and evidence from RAI's Operations Manager Ferrari. Hartford took RAI's assertions as final, regardless of the conflicting evidence that plaintiff provided. Blind reliance by an administrator on an employer's assertions in the face of conflicting records from the beneficiary is arbitrary and capricious. See, e.g., Ricciardi v. Metro. Life Ins. Co., No. 16-CV-3805(CM), 2019 WL 652883 (S.D.N.Y. Feb. 15, 2019) (MetLife determination arbitrary and capricious because "MetLife never performed its own calculation of the [pre-disability earnings]," but "simply relied on what Morgan Stanley told it –

51

a number that seems on its face ridiculously low, and wildly at variance with Ricciardi's W-2 income"); <u>MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia</u>, 32 F. Supp. 2d 600, 607–608 (W.D.N.Y. 1999) (rejecting carrier's reliance on employers' representations regarding claimants' pre-disability earnings and disregard of conflicting evidence showing higher earnings and noting carrier responsible to reconcile conflicting evidence presented to it).

The arbitrariness of Hartford's decision is illustrated, further, by its failure to maintain internal consistency in its interpretation of the Plan's terms. For instance, if Hartford believed that only payments made to Mr. Mayer by RAI counted for calculating his pre-disability earnings, and that RAI was the sole "Employer" in this regard, then Hartford should have treated the commissions paid by RAI to Scarsdale for Mr. Mayer's services as the compensation base. As Mr. Mayer pointed out to Hartford during the benefits calculation process, if those commission payments were used, then the Monthly Rate of Basic Earnings should have been based on the 2013 commissions of $463,256.00 and the 2014 commissions of $448,491.00 – which were significantly more pre-disability earnings than Mr. Mayer was claiming. AR 0618-0620, AR 0622-0624 [7-13-2017 Mayer Supplemental Appeal].

While Hartford and/or Ringler never challenged the commission amounts, corrected W2 or Tax Returns, once the administrative record was closed Hartford

stated in its opening Memorandum of Law in the District Court, "Plaintiff also contended that his Pre-disability Earnings were far higher than he had previously asserted to Hartford Life. For example, Plaintiff claimed that Ringler Scarsdale received more than $900,000 in commissions from Ringler Associates in 2013 and 2014, as supposedly reflected in a 'report' from Ringler Scarsdale's 'general ledger,' which appears to be a document he created in 2017 from unknown data, and which shows payments from entities other than Ringler Associates" (AR610, 618-28).. The District Court relied on this false statement by Defendant in rubber stamping Hartford's claim determination. If Hartford or RAI had challenged the commission report before the record was closed, Plaintiff could have cited the January 6, 2017 emails where Mr. Mayer requested the commission detail report from Ms. Ferrari and Ms. Ferrari emailed it to Mr. Mayer – showing that the commission report was run off an RAI system, Ringler Biz, and was all RAI data, created and stored by RAI. AR618-24. Mr. Mayer could have cited monthly reports from RAI setting forth his monthly commission with the same RAI identification numbers and commission amounts as the commission detail report in the record.

Hartford was inconsistent in its handling of W2's as well. In the first instance, Hartford requested the W2's as part of the "Employer Section" of the initial Application for LTD Benefits (AR1555), and then relied on the W2's it

obtained from RAI to make its determination of Mr. Mayer's Monthly Rate of

Basic Earnings (AR162-64 [12-23-2016 Hartford Claim Notes, "Examiner

Approval/Denial Recommendation"]). Yet after Mr. Mayer submitted corrected

W2's showing higher income, Hartford reversed course and determined that there

was no language in the policy to use W2's (AR250). However, the notes

specifically state there is special provision for use of W2's for earnings. AR164.

Of course, this special provision was not produced by the Hartford.

Hartford engaged in a similar change of course in excluding Scarsdale's

SEP-IRA contributions on behalf of Mr. Mayer from the earnings calculation.

Hartford Ability Analyst Martinez initially refused to include the SEP-IRA

contribution because "Ringler [RAI] doesn't show any SEP in 2013 and 2014"

AR159. Martinez later claimed that Hartford could not count Mr. Mayer's SEP-

IRA contributions because a SEP-IRA was not one of the specifically identified

retirement vehicles in the list in the Monthly Rate of Basic Earnings definition

(AR138 [11-09-2017 Hartford Claim Note]; AR237 [11-09-2017 Hartford Appeal

Denial Letter).

Hartford's flip-flopping of positions on how the Plan applies, and what its

provisions mean, is further evidence of arbitrary and capricious decision-making.

See, e.g., Okuno v. Reliance Standard Life Ins. Co., 836 F.3d 600, 612 (6th Cir.

2016) ("[T]he shifting rationale … over the course of the appeals process further

supports our finding that Reliance arrived at its determinations arbitrarily and capriciously"); Wilkinson v. Sun Life & Health Ins. Co., 127 F. Supp. 3d 545, 567 (W.D.N.C. 2015), aff'd, 674 F. App'x 294 (4th Cir. 2017) ("Sun Life advanced multiple arguments in its effort to justify the discontinuation of Wilkinson's LTD benefits" and relied on "three different theories suggests Sun Life's decision was driven by a desired outcome"); Collins v. Liberty Life Assur. Co. of Bos., 988 F. Supp. 2d 1105, 1129–30 (C.D. Cal. 2013) ("Liberty's shifting rationales provide some evidence that it desired a certain result and summoned up various rationales to reach it"; "This type of self-interested decision-making contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion").

ERISA requires "that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan," and "underscores the particular importance of accurate claims processing by insisting that administrators 'provide a full and fair review ….'" Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008). Yet Hartford closed its eyes to relevant information:

- Hartford denied Mr. Mayer was even disabled because "you are able to perform all of the physical demands of Your Occupation" -- while ignoring the medical report by Dr. Harrison submitted by Mr. Mayer to Hartford two weeks earlier, cf. Metropolitan Life Ins. Co., 554 U.S.

at 118 (where "MetLife ... had failed to provide its independent vocational and medical experts with all of the relevant evidence," this constituted a "serious concern" and supported the district court's decision "to set aside MetLife's discretionary decision").

- Hartford misstated Plan provisions in formal decision letters, and provided inconsistent versions of Plan documents (AR269-72; A155).

- In the initial claim denial, first internal appeal, and Benefit Calculation and Contributory Participation appeals, Hartford violated ERISA's notification and decision deadline procedures, and ignored evidence and argument submitted by plaintiff in support of his Benefit Calculation and Contributory Participation appeals, see Glenn v. MetLife, 461 F.3d 660, 672 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) ("[T]he failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious").

- Hartford withheld relevant documents requested by Mr. Mayer and his counsel, see Yancy v. United of Omaha Life Ins. Co., No. CV14-9803 PSG (PJWX), 2015 WL 9311729, at *16 (C.D. Cal. Dec. 18, 2015) (denying requested opportunity to respond to consultant's report is

"suspicious" and "weigh[ed] in favor of finding that Defendant abused its discretion"); Collins, 988 F. Supp. 2d at 1127 ("[R]efus[al] to disclose the medical reviews … before the final appeal determination" is a failure to "provide meaningful dialogue"); Cherene v. First Am. Fin. Corp. Long-Term Disability Plan, 303 F. Supp. 2d 1030 (N.D. Cal. 2004) (failure to provide information to beneficiary "evidence of an actual conflict").

Finally, in assessing whether Hartford's decision was arbitrary and capricious, the Court should weigh Hartford's financial self-interest, see Metropolitan Life Ins. Co., 554 U.S. at 112, 117–19 (conflict exists where "plan administrator both evaluates claims for benefits and pays benefits claims"). Hartford personnel understood that acknowledging Mr. Mayer's true compensation would have negative financial implications: "[T]here is a significant difference in the benefit if we use the adjusted W2." AR164. All this record evidence, taken together, shows that Hartford acted arbitrarily and capriciously in its construction of the Plan's provisions and its calculation of the benefits owed.

**THE COURT SHOULD AWARD MR. MAYER HIS CORRECT BENEFIT, AWARD INTEREST TO HIM, AND GRANT HIM ATTORNEYS' FEES IN THIS MATTER (IN THE DISTRICT COURT AND IN THIS APPEAL).**

Awarding benefits is the appropriate remedy "where the difficulty is not that the administrative record was incomplete, but that a denial of benefits based on the record was unreasonable." Zuckerbrod, 78 F.3d at 51 n.4; Zervos, 277 F.3d at 648. The record in this case permits the Court to award the correct benefit amount to Mr. Mayer.

Attorneys' fees should be awarded to Mr. Mayer also. "[A] court may, without further inquiry, award attorneys' fees to a plaintiff who has had 'some degree of success on the merits.'" Donachie v. Liberty Life Assur. Co. of Bos., 745 F.3d 41, 46 (2d Cir. 2014); Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 254–255, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010).

In addition, "the need to fully compensate Plaintiff, a consideration of the equities, and the remedial purpose of ERISA … all favor awarding prejudgment interest" to Mr. Mayer. Fairbaugh v. Life Ins. Co. of N. Am., 737 F. Supp. 2d 68, 89 (D. Conn. 2010). The factors set forth by Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 53–54 (2d Cir. 2009) ((i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative

equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court) warrant awarding pre-judgment interest to plaintiff. Hartford's strategy has been to deny and delay in order to financially and mentally drain Mr. Mayer and cause him to drop pursuit of his rightful benefits. It has worked. His marriage, mental and physical health all have suffered.

Mr. Mayer has paid more money in legal fees in terms of real (after tax) dollars then he has received from Hartford. He has had negative income during the almost five-year pendency of this claim. Mr. Mayer filed this claim on December 16, 2015 and was wrongfully not paid any funds until January 2017. During this period alone, he spent approximately $40,000 on legal fees and expert costs, while receiving no funds from Hartford. By the time this case is decided it will be over 5 years since Mr. Mayer filed his claim. The record is complete. The calculation of benefits is not complicated. The numbers needed to calculate the benefits are set forth here:

**W2 Income**

2013 W-2 $151,842.01

2014 W-2 $399,614.01

Total W2 income = $151,842.01 + $399,614.01= $551,456.02 x .66667

= $367,639.18/2 = $183,819.59/12 = $15,318.30 monthly initial benefit

**SEP Plan deferred compensation**

$100,000 over the two relevant years, 2013 $50,000 and 2014 $50,000
$100,000 x .66667 = 66,667/2 = 33,333.5/12 = $2,777.79 monthly initial benefit

**SSA offset amount:** $2,574.60 **(**AR622)

**Total initial Monthly Benefit Amount**

$15,318.30 + $2,777.79 = $18,096.09 - $2,574.60 = $15,521.49

Where the record is complete, the denial of benefits unreasonable, and the

benefit amount readily calculated, remand is not needed. Zuckerbrod, 78 F.3d at 51

n.4.[8]

## **CONCLUSION**

The Court should reverse the District Court's grant of judgment for

defendants, vacate Hartford's calculation of Mr. Mayer's long-term disability

benefits, and order Hartford to pay to Mr. Mayer benefits based on the full income

paid to him under Scarsdale's amended W-2s plus the amount of his SEP-IRA

contributions. Mr. Mayer has demonstrated by a preponderance of the evidence

that (1) his Rate of Basic Monthly Earnings, as defined by the Plan, includes the

average of his prior 2 years of earnings from Scarsdale ($151,842 in 2013, and

---

[8] If the case is remanded, Mr. Mayer respectfully requests that it be transferred to the Eastern District in Islip, Long Island, as he now lives in Eastern Long Island and will be handling this matter *pro se* going forward due to financial constraints. The Islip location would make it easier for the disabled Mr. Mayer to attend court proceedings.

$399,614.01 in 2014), and of his prior 2 years of SEP-IRA contributions ($50,000

in 2013, and $50,000 in 2014); and (2) that he (Mr. Mayer) personally bore the

cost of premiums paid to Hartford on a post-tax basis.  The Court should order

Hartford to compensate Mr. Mayer for the difference between the benefits Hartford

paid to him and the amount of benefits it should have paid, recognize that Mr.

Mayer participated in the Plan on a contributory basis, and pay Mr. Mayer pre-

judgment interest and reasonable attorneys' fees in the litigation before the District

Court and in his appeal before this Court.

Respectfully submitted,

/s/ Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
Attorneys for Appellant, Gregory Mayer

Dated: July 16, 2020

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am an attorney-at-law of the States of New Jersey and New York and the Commonwealth of Pennsylvania and a member of the Bar of the United States Court of Appeals for the Second Circuit. I am a member of the firm of Hegge & Confusione, LLC, attorneys for appellant.

/s/ Michael Confusione

Dated: July 16, 2020

## CERTIFICATE OF COMPLIANCE WITH
## BRIEF LENGTH/TYPE-VOLUME LIMITATION REQUIREMENT

I certify that the accompanying Brief of Appellant, which uses a proportional 14-Point Font in Times New Roman Style, contains less than 14,000 words (Microsoft Word was used to determine the word count) in accordance with F.R.A.P. 32(a)(7).

/s/ Michael Confusione

Dated: July 16, 2020

## CERTIFICATE OF SERVICE

I certify that service of Appellant's Brief and Appendix was served today via ECF on counsel for appellee. I certify that the paper copies are identical to the electronic versions of the Brief and Appendix.

/s/ Michael Confusione

Dated: July 16, 2020

## CERTIFICATE OF ANTI-VIRUS CHECK

I certify that a virus check was performed on the PDFs with Norton Security Suite Version 22.5.4.24 and that no virus was detected.

/s/ Michael Confusione

Dated: July 16, 2020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_Gregory Mayer_

(List the full name(s) of the plaintiff(s)/petitioner(s).)

_18_ CV _2789_ ( _VB_ )(    )

-against-

**NOTICE OF APPEAL**

_Ringler Associates Inc. AND Affiliates Long term Disability Plan and Hartford Life And Accident Insurance Company_

(List the full name(s) of the defendant(s)/respondent(s).)

Notice is hereby given that the following parties: _Gregory MAYER_

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the   ☒ judgment   ☐ order   entered on: _March 27, 2020_

(date that judgment or order was entered on docket)

that: _For the reasons stated in Court's Opinion dated March, 26, 2020, Judgement is entered in defendants Favor and_

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_B_ _4/14/2020_
Dated

_Signature_

Name (Last, First, MI) _Mayer, Gregory J._

Address _11 Olive Street_   City _East Hampton_   State _New York_   Zip Code _11937_

Telephone Number _917-653-4210_

E-mail Address (if available) _GregMayeresq@GMail.com_

---

*Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

SA001

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
GREGORY MAYER,

                    Plaintiff,                 18 **CIVIL** 2789 (VB)

      -against-                  **JUDGMENT**

RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN and
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                    Defendants.
------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated March 26, 2020, Judgment is entered in

defendants' favor and plaintiff's complaint, is dismissed in its entirety; accordingly, this case is

closed.

**Dated:** New York, New York
       March 27, 2020

                               **RUBY J. KRAJICK**
                           _____
                              **Clerk of Court**
          **BY:**
                             _____
                              **Deputy Clerk**

SA002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
GREGORY MAYER,                               :
                    Plaintiff,               :
                                             :          **<u>OPINION AND ORDER</u>**
v.                                           :
                                             :          18 CV 2789 (VB)
RINGLER ASSOCIATES INC. AND                  :
AFFILIATES LONG TERM DISABILITY              :
PLAN and HARTFORD LIFE AND                   :
ACCIDENT INSURANCE COMPANY,                  :
                    Defendants.              :
--------------------------------------------------------------x

Plaintiff Gregory Mayer brings this action under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 <u>et seq</u>., alleging defendants Ringler

Associates Inc. and Affiliates Long Term Disability Plan (the "Plan") and Hartford Life and

Accident Insurance Company ("Hartford Life") wrongfully calculated his long-term disability

benefits and determined that his benefits are fully taxable.  Plaintiff seeks reassessment of those

benefits, payment of unpaid benefits allegedly owed to him, and payment of attorneys' fees and

costs he has incurred in this case.

The parties have agreed to a bench trial on a stipulated record.[1]  (Doc. #32).

For the following reasons, the Court finds and concludes defendants are entitled to

judgment in their favor dismissing the complaint in its entirety.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C.

§ 1132(a)(1)(B).

---

[1]     The Second Circuit has approved of submitting this type of action for a bench trial on a
stipulated record.  <u>See</u> <u>Muller v. First Unum Life Ins. Co.</u>, 341 F.3d 119, 124 (2d Cir. 2003).

## FINDINGS OF FACT

The parties have submitted briefs and a stipulated record, which reflect the following factual background.

Plaintiff is, and at all relevant times was, a resident of the State of New York.  From 2001 to 2015, he was engaged in the sale of annuities to fund structured personal injury settlements.  Plaintiff owned and operated Ringler Associates Scarsdale, Inc. ("RAI-Scarsdale"), an affiliate of Ringler Associates Incorporated ("RAI").

In September 2015, plaintiff stopped working due to physical limitations.  He underwent multiple surgeries to his knees and spine.  Following his surgeries, plaintiff attempted intermittent work activities from October through December 2015, but concluded he could no longer work.  On December 16, 2015, plaintiff applied for long-term disability benefits under the Plan established by RAI.

    A.    <u>The Plan</u>

The Plan's coverage is provided through Group Policy No. GLT-216897, issued by Hartford Life.  The Plan identifies "Employer" as "the Policyholder," and defines "Policyholder" as "Ringler Associates Incorporated and Affiliates," with an address of 27422 Aliso Creek Road, Aliso Viejo, California.  (AR 45, 58, 68).[2]  The same information is provided for the identity and address of the "Plan Administrator."  (AR 68).  The Plan is "administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan."  (AR 69).

The Plan incorporates several "Booklets," which provide different coverages to different classes of employees.  As relevant here, Booklet 4.5 covers all active employees, including

---

[2]    "AR ___" refers to page numbers of the administrative record filed in hard copy in this case.

"producers," not paying their own premiums, whereas Booklet 1.32 covers all producers who choose to pay their own premiums.  (AR 8, 45, 82).  Plaintiff was a "producer" for purposes of Plan coverage.  (AR 1473, 1508).

The Plan provides for a gross long-term disability benefit of 66⅔ percent of a claimant's "Pre-Disability Earnings."  (AR 48).  Pre-Disability Earnings are defined as "your Monthly Rate of Basic Earnings on the day before you became disabled."  (AR 60).  The Plan defines "Monthly Rate of Basic Earnings" as:

> [Y[our average monthly rate of pay, including Bonuses and Commissions, from the Employer for the 2 calendar year(s) ending just prior to the date you become Disabled[:]
>
> 1.      including contributions you make through a salary reduction agreement with the Employer to:
>
>> a)  an Internal Revenue Code (IRC) Section 401(K), 403(b) or 457 deferred compensation arrangement;
>>
>> b)  an executive non qualified deferred compensation arrangement; or
>>
>> c)  a salary reduction arrangement under an IRC Section 125 plan; and
>
> 2.      not including overtime pay or expense reimbursements for the same period as above.

(AR 59).

The Plan further states that if the Employer pays the premiums for an employee's coverage, it "may allocate part of the cost to the employee.  The Employer determines the portion of the cost to be paid by the employee."  (AR 69).

According to the Plan, "[t]he Policyholder will give Hartford Life all information [it] needs regarding matters pertaining to insurance."  (AR 120).  In addition, the Plan empowers Hartford Life to "inspect any of the Policyholder's documents, books, or records which may affect the insurance or premiums of this policy," and "[i]f the Policyholder gives Hartford Life

any incorrect information, the relevant facts will be determined to establish if insurance is in effect and in what amount."  (AR 120).

Moreover, the Plan designates Hartford Life "as the claims fiduciary for benefits provided under the Policy" and grants Hartford Life "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR 31, 68, 105).

        B.    <u>Plaintiff's Long-Term Disability Benefits Claim</u>

As noted above, plaintiff applied for long-term disability benefits under the Plan on December 16, 2015.  On December 17, 2015, RAI faxed additional information to Hartford Life in support of plaintiff's claim, including the "Employer's Section" of the application for long-term disability benefits, completed by RAI Operations Manager Carol Ferrari.  Included with this information was a copy of plaintiff's 2014 W-2 form showing $100,000.16 in earnings, and a statement from Ferrari that RAI paid the premiums for plaintiff's long-term disability benefits.

On December 21, 2015, plaintiff faxed additional information in support of his claim, including a 2014 Form 1099-MISC, showing $125,000 paid to plaintiff by his company, RAI-Scarsdale, and Simplified Employee Pension ("SEP-IRA") contributions of $50,000 and $52,000, made in 2014 and 2015, respectively.  Plaintiff alleged the $125,000 payment reflected on the Form 1099-MISC was a "nonemployee compensation" bonus that should be included in the calculation of his Pre-Disability Earnings, and that his SEP-IRA contributions should also be taken into account in his Pre-Disability Earnings calculation.

Hartford Life then sought additional information from RAI to clarify plaintiff's submissions.  In response, Ferrari provided Hartford Life a copy of plaintiff's 2013 W-2 form showing a total salary of $150,000.16, which included a $50,000 bonus, and again provided a copy of plaintiff's 2014 W-2 form, which showed $100,000.16 in earnings.  Ferrari also noted

that RAI's general ledger for RAI-Scarsdale did not show SEP-IRA contributions, and that RAI did not issue the Form 1099-MISC that plaintiff provided to Hartford Life.  Finally, Ferrari noted RAI pays long-term disability premiums on W-2 gross salaries, and thus paid premiums for plaintiff's disability benefits coverage based on the W-2s RAI had on file for plaintiff.

On January 12, 2016, plaintiff wrote to Hartford Life, contending RAI-Scarsdale, not RAI, should be considered his employer for purposes of claim adjudication, and that RAI-Scarsdale's records demonstrate plaintiff received $463,256 in commissions in 2013, and $448,491 in commissions in 2014.

In a February 16, 2016, email, Ferrari informed plaintiff "[t]he premium payments are [RAI's] responsibility and the calculations are based on payroll activity through our ADP payroll system which we keep for all Associates."  (AR 1405).

On May 13, 2016, Hartford Life denied plaintiff's claim for long-term disability benefits. Along with the denial letter, Hartford Life sent plaintiff a copy of the Plan, attached to which was a copy of Booklet 1.32, which covers producers who choose to pay their own premiums.

On May 25, 2016, Hartford Life responded to a request from plaintiff for all documents relevant to his claim, and again included with its production a copy of Booklet 1.32.

On November 7, 2016, plaintiff appealed the denial of his claim.  On December 6, 2016, Hartford Life overturned its initial decision to deny plaintiff long-term disability benefits, and informed plaintiff it would calculate his gross long-term disability benefit.

On December 21, 2016, Hartford Life contacted RAI to confirm plaintiff's earnings information.  Hartford Life noted that as part of plaintiff's appeal submission, he submitted "corrected" W-2s prepared by RAI-Scarsdale, showing 2013 earnings of $151,842, and 2014 earnings of $399,614.01.  To that end, plaintiff asserted his Monthly Rate of Basic Earnings was

$22,977.33 (($151,842 + $399,614) / 24).  Plaintiff also asserted his claim award should not be fully taxable because he, not RAI, had paid the premiums for coverage.

On January 6, 2017, Hartford Life calculated plaintiff's monthly Pre-Disability Earnings as $10,416.68.  Hartford Life explained that pay statements provided by RAI showed plaintiff "received a bi-weekly payroll in the amount of $3,846.16 for the time period 01/01/2013– 12/31/2014.  He received one bonus in the amount of $50,000 on 12/20/2016.  There was no other bonuses or commissions paid during this time period."  (AR 251).  Hartford Life further noted:  "The total pay for the 2 calendar years prior to your Disability was $250,000.32.  The Monthly Rate of Basic Earnings is calculated as $250,000.32 / 24 = $10,416.68."  (Id.).  Upon determining plaintiff's Pre-Disability Earnings were $10,416.68, Hartford Life then calculated plaintiff's gross monthly disability benefit:  $6,944.45, or 66⅔ percent of his Pre-Disability Earnings.

On January 26, 2017, plaintiff's attorney requested from Hartford Life copies of documents relevant to the administration of plaintiff's claim.  On February 10, 2017, Hartford Life provided plaintiff's attorney a copy of its claim file, and included therein a copy of Booklet 4.5, rather than Booklet 1.32, which Hartford Life had previously produced.  As noted above, Booklet 4.5 governs coverage for producers who do not pay their own premiums, whereas Booklet 1.32 governs coverage for producers who choose to pay their own premiums.

On July 5, 2017, plaintiff's attorney wrote a letter to Hartford Life, notifying the latter of plaintiff's intent to appeal the determination of plaintiff's gross monthly disability benefit and also confirming plaintiff's deadline to file an appeal as July 13, 2017.  (AR 630).  Accordingly, on July 13, 2017, plaintiff's attorney submitted materials in support of plaintiff's appeal.  (AR 529–91).  Hartford Life designated July 13, 2017, as the date of commencement of plaintiff's appeal.

In his appeal submission, plaintiff asserted his benefits should be calculated from compensation reflected in corrected RAI-Scarsdale W-2s, as well as his $102,000 SEP-IRA contributions, because RAI-Scarsdale, not RAI, should be considered his "Employer" for purposes of claim assessment.  Plaintiff also contended RAI-Scarsdale received more than $900,000 in commissions from RAI in 2013 and 2014, as reflected in a report generated by RAI-Scarsdale.  However, that report showed payments from entities other than RAI.  In sum, plaintiff asserted earnings in 2013 and 2014 of $651,456, rather than $250,000.  This calculation no longer included plaintiff's previous assertion of a $125,000 "nonemployee compensation" bonus in 2014.

By letter dated August 24, 2017, Hartford Life notified plaintiff it was "still awaiting information from the Employer needed to fully investigate [plaintiff's] claim," and it should render a decision on plaintiff's appeal by October 10, 2017.  (AR 239).

By letter dated September 14, 2017, plaintiff requested any correspondence or evidence pertinent to the appeals process, as well as an opportunity to respond to any such new material developed in the course of the appeal.  Plaintiff made a similar request on October 4, 2017.

In an email to plaintiff on September 20, 2017, which subsequently was forwarded to Hartford Life, RAI maintained it was the "Employer" under the Plan, not RAI-Scarsdale, as asserted by plaintiff.

On November 9, 2017, Hartford Life issued a decision letter upholding its claim determination.  Accordingly, Hartford Life determined that its initial Pre-Disability Earnings calculation was correct.  Hartford Life further determined the Plan is self-administered not by RAI-Scarsdale, but by RAI—the Policyholder, Employer, and Plan Administrator, pursuant to the Plan's language—and thus RAI was responsible for keeping all enrollment documents on file

and administering the Plan.  Accordingly, Hartford Life determined it correctly adjudicated plaintiff's claim based on the information provided by RAI.

Moreover, Hartford Life explained plaintiff's SEP-IRA contributions were disregarded from the Pre-Disability Earnings calculation because a "SEP-IRA is considered a 408(k) plan," and thus not a salary-reduction or other agreement within the Plan's definition of "Monthly Rate of Basic Earnings."  (AR 237).

Finally, on appeal, Hartford Life determined that Booklet 4.5, not Booklet 1.32, governed plaintiff's claim.  As noted above, Booklet 4.5 provides coverage for producers who do not pay their own premiums under the Plan.  Hartford Life therefore confirmed plaintiff's claim benefit was fully taxable, as RAI paid to Hartford Life the premiums for plaintiff's coverage.  Hartford Life explained that even if RAI reallocated premium costs to RAI-Scarsdale or plaintiff, RAI nevertheless was responsible for, and paid, premiums to Hartford Life for plaintiff's long-term disability coverage.

## CONCLUSIONS OF LAW

I.    Disputed Standard of Review

In a bench trial, the Court reviews the plan administrator's decision de novo unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When such authority is granted—as it was in this case—the Court typically reviews the administrator's decision under an arbitrary and capricious standard.  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008).  However, if the administrator fails to establish it substantially complied with ERISA's claims-procedure regulations, or if the Plan's discretionary language is preempted by an applicable statute, de novo review is appropriate.  See Thoma v. Fox Long Term Disability Plan, 2018 WL 6514757, at *25–26 (S.D.N.Y. Dec. 11, 2018).

The administrator "bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it." Sharkey v. Ultramar Energy, 70 F.3 226, 230 (2d Cir. 1995).[3]

The parties contest whether the Court must review Hartford Life's decision respecting plaintiff's long-term disability benefits de novo or under an "arbitrary and capricious" standard.

A.    California Law

Plaintiff first contends California's "no discretion" insurance law governs this Court's review of Hartford's long-term disability plan determination, and, as a result, a de novo standard of review applies.  Defendants argue the California statute does not apply, and thus does not bar discretion.

The Court agrees with defendants.

The California Insurance Code states in pertinent part:

> If a policy, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds . . . disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this states, that provision is void and unenforceable.

Cal. Ins. Code § 10110.6(a).  It continues:

> For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.

Cal. Ins. Code § 10110.6(c).

---

[3]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Plaintiff is, and at all relevant times was, a resident of New York, not California. Accordingly, by its plain terms, the above statute does not govern Hartford Life's determination of plaintiff's long-term disability benefits claim. Indeed, "the statute applies only to California residents." Campbell v. Hartford Life & Accident Ins. Co., 2018 WL 4963118, at *8 n.8 (S.D. Fla. Oct. 15, 2018); see also Pfenning v. Liberty Life Assur. Co., 2015 WL 9460578, at *8 (S.D. Ohio Dec. 28, 2015), vacated and remanded by agreement Pfenning v. Liberty Life Assur. Co. of Bos., 2016 WL 11618609, at *1 (6th Cir. Aug. 2, 2016) ("Liberty further argues that this discretionary clause is valid because California law only applies to California residents. The Court agrees.").[4]

Plaintiff relies on Orzechowski v. Boeing Co. Non-Union LTD Plan No. 625, 856 F.3d 686 (9th Cir. 2017), to argue the contrary. But in that case, the plaintiff was a California resident, and thus the statute was applicable. See Complaint at 3, Orzechowski v. Boeing Co. Non-Union LTD Plan No. 625 (C.D. Cal. Nov. 2, 2012), ECF No. 1. That is not the case here.

B.     Alleged ERISA Violations

Plaintiff next contends Hartford Life violated ERISA's claim-procedure regulations, and as a result its decision respecting plaintiff's long-term disability benefits is not entitled to deference. Specifically, plaintiff argues Hartford Life failed to comply with claims-procedure requirements set forth in 29 C.F.R. § 2560.503-1 ("Section 503-1"), by (i) refusing to consider plaintiff's evidence and arguments concerning his earnings; (ii) failing to decide plaintiff's appeal of Hartford Life's disability coverage determination within forty-five days, or, in the

---

[4]     In Pfenning v. Liberty Life Assur. Co., the defendant insurer first argued the California statute did not apply because the plaintiff was not a resident of California, but, following plaintiff's appeal, agreed to de novo review in the district court. Pfenning v. Liberty Life Assur. Co. of Bos., 354 F. Supp. 3d 826, 827 (S.D. Ohio 2017). Accordingly, the Sixth Circuit did not address the application of the California statute at issue.

alternative, failing to provide plaintiff a timely and sufficient notice warranting an extension of time to decide the appeal; and (iii) failing to provide all requested documentation concerning plaintiff's appeal.

With respect to plaintiff's first argument—that Hartford Life failed to consider plaintiff's submissions and arguments—the Court disagrees. Simply, the administrative record contradicts plaintiff's assertion. Included therein are multiple communications between Hartford Life and RAI regarding plaintiff's submissions in support of this claim, as well as documents demonstrating Hartford Life's investigation and consideration of plaintiff's submissions. In other words, the administrative record demonstrates Hartford Life accounted for plaintiff's submissions, on direct review and on appeal.

The Court is also not persuaded by plaintiff's second contention, that Hartford Life did not timely inform plaintiff of its need for an extension of time to assess plaintiff's appeal, and that Hartford Life cited no special circumstances for the extension.

If the insurer determines it cannot resolve a claimant's appeal within forty-five days of the claimant's submission, Section 503-1(i)(3)(i) requires the insurer to provide the claimant an extension notice within that timeframe indicating the "special circumstances" requiring an extension of time. 29 C.F.R. § 2560.503-1(i)(3)(i) (modifying for disability claim appeals the timeframe set forth in Section 503-1(i)(1)(i)); see also id. § 2560.503-1(i)(1)(i). Pursuant to the Department of Labor's preamble to Section 503-1(i)(1)(i), "'special circumstances' refers to 'reasons beyond the control of the plan.'" Hafford v. Aetna Life Ins. Co., 2017 WL 4083580, at *5 (S.D.N.Y. Sept. 13, 2017) (quoting ERISA Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, 70,250).

On July 5, 2017, plaintiff's attorney wrote a letter acknowledging plaintiff's July 13, 2017, deadline to file an appeal. Plaintiff then submitted substantial materials in support of his

appeal on July 13, 2017.  Hartford Life reasonably designated July 13, 2017, as the date of commencement of plaintiff's appeal.

On August 24, 2017—forty-two days after July 13, 2017—Hartford Life notified plaintiff it was "still awaiting information from the Employer needed to fully investigate [plaintiff's] claim."  (AR 239).  Accordingly, Hartford Life did provide plaintiff notice, within forty-five days of plaintiff's appeal, of special circumstances warranting an extension of time to complete its review.

Finally, the Court disagrees with plaintiff's third argument, that Hartford Life violated ERISA's Section 503-1 claim-procedure requirements by failing to provide plaintiff requested documentation prior to its determination on appeal.

The current version of Section 503-1 applies to claims filed on or after April 1, 2018. The regulation states claims procedures "will not . . . be deemed to provide a claimant with a reasonable opportunity for a full and fair review . . . unless . . . the claims procedures":

> (i)  Provide that before the plan can issue an adverse benefit determination <u>on</u> <u>review</u> on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination <u>on</u> <u>review</u> is required to be provided . . . to give the claimant a reasonable opportunity to respond . . . ; and

> (ii)  Provide that, before the plan can issue an adverse benefit determination <u>on</u> <u>review</u> on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale; the rationale must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination <u>on</u> <u>review</u> is required to be provided . . . to give the claimant a reasonable opportunity to respond.

29 C.F.R. § 2560.503-1 (h)(4)(i)-(ii) (emphasis added).

However, a prior version of Section 503-1, which was in effect when plaintiff filed his claim, does <u>not</u> contain the above language.  Rather, it provides claims procedures "will not . . . be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures comply with the requirements of paragraphs (h)(2)(ii) through (iv) and (h)(3)(i) through (v) of this section."  29 C.F.R. § 2560.503-1(h)(4).  The cited subsections do not require a claims fiduciary to provide a claimant, prior to rendering a decision on appeal, new or additional information developed or considered on review.  Several circuit courts of appeals have confirmed as such, holding the version of Section 503-1 applicable to plaintiff's claim does not require disclosure of information generated or received as part of the administrative appeal prior to rendering a decision on review.  <u>See</u>, <u>e.g.</u>, <u>Midgett v. Washington Grp. Int'l Long Term Disability Plan</u>, 561 F.3d 887, 895 (8th Cir. 2009); <u>Glazer v. Reliance Std. Life Ins. Co.</u>, 524 F.3d 1241, 1245 (11th Cir. 2008); <u>Metzger v. UNUM Life Ins. Co. of Am.</u>, 476 F.3d 1161, 1167 (10th Cir. 2007).  The Second Circuit has yet to weigh in on the issue.

Plaintiff's argument relies heavily on <u>Hughes v. Hartford Life & Accident Ins. Co.</u>, 368 F. Supp. 3d 386 (D. Conn. 2019), in which a district court disagreed with the above circuit courts' determinations.  In <u>Hughes v. Hartford Life & Accident Ins. Co.</u>, an insurer denied plaintiff's disability benefits claim and upheld the decision on appeal.  <u>Id</u>. at 388.  While the internal appeal was pending, the insurer hired a doctor to examine the plaintiff, relied on the doctor's report in its decision on review, and, despite plaintiff's requests, did not provide plaintiff a copy of the doctor's report or allow plaintiff to respond to it.  <u>Id</u>.  The district court held that the insurer failed to provide plaintiff a full and fair review on appeal.  <u>Id</u>. at 389.

Given the applicable regulatory text and history, the Court declines to depart from the reasoning of the circuit courts to have considered this issue.  But even if the Court did so, and

instead adopted the reasoning of <u>Hughes v. Hartford Life & Accident Ins. Co.</u>, plaintiff nevertheless does not reasonably claim he was deprived of a meaningful opportunity to respond to documentation or information developed on administrative appeal by Hartford Life which affected the outcome of the appeal.

And here, in accordance with ERISA's claim-procedure requirements, Hartford Life explained in its appeal decision letter dated November 9, 2017, that plaintiff is "entitled to receive upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to this claim" and may commence a civil action in a court of law if he disagreed with the determination.  (AR 237).

Accordingly, pursuant to claim-requirement procedures applicable to plaintiff's claim, Hartford Life did not violate ERISA by failing to provide plaintiff any new or additional materials generated or considered on review prior to rendering a decision on appeal.

For this reason, and those above, the Court evaluates Hartford Life's determination of plaintiff's disability benefits claims under the deferential arbitrary and capricious standard.

II.    <u>Applicable Standard of Review</u>

Under the arbitrary and capricious standard, the Court may reverse Hartford Life's decision only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 442 (2d Cir. 1995).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance."  <u>Durakovic v. Bldg. Serv. 32 BJ Pension Fund</u>, 609 F.3d 133, 141 (2d Cir. 2010).  A decision concerning a claimant's disability benefits is not arbitrary or capricious merely because the record contains evidence supporting an alternative finding.  <u>See</u> <u>Pulvers</u>

v. First Unum Life Ins. Co., 210 F.3d 89, 94 (2d Cir. 2000) (upholding denial of benefits despite

"evidence in the record . . . that would have supported a contrary finding"), abrogated on other

grounds by McCauley v. First Unum Life Ins. Co., 551 F.3d at 132–33.

This is "a highly deferential standard of review."  Fuller v. J.P Morgan Chase & Co., 423

F.3d 104, 107 (2d Cir. 2005).  Indeed, it is "the least demanding form of judicial review of

administrative action."  Badawy v. First Reliance Standard Life Ins. Co., 581 F. Supp. 2d 594,

601 (S.D.N.Y. 2008).

III.    Application

Having carefully reviewed the record, the Court concludes Hartford Life's decision

respecting plaintiff's long-term disability benefits was neither arbitrary nor capricious.

First, although plaintiff contends Hartford Life should have considered RAI-Scarsdale to

be plaintiff's Employer under the Plan, and thus should have accorded more weight to

documents generated by RAI-Scarsdale (including plaintiff's corrected W-2s and a general

ledger showing certain commissions paid to plaintiff by RAI-Scarsdale), the Court finds it was

reasonable for Hartford Life to rely on documentation and information provided by RAI.

Specifically, it was reasonable for Hartford Life to determine RAI was the Employer, Plan

Administrator, and Policyholder under the Plan, and thus to rely on information provided by RAI

concerning plaintiff's earnings.  The administrative record demonstrates RAI-Scarsdale did not

act as plaintiff's "Employer" for purposes of Plan administration, did not act as the

"Policyholder" for purposes of administering the Plan, and neither calculated nor paid directly to

Hartford Life premiums for plaintiff's coverage.  To the contrary, the administrative record

demonstrates RAI managed Plan enrollment, administrated the Plan, paid Plan premiums, and

served as the Policyholder in all material respects.  Indeed, RAI was responsible for paying Plan

premiums based on the evidence of earnings in its possession for employees, including those of

affiliate entities, such as RAI-Scarsdale.  For these reasons, it was reasonable for Hartford Life to rely on the W-2s and earnings information provided by RAI, rather than on information provided by plaintiff, to calculate plaintiff's gross monthly disability benefit.

Second, it was reasonable for Hartford Life to disregard plaintiff's SEP-IRA contributions for purposes of calculating plaintiff's Pre-Disability Earnings.  As noted above, Hartford Life informed plaintiff such contributions were made toward a 408(k) plan, and thus not to any salary-reduction or other agreement within the Plan's definition of Monthly Rate of Basic Earnings.

Third, it was reasonable for Hartford Life to determine plaintiff's long-term disability benefit was fully taxable.  Although plaintiff provided Hartford Life a letter from his accountant noting "the company" paid plaintiff's premiums (AR 943), RAI confirmed that it paid Hartford Life premiums for plaintiff's coverage under the Plan.  Hartford Life noted that, even if RAI first paid plaintiff's premiums, and then reassigned those costs to RAI-Scarsdale, any dispute respecting whether plaintiff effectively paid his own premium would need to be resolved by plaintiff and RAI, not plaintiff and Hartford Life, "since employees do not have the option to pay premiums back to their Employer in order to make a non-contributory benefit a contributory benefit."  (AR 237).

Fourth, although plaintiff contends it was arbitrary or capricious for Hartford Life to determine Booklet 4.5 governed plaintiff's coverage, the administrative record supports this determination.  As noted above, Hartford Life first sent plaintiff a copy of Booklet 1.32, which applies to producers choosing to pay their own premium, but later produced to plaintiff Booklet 4.5, which covers producers who do not pay their premiums.  The administrative record confirms RAI administered the Plan, including on behalf of plaintiff, and paid to Hartford Life the premiums associated with plaintiff's coverage.  Therefore, it was reasonable for Hartford Life to

determine Booklet 4.5 governed plaintiff's claim, and that his gross benefit was taxable accordingly.

Finally, as an additional matter, plaintiff argues Hartford Life's adjudication of his claim was arbitrary and capricious due to Hartford Life's financial self-interest as both claim administrator and benefits payor, and because the benefits decision was marred by procedural and substantive defects.

Courts "may dial back deference if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." Miles v. Principal Life Ins. Co., 720 F.3d 472, 485 (2d Cir.2013).  A plan administrator that both evaluates and pays benefit claims has an inherent conflict of interest.  McCauley v. First Unum Life Ins. Co., 551 F.3d at 133. Such conflict is "but one factor among many that a reviewing judge must take into account" in assessing whether a claim fiduciary's decision is arbitrary or capricious.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008).  Indeed, "[i]n the event of such a conflict of interest, 'a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion . . . and the significance of the factor will depend on the circumstances of the particular case.'"  Correia v. Unum Life Ins. Co. of Am., 2016 WL 5462827, at *24 (S.D.N.Y. Sept. 29, 2016) (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. at 108).

Here, even assuming Hartford Life was operating under a conflict of interest, there is no credible evidence in the administrative record to suggest the conflict affected Hartford Life's decision or was otherwise outcome-determinative.  Nor is there credible evidence Hartford Life has a history of biased claim adjudication.  See Metro. Life Ins. Co. v. Glenn, 554 U.S. at 117. And although Hartford Life first denied plaintiff's long-term disability benefits claim outright, it also reversed itself following further review.  Moreover, for the reasons set forth herein, the

administrative record does not support a finding that there were procedural or substantive defects concerning Hartford Life's claim adjudication to render arbitrary or capricious Hartford Life's decision respecting plaintiff's claim.

In sum, because Hartford Life's decision respecting plaintiff's long-term disability benefits is supported by substantial evidence, the decision is neither arbitrary nor capricious. Cf. Pagan v. NYNEX Pension Plan, 52 F.3d at 442 (noting a decision is arbitrary and capricious only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law").

## CONCLUSION

The Court finds and concludes defendants are entitled to judgment in their favor.

The Clerk is instructed to terminate plaintiff's motion for summary judgment.  (Doc. #29).

The Clerk is further instructed to enter Judgment in defendants' favor dismissing plaintiff's complaint in its entirety, and close this case.

Dated:  March 26, 2020
            White Plains, NY

SO ORDERED:


Vincent L. Briccetti
United States District Judge