# Docket No. 20-1281

===========================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

===========================================================

GREGORY MAYER,

Plaintiff-Appellant,

v.

RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN AND
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

Defendants-Appellees.

---

ON APPEAL FROM A FINAL JUDGMENT OF
THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

Sat Below:  Honorable Vincent L. Briccetti, U.S.D.J.

---

**APPENDIX VOL. I (A1-160) OF APPELLANT**

---

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
(800) 790-1550; (888) 963-8864 (facsimile); mc@heggelaw.com

Of Counsel and On the Brief

# TABLE OF APPENDIX

## Special Appendix (bound with Brief, SA1-20)

Notice of Appeal                                               SA1

Judgment of District Court, 3/27/20                            SA2

Opinion of District Court, 3/26/20                             SA3

## Appendix Vol. I (A1-160, bound separately)

District Court Docket Sheet                                    A1

Complaint                                                      A7

Answer                                                         A24

Plaintiff's Notice of Motion for Summary Judgment              A36

Plaintiff's Proposed Findings of Fact/Conclusions of Law       A38

Defendant's Proposed Findings of Fact/Conclusions of Law       A111

Letter to court from defendant's counsel (6/21/19)             A155

Stipulation and Order (6/3/19) re: Administrative Record        A156

Privilege Log from Hartford                                    A159

CLOSED,ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:18-cv-02789-VB

| | |
|---|---|
| Mayer v. Ringler Associates Inc. and Affiliates Long Term Disability Plan et al | Date Filed: 03/29/2018 |
| Assigned to: Judge Vincent L. Briccetti | Date Terminated: 03/27/2020 |
| Demand: $360,000 | Jury Demand: None |
| Cause: 29:1132 E.R.I.S.A.: Civil Enforcement of Employee Benefits | Nature of Suit: 791 Labor: E.R.I.S.A. |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Gregory Mayer**                    represented by **Joseph Francis Fields**
Dickstein Shapiro LLP (NYC)
1633 Broadway
New York, NY 10019-6708
212-835-1469
Fax: 212-997-9880
Email: fieldsj@dsmo.com
*ATTORNEY TO BE NOTICED*

**Mark Peter Scherzer**
Mark Scherzer Law Office
49 Nassau Street
Ste Fourth Floor
New York, NY 10038
212-406-9606
Fax: 212-964-6903
Email: markscherzerlaw@verizon.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ringler Associates Inc. and Affiliates Long Term Disability Plan**                    represented by **Patrick Walter Begos**
Robinson & Cole LLP
1055 Washington Blvd
Stamford, CT 06901
203-462-7500
Fax: 203-462-7599
Email: pbegos@rc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

A001

Gregory James Bennici
Robinson & Cole, LLP (Stamford)
1055 Washington Boulevard
Stamford, CT 06901
(203) 462-7500
Fax: (203) 462-7599
Email: gbennici@rc.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hartford Life and Accident Insurance Company**     represented by    **Gregory James Bennici**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick Walter Begos**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/29/2018 | 1 | COMPLAINT against Hartford Life and Accident Insurance Company, Ringler Associates Inc.and Affiliates Long Term Disability Plan. (Filing Fee $ 400.00, Receipt Number 0208-14874636)Document filed by Gregory Mayer.(Scherzer, Mark) (Entered: 03/29/2018) |
| 03/29/2018 | 2 | CIVIL COVER SHEET filed. (Scherzer, Mark) (Entered: 03/29/2018) |
| 03/29/2018 | 3 | **FILING ERROR - DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS** REQUEST FOR ISSUANCE OF SUMMONS as to Ringler Associates Inc.and Affiliates Long Term Disability Plan, re: 1 Complaint. Document filed by Gregory Mayer. (Scherzer, Mark) Modified on 3/30/2018 (vf). (Entered: 03/29/2018) |
| 03/29/2018 | 4 | **FILING ERROR - DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS** REQUEST FOR ISSUANCE OF SUMMONS as to Hartford Life and Accident Insurance Company, re: 1 Complaint. Document filed by Gregory Mayer. (Scherzer, Mark) Modified on 3/30/2018 (vf). (Entered: 03/29/2018) |
| 03/30/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Vincent L. Briccetti. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges /District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (vf) (Entered: 03/30/2018) |
| 03/30/2018 | | Magistrate Judge Lisa M. Smith is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (vf) (Entered: 03/30/2018) |
| 03/30/2018 | | Case Designated ECF. (vf) (Entered: 03/30/2018) |

| 03/30/2018 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Mark Peter Scherzer to RE-FILE Document No. 3 Request for Issuance of Summons, 4 Request for Issuance of Summons. The filing is deficient for the following reason(s): plaintiff or plaintiff's attorney information section not provided; Filing Court title not provided. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (vf)** (Entered: 03/30/2018) |
|---|---|---|
| 03/30/2018 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Ringler Associates Inc. and Affiliates Long Term Disability Plan, re: 1 Complaint. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 03/30/2018) |
| 03/30/2018 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Hartford Life and Accident Insurance Company, re: 1 Complaint. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 03/30/2018) |
| 04/04/2018 | 7 | NOTICE OF APPEARANCE by Patrick Walter Begos on behalf of Hartford Life and Accident Insurance Company. (Begos, Patrick) (Entered: 04/04/2018) |
| 04/04/2018 | 8 | ELECTRONIC SUMMONS ISSUED as to Hartford Life and Accident Insurance Company. (sj) (Entered: 04/04/2018) |
| 04/04/2018 | 9 | ELECTRONIC SUMMONS ISSUED as to Ringler Associates Inc. and Affiliates Long Term Disability Plan. (sj) (Entered: 04/04/2018) |
| 04/11/2018 | 10 | WAIVER OF SERVICE RETURNED EXECUTED. Hartford Life and Accident Insurance Company waiver sent on 4/5/2018, answer due 6/4/2018. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 04/11/2018) |
| 05/02/2018 | 11 | WAIVER OF SERVICE RETURNED EXECUTED. Ringler Associates Inc. and Affiliates Long Term Disability Plan waiver sent on 4/12/2018, answer due 6/11/2018. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 05/02/2018) |
| 06/01/2018 | 12 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Hartford Life, Inc., Corporate Parent The Hartford Financial Services Group, Inc., Corporate Parent Hartford Holdings, Inc. for Hartford Life and Accident Insurance Company. Document filed by Hartford Life and Accident Insurance Company.(Begos, Patrick) (Entered: 06/01/2018) |
| 06/01/2018 | 13 | ANSWER to 1 Complaint. Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan.(Begos, Patrick) (Entered: 06/01/2018) |
| 06/05/2018 | 14 | NOTICE OF INITIAL CONFERENCE: Initial Conference set for 7/13/2018 at 02:15 PM in Courtroom 620, 300 Quarropas Street, White Plains, NY 10601 before Judge Vincent L. Briccetti. (mml) (Entered: 06/05/2018) |
| 07/13/2018 | | Minute Entry for proceedings held before Judge Vincent L. Briccetti: Initial Pretrial Conference held on 7/13/2018. A joint letter regarding settlement is due on or before 10-12-18. Next conference is scheduled for 11-16-18 at 11:00 a.m. (dh) (Entered: 07/13/2018) |
| 07/13/2018 | | Set/Reset Hearings: Status Conference set for 11/16/2018 at 11:00 AM in Courtroom 620, 300 Quarropas Street, White Plains, NY 10601 before Judge Vincent L. Briccetti. (dh) (Entered: 07/13/2018) |

| | | |
|---|---|---|
| 07/13/2018 | 15 | CIVIL CASE DISCOVERY PLAN AND SCHEDULING ORDER: This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel and any unrepresented parties, pursuant to Fed. R. Civ. P. 16 and 26(f): All parties do not consent to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The case is not to be tried to a jury. Motions due by 8/12/2018. Deposition due by 9/26/2018. All Fact Discovery due by 11/10/2018. All Discovery due by 11/10/2018. The Magistrate Judge assigned to this case is the Honorable Lisa M. Smith. The next Case Management Conference set for 11/16/2018 at 11:00 AM before Judge Vincent L. Briccetti. By 10/12/18, counsel to submit joint letter regarding settlement. And as set forth herein. SO ORDERED. (Signed by Judge Vincent L. Briccetti on 7/13/2018) (ama) (Entered: 07/13/2018) |
| 10/10/2018 | 16 | FIRST LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge Vincent L. Briccetti from Mark Scherzer dated October 10, 2018. Document filed by Gregory Mayer.(Scherzer, Mark) (Entered: 10/10/2018) |
| 10/10/2018 | 17 | ORDER granting 16 Letter Motion for Extension of Time to Complete Discovery: Discovery deadlines extended as set forth in the letter-motion: non-expert depositions shall be completed by 11/27/2018; requests to admit shall be served by 12/10/2018; the parties shall submit a joint letter regarding settlement by 12/11/2018; and all discovery shall be completed by 1/7/2019. The conference scheduled for 11/16/2018 is adjourned to 1/18/2019, at 2:15 p.m. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (Keenan, Lindsey) (Entered: 10/10/2018) |
| 10/22/2018 | 18 | NOTICE OF APPEARANCE by Joseph Francis Fields on behalf of Gregory Mayer. (Fields, Joseph) (Entered: 10/22/2018) |
| 12/11/2018 | 19 | JOINT LETTER addressed to Judge Vincent L. Briccetti from Patrick W. Begos dated December 11, 2018 re: Status of Settlement Discussions. Document filed by Hartford Life and Accident Insurance Company.(Begos, Patrick) (Entered: 12/11/2018) |
| 01/18/2019 | | Minute Entry for proceedings held before Judge Vincent L. Briccetti: Status Conference held on 1/18/2019. Order to follow. (dh) (Entered: 01/18/2019) |
| 01/18/2019 | 20 | ORDER: As discussed at a case management conference held today and attended by is HEREBY ORDERED: 1. By March 15, 2019, the parties shall submit a joint status report regarding (i) settlement; (ii) the status of the administrative record; (iii) whether the parties intend to resolve this case at summary judgment or a bench trial; and (iv) a proposed briefing schedule for dispositive motion practice, if applicable. (Signed by Judge Vincent L. Briccetti on 1/18/2019) (mml) (Entered: 01/18/2019) |
| 03/14/2019 | 21 | LETTER MOTION for Extension of Time *to Report to the Court* addressed to Judge Vincent L. Briccetti from Mark Scherzer dated March 14, 2019. Document filed by Gregory Mayer.(Scherzer, Mark) (Entered: 03/14/2019) |
| 03/14/2019 | 22 | ORDER granting 21 Letter Motion for Extension of Time: By 4/4/2019, counsel shall submit a joint further status report regarding (i) settlement, (ii) the status of the administrative record, and (iii) a proposed briefing schedule if the case does not settle. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (Briccetti, Vincent) (Entered: 03/14/2019) |
| 04/04/2019 | 23 | LETTER addressed to Judge Vincent L. Briccetti from Mark Scherzer dated April 4, 2019 re: Status Report. Document filed by Gregory Mayer.(Scherzer, Mark) (Entered: 04/04/2019) |

A004

| | | |
|---|---|---|
| 04/05/2019 | 24 | MEMO ENDORSEMENT on re: 23 LETTER addressed to Judge Vincent L. Briccetti from Mark Scherzer dated April 4, 2019 re: Status Report. Document filed by Gregory Mayer. ENDORSEMENT: The parties' anticipated cross-motions are due 5/24/19. Oppositions to the motions are due 6/25/2019. Application granted. So ordered. (Cross Motions due by 5/24/2019. Responses due by 6/25/2019) (Signed by Judge Vincent L. Briccetti on 4/4/2019) (rjm) (Entered: 04/05/2019) |
| 05/20/2019 | 25 | LETTER MOTION for Extension of Time *re:Motion Deadlines* addressed to Judge Vincent L. Briccetti from Mark Scherzer dated May 20, 2019. Document filed by Gregory Mayer.(Scherzer, Mark) (Entered: 05/20/2019) |
| 05/20/2019 | 26 | ORDER granting 25 Letter Motion for Extension of Time: The parties' time to file their anticipated cross-motions is extended to 5/31/2019. Oppositions to the motions are due 7/2/2019. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (jal) (Entered: 05/20/2019) |
| 05/31/2019 | 27 | TRIAL BRIEF - *Defendants' Opening Memorandum of Law for Bench Trial on Stipulated Record*. Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan.(Begos, Patrick) (Entered: 05/31/2019) |
| 05/31/2019 | 28 | PROPOSED STIPULATION AND ORDER. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 05/31/2019) |
| 05/31/2019 | 29 | MOTION for Summary Judgment *[to be treated as motion subject to FRCP Rule 52]*. Document filed by Gregory Mayer. Responses due by 7/2/2019(Scherzer, Mark) (Entered: 05/31/2019) |
| 05/31/2019 | 30 | RULE 56.1 STATEMENT. Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 05/31/2019) |
| 05/31/2019 | 31 | MEMORANDUM OF LAW in Support re: 29 MOTION for Summary Judgment *[to be treated as motion subject to FRCP Rule 52]*. . Document filed by Gregory Mayer. (Scherzer, Mark) (Entered: 05/31/2019) |
| 06/03/2019 | 32 | STIPULATION AND ORDER REGARDING TRIAL RECORD: IT IS STIPULATED by and between the parties hereto that: 1. The Court shall conduct a bench trial on the following record: (a) Mayer v Hartford 0001 through Mayer v Hartford 001618, to be filed in hard copy as an Administrative Record, excluding documents withheld as privileged; (b) Mayer v Hartford Add. 1619 - Mayer v Hartford Add. 1763 (c) Privilege Log, Mayer v. Hartford Add 1764 2. Hartford does not dispute plaintiff's assertion that: (a) Plaintiff received Certificate 216897(GLT) 1.32 (Mayer v. Hartford 75-111) with the letter denying his claim elated May 13, 2016 (Mayer v Hartford 269-272), sent with Tonya Martinez's email elated May 13, 2016 (Add. 1739), and with the documents produced to Mr. Mayer's counsel under cover of a letter from Tonya Martinez elated May 26, 2016. (Mayer v. Hartford 268)(b) Plaintiff received Certificate 216897(GLT) 4.5 (Mayer v. Hartford 38-74) with the documents produced to Mr. Mayer's counsel under cover of Tonya Martinez's letter, as further set forth in this Order. (Signed by Judge Vincent L. Briccetti on 6/3/2019) (mml) (Entered: 06/03/2019) |
| 06/21/2019 | 33 | LETTER addressed to Judge Vincent L. Briccetti from Patrick W. Begos dated June 21, 2019 re: Plaintiff's Rule 56.1 Statement (Doc. 30). Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan.(Begos, Patrick) (Entered: 06/21/2019) |

## A005

| 06/21/2019 | 34 | MEMO ENDORSEMENT on re: 33 Letter, filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan. ENDORSEMENT: The Court deems Doc. #30 plaintiff's Proposed Findings of Fact and Conclusions of Law. By 7/2/2019, defendants shall file Proposed Findings of Fact and Conclusions of Law. The parties' oppositions to the pending cross-motions remain due 7/2/2019. SO ORDERED. (Signed by Judge Vincent L. Briccetti on 6/21/2019) (mml) (Entered: 06/24/2019) |
| 06/21/2019 | | Set/Reset Deadlines: Responses due by 7/2/2019. (mml) (Entered: 06/24/2019) |
| 06/25/2019 | 35 | CONSENT LETTER MOTION for Extension of Time addressed to Judge Vincent L. Briccetti from Patrick W. Begos dated June 25, 2019. Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan.(Begos, Patrick) (Entered: 06/25/2019) |
| 06/25/2019 | 36 | ORDER granting 35 Motion for Extension of Time: The parties' time to oppose the pending cross-motions and defendants' time to file Proposed Findings of Fact and Conclusions of Law are extended to 7/9/2019. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (jal) (Entered: 06/25/2019) |
| 07/09/2019 | 37 | REPLY MEMORANDUM OF LAW in Support re: 29 MOTION for Summary Judgment *[to be treated as motion subject to FRCP Rule 52]*. . Document filed by Gregory Mayer. (Attachments: # 1 Appendix Counter-Statement to Defendants' Proposed Findings)(Scherzer, Mark) (Entered: 07/09/2019) |
| 07/09/2019 | 38 | NOTICE OF APPEARANCE by Gregory James Bennici on behalf of Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan. (Bennici, Gregory) (Entered: 07/09/2019) |
| 07/09/2019 | 39 | RESPONSE to Motion re: 29 MOTION for Summary Judgment *[to be treated as motion subject to FRCP Rule 52]. (Defendants' Response to Plaintiff's Trial Brief)*. Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan. (Bennici, Gregory) (Entered: 07/09/2019) |
| 07/09/2019 | 40 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW. Document filed by Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan.(Bennici, Gregory) (Entered: 07/09/2019) |
| 03/26/2020 | 41 | OPINION AND ORDER re: 29 MOTION for Summary Judgment *[to be treated as motion subject to FRCP Rule 52]* filed by Gregory Mayer. The Court finds and concludes defendants are entitled to judgment in their favor. The Clerk is instructed to terminate plaintiff's motion for summary judgment. (Doc. #29). The Clerk is further instructed to enter Judgment in defendants' favor dismissing plaintiff's complaint in its entirety, and close this case. SO ORDERED. (Signed by Judge Vincent L. Briccetti on 3/26/2020) (mml) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/26/2020) |
| 03/27/2020 | 42 | CLERK'S JUDGMENT re: 41 Memorandum & Opinion. in favor of Hartford Life and Accident Insurance Company, Ringler Associates Inc. and Affiliates Long Term Disability Plan against Gregory Mayer. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated March 26, 2020, Judgment is entered in defendants' favor and plaintiff's complaint, is dismissed in its entirety; accordingly, this case is closed. (Signed by Clerk of Court Ruby Krajick on 03/27/2020) (Attachments: # 1 Notic eof Right to Appeal) (dt) (Entered: 03/27/2020) |

A006

MARK SCHERZER, ESQ.
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Floor 4
New York, New York 10038
Tel: (212) 406-9606
Email:  markscherzerlaw@verizon.net


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GREGORY MAYER,                                         :

                   Plaintiff,                :         18- CV- 2789  (          )(        )

    -against-                                              :


                                         :
RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN                     :
and HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,                               :                 <u>COMPLAINT</u>

               Defendants.                 :
------------------------------------------------------------X


      Plaintiff, Gregory Mayer, by his attorney, Mark Scherzer, for his Complaint, respectfully

alleges:


<u>**Preliminary Statement**</u>


      1.     Plaintiff, Gregory Mayer, brings this action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1000 *et seq.*, to obtain full

payment of the long-term disability benefits to which he is entitled from defendants, Ringler

Associates Inc. and Affiliates Long Term Disability Plan (the "Plan") and Hartford Life and

Accident Insurance Company ("Hartford").  Plaintiff has been awarded benefits but has been

paid a reduced amount that does not reflect his entire income from his employer. Mayer also

seeks a judgment declaring that the long-term disability benefits are not taxable, because

premium payments were allocated to him rather than paid as an expense of business by the

employer, and enjoining defendants from treating the benefits as taxable income.


### Parties


2.     Mr. Mayer is a citizen of the State of New York, residing in Scarsdale,

Westchester County, New York. Mr. Mayer has been a member of the bar of this Court since

1993.


3.     Before his disability Mr. Mayer was an employee of Ringler Associates

Scarsdale, Inc. ("Ringler Scarsdale")


4.     Ringler Scarsdale,is a corporation with offices at 80 Maiden Lane, New York,

New York.  Ringler Scarsdale was at all relevant times an affiliated company of Ringler

Associates Incorporated.


5.     Upon information and belief, Ringler Associates, Incorporated is a corporation

with its principal place of business at 27422 Aliso Creek Road, Suite 200, Aliso Viejo, CA

92656.  Ringler Associates, Incorporated, is an insurance agency which collects commissions

from life insurance companies for sales of structured settlement contracts completed by Ringler


2

Affiliated companies including Scarsdale.

6.      Upon information and belief, Ringler Associates, Incorporated, established the Ringler Associates and  Affiliates Long Term Disability Plan ("the Plan") on behalf of itself and its affiliated companies in or before 1999.

7.      Upon information and belief, Hartford is a corporation with its principal place of business at 200 Hopmeadow St., Simsbury, CT 06089, and is engaged in the business of issuing and administering policies of group long term disability income insurance.  Hartford is licensed to do business in the States of California and New York, and has issued policies, including the policy covering the Plan, covering individuals who reside in the State of New York.  Upon information an belief, the Plan was insured by Hartford from no later than 1999 until on or about December 31, 2017.

## Jurisdiction and Venue

8.      Upon information and belief, the Plan is an "employee welfare benefit plans" or "welfare plan" subject to ERISA, including its civil enforcement provisions.  ERISA §§ 3(1), 3(3), 4(a), 502(a)(1)(B), and (a)(3), 29 U.S.C. §§ 1002(1), (3), 1003(a), 1132(a)(1)(B), and (a)(3).

9.      The court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, and pursuant to §§ 502(a)(1)(B) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e)(1), and (g).

3

10.     Venue is appropriate in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because the breach that is the subject of this lawsuit took place in this district.

### Factual Allegations

### A.     The Plan, Insurance Policy, Administration and Coverage

11.     Upon information and belief, the Plan's coverage is and has been since 1999

provided through a group long term disability insurance policy contract, GLT 216897 ("the

Policy") issued by Hartford.

12.     Upon information and belief, the Policy was issued and delivered to the Plan

Administrator in California.  Upon information and belief, the Policy is regulated by the

California Insurance Department and is subject to California law to the extent such law is not

preempted by ERISA.

13.     The Plan names Ringler Associates Incorporated and Affiliates as Plan

Administrator.  Upon information and belief, Ringler Associates Incorporated has performed

Plan Administrator functions for itself and the Affiliates.

14.     Upon information and belief, Hartford is the claim decision-making fiduciary for

benefits provided under the Plan.

4

A010

15.   Mr. Mayer was at all relevant times covered as a "Producer" under the terms of the Plan.

**B.      The Plan's Disability Benefit Provisions**

16.   Upon information and belief, after a 3 month "elimination period," the Plan pays disability benefits if a participant is Totally Disabled, defined as being unable as a result of injury or sickness "to perform with reasonable continuity the Essential Duties necessary to pursue Your usual occupation in the usual or customary way."

17.   The monthly Plan benefit for Total Disability is 66 2/3% of Monthly Rate of Basic Earnings, which are defined as: "your average monthly rate of pay, including Bonuses and Commissions, from the Employer for the 2 calendar year(s) ending just prior to the date you become Disabled…"

18.   Monthly Rate of Basic Earnings is "your average monthly rate of pay, including Bonuses and Commissions… 1. Including contributions you make through a salary reductiotn agreement with the Employer to: a) an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement; b) an executive non qualified deferred compensation arrangement; or c) an arrangement under an IRC Section 125 plan, including contributions you make through a salary reduction arrangement under an IRC Section 125 plan."

19.     The Maximum Monthly Benefit under the Plan is $20,000.

20.     The Plan and Policy provide for a cost of living increase in benefits for each year
after the first year of benefits, in an amount equal to the lesser of 3% or one half of the increase
over the previous year in the consumer price index for urban wage earners, based on the index
as of July 31 of each year.

21.     Upon information and belief, pursuant to the formula set forth in paragraph 19, as
of January 1, 2017, any benefits due to Mr. Mayer under the Plan increased by .15% over the
previous year's benefits, and as of January 1, 2018, increased by.1% over the previous year.

22.     With respect to premium payment, the Policy provides that "The Employer pays
the premium for the insurance,but may allocate part of the cost to the employee. The Employer
determines the portion of the cost to be paid by the employee."

**C.     Mr. Mayer's Employment and Compensation**

23.     Prior to September 15, 2015, Mr. Mayer was employed as a structured settlement
consultant by Ringler Scarsdale. Mr. Mayer was qualified for this occupation in that he
possessed a law license, designation as a certified financial planner (CFP), an insurance
license, and 15 years of work in the field.  The occupation required constant travel throughout
the United States for attendance at court conferences, mediations and trials, to which he carried
a suit case and a large computer bag containing a portable office including a laptop computer,

6

printer, scanner, brochures, copy paper and other necessary office supplies.   The job required

a need for acute concentration, manipulation of detailed and complex legal and financial data,

and the ability to draft complex documents and accurate financial proposals for large

settlements in a time sensitive setting.  The job also required extensive entertainment of clients

through evening dinners and daytime golf outings.

24.    Mr. Mayer performed his services as the sole employee of Ringler Scarsdale,

which acted as an independent contractor of Ringler Associates, Incorporated.  Ringler

Associates, Incorporated, paid commissions to Ringler Scarsdale based on the business

generated by Mr. Mayer's efforts.  The commissions paid to Ringler Scarsdale exceeded $1.3

million in the three fiscal years which contributed to earnings received by Mr. Mayer in

calendar years 2013 and 2014.

25.    Mr. Mayer was employed solely by Ringler Scarsdale and received all his

compensation solely from Ringler Scarsdale in 2013, 2014, and up to the time of his disability

in 2015.

26.    Mr. Mayer was never an employee of Ringler Associates Incorporated.

27.    Ringler Associates Incorporated did not compensate Mr. Mayer in the years 2013,

2014 or 2015.

28.    Ringler Associates Incorporated does not manage, control or have full knowledge

of the method or amount Mr. Mayer is compensated by Ringler Scarsdale.

29.   Ringler Scarsdale fully controlled the amounts and methods by which Mr. Mayer was compensated.

30.   Forms W-2 issued by Ringler Scarsdale to Mr. Mayer showed wage income of $150,000.16 in 2013 and $399,614.01 in 2014, or average monthly income of $22,900.59. These were corrected from W-2's provided by Ringler Associates, Inc. in the name of Ringler Scarsdale showing wages of $150,000.16 in 2013 and $100,000.36 in 2014 as proof of Mayer's compensation.

31.   The W-2s issued by Ringler Scarsdale included in Mr. Mayer's compensation the amounts of the premiums paid for Mr. Mayer's coverage under the Plan.  The inclusion of these premium amounts in Mr. Mayer's W-2 income constituted an allocation by Ringler Scarsdale to Mr. Mayer of the premium payment obligation, as permitted by the Policy.

32.   Mr. Mayer in addition made contributions to Fidelity SEP-IRA accounts from the commissions paid to Ringler Scarsdale a total of $100,000 with respect to calendar years 2013 and 2014.

### D.   Mr. Mayer's Disability and Claim for Plan Benefits

33.   On or about September 15, 2015, Mr. Mayer underwent a disc fusion at L5-S1, the location of ruptured discs which had caused Mr. Mayer to undergo two previous

discectomies.

34.    The surgery was only marginally successful, with flexibility in the fixation device, and Mr. Mayer had continuing abnormalities in posture, spasms and pain, decreased and abnormal range of motion, weakness, abnormal reflexes, decreased sensation, and difficulty walking.  He suffered foraminal stenosis and encroachment, and the resulting pain and fatigue rendered him unable to continue working at his occupation. Further, Mr. Mayer has severe arthritis in his left knee due to injuries and four left knee surgeries. Additionally, Mr. Mayer has permanent nerve damage and structural deformities in his left foot.

35.    Upon terminating active work in September, 2015, Mr. Mayer provided due notice of disability and thereafter provided due proof of disability under the Plan.

36.    In assessing the claim, Hartford relied on an inaccurate Physical Demands Analysis submitted by Ringler Associates, Incorporated, which among other inaccuracies claimed Mr. Mayer worked an 8-5 shift and was not required to Push, Pull or lift or Carry anything.  Hartford refused to consider a Physical Demands Analysis submitted by Ringler Scarsdale.

37.    In assessing the claim Hartford also relied upon incomplete salary bonus and commission information submitted it by Ringler Associates Incorporated as part of an "Employer's Statement."

9

A015

38.    In response to Mr. Mayer's protests, Hartford continued to rely upon the incomplete financial information. even after Ringler Associates Incorporated instructed Hartford to obtain additional salary, bonus and commission information from Ringler Scarsdale.

39.    By letter, dated May 13, 2016, Hartford denied Mr. Mayer's claim, asserting that he had not met the Plan's definition of disability.  In that same denial letter, Hartford misquoted the Plan's wording, asserting that Mr. Mayer was covered for only two years for disability in his own occupation, after which he would have to be disabled from any other occupation for which he was reasonably qualified in order to receive benefits.  Hartford had in a previous letter similarly inaccurately claimed that coverage was only two years for the claimant's own occupation.

40.    On or about July 21, 2016 (months after the denial and Mr. Mayer's request for correction of this document and the financial information), Ringler Associates Incorporated submitted a corrected Physical Demands Analysis to the Hartford which stated among other things that Mr. Mayer works 8-18 hours a day and is required to carry a suit case and computer case. At that time Ringler Associates Incorporated requested that the Hartford reconsider the denial of the claim.

41.    Mr. Mayer duly appealed Hartford's determination, demonstrating both that Hartford had misrepresented the definition of disability (the policy covered disability from his own occupation for the full benefit period rather than just 24 months) and that he was unable to perform the Essential Duties necessary to pursue his occupation in the usual and customary

way.

42.    By letter dated December 23, 2016, Hartford reversed its initial denial and awarded Mr. Mayer long term disability benefits, paying him benefits retroactively to the end of the elimination period.  Mr. Mayer's family had gone without his income for over a year as a result of Hartford's initial denial.

43.    While acknowledging Mr. Mayer's disability, Hartford computed his benefit based on Ringler Associates, Incorporated's incomplete report of salary of $100,000 per year in 2013 and 2014, and of a $50,000.00 bonus in one year, for basic monthly earnings of $10,416.68. Based on that computation, Hartford paid Mr. Mayer a gross monthly benefit of $6,944.45. In so doing, Hartford disregarded Mr. Mayer's W2's submitted by Ringler Scarsdale and the personal tax returns submitted by Mr. Mayer for 2013 and 2014. Through application of cost of living (COLA) increases, the monthly benefit paid by Hartford has increased to $,7076.94.

44.    Mr. Mayer disagreed with Hartford's computation of his monthly benefit, and duly appealed, asserting that:

       a.   the full amount of his W-2 income from his employer Ringler Scarsdale, one of the affiliate insured companies of Ringler Associates, Incorporated and Affiliates, should have been used as the basis of his long-term disability benefit, because that was the income paid him by his employer;

       b.   the $50,000.00 SEP-IRA contributions made for him by Ringler Scarsdale in

11

A017

2013 and 2014 should also have been included in his income, because it was commissions Mr. Mayer directed be paid to his Sep-IRA and it served the same role as the deferred compensation amounts set forth in the Plan as additional income to be considered; and

c.  the benefit was erroneously reported by Hartford as taxable income to him because Ringler Scarsdale did not pay the premium but instead allocated that payment to Mr. Mayer as taxable compensation.

45.  By letter dated November 9, 2017, Hartford denied Mr. Mayer's appeal, asserting that:

a.  Only the amounts of income reported on the initial W-2 forms issued by Ringler Associates Incorporated were covered by the Policy, because Ringler Associates Incorporated was the "employer";

b.  The contributions made to Mr. Mayer's SEP-IRA were not includable in his income because they were not made under one of the specific sections of the Internal Revenue Code enumerated in the Policy as includible in income; and

c.  The benefits paid to Mr. Mayer were taxable because, although charged back from Ringler and Associates Incorporated to Ringler Scarsdale's account and against payment of commissions to it, Ringler Scarsdale, in Hartford's view, treated the premiums as a business expense.

46.  Plaintiff has exhausted the Plan's required internal appeal procedures with regard to the denial of his full disability benefits and the tax treatment of the same.

12

A018

## FIRST CAUSE OF ACTION:
## IMPROPER DENIAL OF BENEFITS

47.   Plaintiff repeats and realleges paragraphs 1 through 46, inclusive, of the Complaint as if fully set forth herein.

48.   Mr. Mayer was in fact never employed by Ringler Associates Incorporated, which Hartford insisted upon calling his "Employer," but rather was at all relevant times an employee of the Affiliated company, Ringler Scarsdale.

49.   To the extent that Mr. Mayer's covered compensation was to be based upon wages and other compensation received from his Employer, Hartford should have determined his covered compensation according to the corrected W-2s issued by Ringler Scarsdale, his actual Employer, rather than by the W-2s, based on partial information, previously issued by Ringler Associates Incorporated.

50.   Had Hartford properly counted Mr. Mayer's entire W-2 income as income for purposes of computing the monthly LTD benefit, the initial benefit would have been $15,257.62 per month instead of $6,944.45.

51.   By reason of Hartford's improper, arbitrary and unreasonable failure to pay benefits based on Mr. Mayer's total W-2 compensation, he has been damaged in an amount not less than $225,032 through March, 2018 and will continue to be damaged at the rate of

$8,409.54 per month, plus applicable COLA, for each future month that benefits are received.

52.    Upon information and belief, the purpose of the Plan provision for coverage of amounts paid into deferred compensation arrangements is to cover to the fullest extent the income earned by producers under the Plan, including amounts they were able to reserve for retirement. Covering amounts paid into SEP-IRA plans under Internal Revenue Code Section 408 in Affiliate companies like Ringler Scarsdale fulfills the purposes of the plan. Had the $100,000.00 in SEP-IRA contributions in the 2013-2014 period also been counted as income for purposes of computing the monthly LTD benefit, the benefit would be $18,407.57 per month instead of $7,076.00.

53.    The SEP-IRA contributions were commission payments due and owing Mr. Mayer by Ringler Scarsdale which Mr. Mayer instructed Ringler Scarsdale to pay to his SEP-IRA at Fidelity. If not included as deferred income under the terms of the Policy they should nevertheless be included in the compensation base for benefits as commission payments .

54.    By reason of Hartford's improper, arbitrary, and unreasonable failure to pay benefits based on Mr. Mayer's total W-2 compensation plus SEP-IRA contributions, he has been damaged in an amount not less than $289,332.69 through March, 2018 and will continue to be damaged at the rate of $11,331.57 per month plus applicable COLA for each future month that benefits are received.

55.    If, alternatively, Hartford is correct that the Plan covers amounts paid by Ringler

14

A020

Associates Incorporated, rather than Ringler Scarsdale, then it must cover all the commissions paid by Ringler Associates, Incorporated to Ringler Scarsdale for Mr. Mayer's services.

56.    Payments to Ringler Scarsdale in calendar years 2013 and 2014 for commissions on Mr. Mayer's sales totaled over $900,000.00 over the two year period.   Under the terms of the Plan, if all the commissions paid for Mr. Mayer's sales were included in the calculation, he would have been entitled to the maximum monthly benefit of $20,000.00.

57.    By reason of Hartford's improper, arbitrary and unreasonable failure to pay benefits based on Mr. Mayer's total commissions earned, he has been damaged in an amount not less than $359,514. through March, 201,8 and will continue to be damaged at the rate of $13,154 per month plus applicable COLA for each future month that benefits are received.

## SECOND CAUSE OF ACTION:
## DECLARATORY AND INJUNCTIVE RELIEF

58.    Plaintiff repeats and realleges paragraphs 1 through 32, inclusive, of the complaint as if fully set forth herein.

59.    Upon information and belief, federal, state, and local tax authorities, in determining the tax treatment of long term disability benefits received, will rely upon the characterization of those payments on reporting forms submitted by defendants.

60.    Upon information and belief, defendants are reporting long term disability

15

A021

benefits paid to Mr. Mayer as taxable income to the taxing authorities.

61.    Hartford's conclusion that deduction of premiums from the amounts paid by
Ringler Associates Incorporated to Ringler Scarsdale demonstrated that the premiums were
paid as a business expense by the Employer and therefore the benefits were taxable was
arbitrary and without factual basis in at least two respects:

      a.   It ignored the information on the W-2 forms and in the statement submitted
         by Ringler Scarsdale's accountant that the premium amounts were allocated
         to and treated as income to Mr. Mayer; and

      b.   It was inconsistent with Hartford's previous determination that Ringler
         Associates Incorporated and not Ringler Scarsdale was Mr. Mayer's
         Employer.

62.    Hartford substantiated its wrongful taxation decision by quoting a letter dated
October 26, 2016, from Ringler Scarsdale's Accountant that "Mr. Mayer's long term disability
was paid by the company."  Hartford omitted, however, the next two sentences of that same
letter which stated "However, the premium payments were added to Mr. Mayer's W2 as a
taxable fringe benefit to him. So accordingly, he has been personally paying for the premiums
with after tax dollars and has paid the tax on the premium payments for at least the last three
years"

63.    Plaintiff has exhausted the Plan's required internal appeal procedures but
defendants have failed and refused to correct the tax reporting of his benefits.

16

A022

64.   Hartford's taxability determination is improper, arbitrary and capricious.

65.   Plaintiff will be damaged by being taxed on payments that should be, because he paid taxes on the premiums, treated as tax free.

66.   Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff demands judgment:

On his first cause of action against the Plan and Hartford, awarding him not less than $225,032, $289,332, or $359,514 in Plan benefits, as the Court may determine, with pre-judgment interest from the accrual date of each monthly benefit;

On his second cause of action, declaring that the benefits received by Mr. Mayer under the Plan are tax-free benefits, based on his payment of premiums for the coverage with his after-tax dollars, and enjoining defendants not to report the payments as taxable benefits and to correct any contrary reporting previously made,

together with interest and costs of this action, attorneys' fees, and such other, further and different relief as to the Court seems just, proper, and equitable.

Dated:         New York, New York
               March 29, 2018

                                    _____
                                    MARK SCHERZER, ESQ.
                                    Attorney for Plaintiff
                                    LAW OFFICE OF MARK SCHERZER
                                    49 Nassau St., 4th floor
                                    New York, NY 10038
                                    Tel: (212) 406-9606
                                    Fax: (212) 964-6903
                                    Email: markscherzerlaw@verizon.net

17

A023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                         :

GREGORY MAYER,                        :

                 Plaintiff,       :   Case No. 7:18-cv-02789-VB

                         :

         -against-            :

RINGLER ASSOCIATES INC. AND AFFILIATES  :
LONG TERM DISABILITY PLAN and HARTFORD  :
LIFE AND ACCIDENT INSURANCE COMPANY,  :

              Defendants.     :

                         :
-------------------------------------------------------------------- x

## ANSWER AND AFFIRMATIVE DEFENSES

Defendants, Group Long Term Disability Plan for Employees of Ringler Associates Incorporated and Affiliates – improperly named in this action as "Ringler Associates Inc. and Affiliates Long Term Disability Plan" – (the "Plan") and Hartford Life and Accident Insurance Company ("Hartford Life" and, collectively with the Plan, "Defendants"), hereby answer Plaintiff Gregory Mayer's ("Plaintiff") Complaint (the "Complaint") as follows:

### Preliminary Statement

1.     Deny each allegation set forth in paragraph 1 of the Complaint as alleged, except admit that:  Plaintiff challenges a decision regarding his claim for benefits under the Plan, and that ERISA governs the Plan, Plaintiff's claims and this action.

### Parties

2.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2 of the Complaint; however, claim records reflect that Plaintiff's last known residence was in Scarsdale, New York.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 3 of the Complaint.

4.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 4 of the Complaint.

5.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Complaint; however, claim records reflect that Ringler Associates Incorporated's last known address was 217422 Aliso Creek Road, Suite 200, Aliso Viejo, CA 92656.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint; however, admit that Ringler Associates Incorporated established the Plan.

7.      Deny each allegation set forth in paragraph 7 of the Complaint as alleged, except admit that Hartford Life is an insurance company that is licensed to engage in the business of insurance in the States of California and New York, and that it issued group insurance policy GLT-216897 (the "Policy") to insure certain benefits payable under the Plan.

### Jurisdiction and Venue

8.      The allegations set forth in paragraph 8 of the Complaint state legal conclusions as to which no response is required. To the extent that the allegations set forth in paragraph 8 are interpreted to include any factual allegations, Defendants deny them; however, Defendants admit that ERISA governs the Plan, Plaintiff's claims and this action.

9.      The allegations set forth in paragraph 9 of the Complaint state legal conclusions as to which no response is required. To the extent that the allegations set forth in paragraph 9 are

2

interpreted to include any factual allegations, Defendants deny them as alleged; however, Defendants do not contest personal jurisdiction.

10.     The allegations set forth in paragraph 10 of the Complaint state legal conclusions as to which no response is required.  To the extent that the allegations set forth in paragraph 10 are interpreted to include any factual allegations, Defendants deny them as alleged; however, Defendants do not contest venue in this District.

### Factual Allegations

11.     Deny each allegation set forth in paragraph 11 of the Complaint as alleged, except admit that Hartford Life issued group insurance policy GLT-216897 (the "Policy") to insure certain benefits payable under the Plan.  Defendants refer to the Plan and the Policy (together, "Plan Documents") for their true and complete terms.

12.     Deny each allegation set forth in paragraph 12 of the Complaint as alleged, except admit that the Policy was delivered to the Plan Administrator in California, and refer to the Plan Documents for their true and complete terms.

13.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the Complaint, except admit that that the Plan Documents name "Ringler Associates Incorporated and Affiliates" as the Plan Administrator, and refer to the Plan Documents for their true and complete terms.

14.     Responding to the allegations set forth in paragraph 14 of the Complaint, admit that Hartford Life was designated claims fiduciary for benefits provided under the Policy, with full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

15.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 of the Complaint, but do not dispute that Plaintiff was in an Eligible Class under the terms of the Plan as of his date of disability.

16.   Responding to the allegations set forth in paragraph 16 of the Complaint, deny that they set forth complete or accurate definitions of Plan terms, but admit that the Plan includes a definitions of "Elimination Period", "Total Disability or Totally Disabled" and other relevant provisions, and refer to the Plan Documents for their true and complete terms.

17.   Responding to the allegations set forth in paragraph 17 of the Complaint, deny that they set forth complete or accurate definitions of Plan terms, but admit that the Plan includes a definition of "Monthly Rate of Basic Earnings" and refer to the Plan for its true and complete terms, and do not dispute that Plaintiff was eligible to receive a Benefit Percentage of 66 2/3%.

18.   Responding to the allegations set forth in paragraph 18 of the Complaint, deny that they set forth complete or accurate definitions of Plan terms, but admit that the Plan includes a Cost-of-Living Adjustment and refer to the Plan Documents for their true and complete terms.

19.   Admit the allegation set forth in paragraph 19 of the Complaint.

20.   Responding to the allegations set forth in paragraph 20 of the Complaint, deny that they set forth complete or accurate definitions of Plan terms, except admit that the Plan provides for a cost-of-living increase in Monthly Benefits, and refer to the Plan Documents for their true and complete terms.

21.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 of the Complaint and refer to the administrative record pertaining to Plaintiff's claim ("Administrative Record") for its true and complete contents.

22.     Deny each allegation set forth in paragraph 22 of the Complaint as alleged, and refer to the Plan Documents for their true and complete terms.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23 of the Complaint, and refer to the Administrative Record for its true and complete contents.

24.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 24 of the Complaint, and refer to the Administrative Record for its true and complete contents.

25.     Deny each allegation set forth in paragraph 25 of the Complaint as alleged, and refer to the Administrative Record for its true and complete contents.

26.     Deny each allegation set forth in paragraph 26 of the Complaint as alleged, and refer to the Administrative Record for its true and complete contents.

27.     Deny each allegation set forth in paragraph 27 of the Complaint as alleged, and refer to the Administrative Record for its true and complete contents.

28.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28 of the Complaint, and refer to the Administrative Record for its true and complete contents.

29.     Deny each allegation set forth in paragraph 29 of the Complaint as alleged, and refer to the Administrative Record for its true and complete contents.

30.     Deny each allegation set forth in paragraph 30 of the Complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, and refer to the Administrative Record for its true and complete contents.

31.    Deny each allegation set forth in paragraph 31 of the Complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, and refer to the Administrative Record for its true and complete contents.

32.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 32 of the Complaint, and refer to the Administrative Record for its true and complete contents.

33.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33 of the Complaint, but admit that the Administrative Record contains evidence that Plaintiff underwent surgery related to a fusion at L5-S1 on September 15, 2015, and refer to the Administrative Record for its true and complete contents.

34.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 34 of the Complaint, and refer to the Administrative Record for its true and complete contents.

35.    Deny each allegation set forth in paragraph 35 of the Complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, but admit that Plaintiff submitted an application for long term disability income benefits, and refer to the Administrative Record for its true and complete contents.

36.    Deny each allegation set forth in paragraph 36 of the Complaint, and refer to the Administrative Record for its true and complete contents.

37.    Deny each allegation set forth in paragraph 37 of the Complaint, and refer to the Administrative Record for its true and complete contents.

38.     Deny each allegation set forth in paragraph 38 of the Complaint as they are nei-
ther an accurate nor complete characterization of the information set forth in the Administrative
Record, and refer to the Administrative Record for its true and complete contents.

39.     Deny each allegation set forth in paragraph 39 of the Complaint as they are nei-
ther an accurate nor complete characterization of the May 13, 2016 letter or the information set
forth in the Administrative Record, but admit that Hartford Life investigated and evaluated Plain-
tiff's claim and initially determined that Plaintiff did not qualify for benefits, and refer to the
Administrative Record for its true and complete contents.

40.     Deny each allegation set forth in paragraph 40 of the Complaint as they are nei-
ther an accurate nor complete characterization of the information set forth in the Administrative
Record, but admit that Ringer Associates Incorporated provided Hartford Life with a revised
Physical Demands Analysis by email dated July 21, 2016, and refer to the Administrative Record
for its true and complete contents.

41.     Deny each allegation set forth in paragraph 41 of the Complaint as they are nei-
ther an accurate nor complete characterization of the information set forth in the Administrative
Record, but admit that Plaintiff, through counsel, administratively appealed Hartford Life's deci-
sion, and refer to the Administrative Record for its true and complete contents.

42.     Deny each allegation set forth in paragraph 42 of the Complaint, but admit that
Hartford Life reversed its determination that Plaintiff did not qualify for benefits and notified
Plaintiff's counsel of its decision to reverse its prior determination by letter dated December 9,
2016. Defendants refer to the Administrative Record for their true and complete contents.

43.     Deny each allegation set forth in paragraph 43 of the Complaint as they are nei-
ther an accurate nor complete characterization of the information set forth in the Administrative

7

Record, but admit that Hartford Life determined that Plaintiff's Monthly Rate of Basic Earnings was $10,416.68 and that his initial gross monthly benefit was $6,944.45. Defendants refer to the Administrative Record for its true and complete contents.

44.    Deny each allegation set forth in paragraph 44 of the Complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, but admit that Plaintiff, through counsel, administratively appealed Hartford Life's computation of his monthly benefit, and refer to the Administrative Record for its true and complete contents.

45.    Deny each allegation set forth in paragraph 45 of the Complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, but admit that Hartford Life conducted a full and fair review of Plaintiff's administrative appeal of the computation of his monthly benefit and issued a decision upholding its computation by letter dated November 9, 2017. Defendants refer to the Administrative Record for their true and complete contents.

46.    The allegations set forth in paragraph 46 of the Complaint state legal conclusions as to which no response is required. To the extent that the allegations set forth in paragraph 46 are interpreted to include any factual allegations, Defendants deny them, but do not dispute that plaintiff has exhausted administrative remedies.

## FIRST CAUSE OF ACTION

47.    Responding to paragraph 47 of the Complaint, repeats each prior response.

48.    Deny.

49.    Deny.

50.    Deny.

8

A031

51.   Deny.

52.   Deny.

53.   Deny.

54.   Deny.

55.   Deny.

56.   Deny.

57.   Deny.

## SECOND CAUSE OF ACTION

58.   Responding to paragraph 58 of the Complaint, repeats each prior response.

59.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 59 of the Complaint.

60.   Deny each allegation set forth in paragraph 60 of the complaint, but admit that Hartford Life concluded that benefits it paid to plaintiff under the Plan were taxable, and refer to the Administrative Record for its true and complete contents.

61.   Deny.

62.   Deny each allegation set forth in paragraph 62 of the complaint as they are neither an accurate nor complete characterization of the information set forth in the Administrative Record, and refer to the Administrative Record for its true and complete contents.

63.   The allegations set forth in paragraph 63 of the Complaint state legal conclusions as to which no response is required.  To the extent that the allegations set forth in paragraph 63 are interpreted to include any factual allegations, Defendants deny them, but do not dispute that plaintiff has exhausted administrative remedies.

64.   Deny.

9

A032

65.    Deny.

66.    Deny.

As the section beginning "WHEREFORE" pertaining to Plaintiff requested relief on page 17 of the Complaint contains merely statements of the nature of relief Plaintiff seeks, no answer is required.  To the extent that it is necessary, however, Defendants deny that Plaintiff has any basis for or entitlement to any of the relief requested.

Any other allegations of the Complaint that are not specifically admitted herein are denied.

## AFFIRMATIVE DEFENSES

For its affirmative defenses, Defendants allege, without assuming any burden of proof that would otherwise rest on Plaintiff, as follows:

### FIRST DEFENSE

Defendants have complied with and performed all of its obligations and duties to Plaintiff under the Policy and the Plan, and the handling of his claim for disability benefits complied with ERISA and all applicable regulations.

### SECOND DEFENSE

Because the applicable Plan Documents afford Hartford Life the full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy, an arbitrary and capricious standard of review should be applied by the court in reviewing Hartford Life's claim decisions.  Hartford Life's decisions and actions with respect to Plaintiff's claim were neither arbitrary nor capricious but were correct, legitimate, and reasonable.

10

A033

**THIRD DEFENSE**

Plaintiff has no claim for payment of attorney's fees under ERISA because Hartford Life's handling of this claim was reasonable and all actions in the handling of said claim were taken in good faith.

**FOURTH DEFENSE**

Plaintiff would not be entitled under any circumstances to an award of attorney's fees or costs incurred prior to the commencement of this action.

**FIFTH DEFENSE**

While Hartford Life denies that Plaintiff is eligible to the additional benefits he seeks under the Policy and Plan, should Plaintiff recover any additional benefits, such benefits are subject to all of the applicable terms, conditions, exclusions, overpayment recovery, and offset provisions provided for in the Plan Documents, including but not limited to offsets for other income benefits such as disability benefits from the Social Security Administration.

**SIXTH DEFENSE**

To the extent that Plaintiff claims, or seeks a ruling or declaration entitling him to future benefits, extra-contractual and/or punitive damages, such relief is not permitted by ERISA.

A034

WHEREFORE, Defendants demand judgment dismissing the Complaint, and awarding such other and further relief as may be deemed just and proper.

Dated: June 1, 2018

**DEFENDANTS**

By: */s/ Patrick W. Begos*
    Patrick W. Begos
    Gregory J. Bennici
    ROBINSON & COLE LLP
    1055 Washington Boulevard
    Stamford, Connecticut 06901
    Tel. No.:  (203) 462-7500
    Fax No.:  (203) 462-7599
    Email:  pbegos@rc.com
    Email:  gbennici@rc.com

A035

MARK SCHERZER, ESQ. (MS-2622)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Floor 4
New York, New York 10038
Tel: (212) 406-9606
Email:  markscherzerlaw@verizon.net


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GREGORY MAYER,                                     :

                       Plaintiff,                  :          18 CV 2789 (VB)

        -against-                                  :

                                                   :

RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN                          :
and HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,                                 :          **NOTICE OF MOTION**

Defendants.                                        :
------------------------------------------------------------X

        **S I R S :**

        PLEASE TAKE NOTICE that upon the Stipulation Regarding Trial Record, dated May

31, 2019, the Administrative Record, Additions to the Administrative Record, and Privilege Log,

Plaintiff's Rule 56.1 Statement (Proposed Findings of Fact and Conclusions of Law), dated May

31, 2019, Plaintiff's Memorandum of Law, dated May 31, 2019, and upon all the pleadings and

proceedings in this case to date, the plaintiff Gregory Mayer hereby moves this Court at the

Courthouse, 300 Quarropas Street, Room 620, White Plains, New York, for an order pursuant to

Fed. R. Civ. P. 56 (to be treated as a motion subject to Fed. R. Civ. P. 52) granting judgment on

the administrative record after bench trial in favor of plaintiff; ordering defendants to pay

plaintiff long term disability benefits based on the full income earned by him from RAI-

Scarsdale, Inc., including SEP-IRA contributions, and recognizing him as a contributory

participant in the Ringler Associates, Inc. and Affilitates Long Term Disability Plan who paid his

own premiums to participate, and awarding plaintiff his reasonable attorneys' fees and costs.

       PLEASE TAKE NOTICE that pursuant to the parties' agreement and the Court's

scheduling order, answering papers, if any, must be served on or before July 2, 2019.

Dated:      New York, New York
           May 31, 2019

                             MARK SCHERZER, ESQ. (MS-2622)
                             Law Office of Mark Scherzer
                             Attorney for Plaintiff
                             49 Nassau Street, Fourth Floor
                             New York, New York 10038
                             Tel: (212) 406-9606
                             Email:  markscherzerlaw@verizon.net

TO:    Robinson & Cole LLP
        ATTN:  Patrick Begos, Esq.
        1055 Washington Boulevard,
        Stamford, CT  06901
        Tel:  203-462-7500
        Email:  pbegos@rc.com

MARK SCHERZER, ESQ. (MS-2622)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Fourth Floor
New York, New York 10038
Tel: (212) 406-9606
Email:  markscherzerlaw@verizon.net


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GREGORY MAYER,                                              :

                        Plaintiff,                      :        18 CV 2789 (VB)

     -against-                                               :

                                            :
RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN                                  :
and HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,                                         :

Defendants.                                                :
------------------------------------------------------------X


## PLAINTIFF'S FRCP RULE 56.1 STATEMENT OF FACTS
## (TO BE TREATED AS RULE 52 PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW)


Of Counsel:
    ▪Mark Scherzer, Esq.
    ▪A. Christopher Wieber, Esq.

**TABLE OF CONTENTS**

**PROPOSED FINDINGS OF FACT**........................................................................ 1

I.   THE PARTIES....................................................................................... 1

II.   PLAN DOCUMENTATION, AND PLAN ELIGIBILITY AND PARTICIPATION
PROVISIONS.............................................................................................. 3

III.   RESPONSIBILITIES OF HARTFORD, RAI, AND RAI-SCARSDALE UNDER
THE LTD PLAN ......................................................................................... 7

IV.   FACTS PERTAINING TO MR. MAYER'S EMPLOYMENT AND
AFFILIATION WITH RAI/RAI-SCARSDALE, AND COMPENSATION ...................... 8

V.   Mr. MAYER'S DISABILITY................................................................. 11

VI.   HARTFORD'S ADMINISTRATION OF MR. MAYER'S DISABILITY
CLAIM........................................................................................................ 12

   A.   Hartford's Initial Claim Decision ................................................ 12

   B.   Mr. Mayer's First Request for Plan Documents ................................... 24

   C.   Hartford's First Production of the Administrative Record.................... 25

   D.   Mr. Mayer's Appeal of Hartford's Denial of his Disability Claim and Hartford's
   Overturn Decision and Approval of LTD Benefits............................................ 26

   E.   Hartford's Determination of Mr. Mayer's Monthly Rate of Basic Earnings ..... 31

   F.   Hartford's Second Production of the Administrative Record............................ 42

   G.   Mr. Mayer's Benefit Calculation Appeal and Hartford's Appeal Process ......... 45

   H.   Hartford's Post-Appeal Claim File Production and Additional
   Administration of Mr. Mayer's LTD Claim...................................................... 60

i

**VII.     MR. MAYER'S LAWSUIT, HARTFORD'S LITIGATION PRODUCTION OF THE ADMINISTRATIVE RECORD, AND THE POLICY'S CHOICE OF CALIFORNIA LAW** ................................................. **61**

**VIII.     EVIDENCE OF HARTFORD'S BIAS AND CLAIM HANDLING IMPROPRIETIES** ................................................................................. **62**

**PROPOSED CONCLUSIONS OF LAW** ................................................. **65**

**I.     The LTD Plan is an ERISA plan and is subject to ERISA law and regulations** ....... **65**

**II.     Jurisdiction and venue in this court are proper under ERISA** ................................. **65**

**III.     The LTD Plan is subject to *de novo* review** ................................................. **65**

**A.     The LTD Plan is barred by California law from conferring discretionary authority** ................................................................................. **65**

**1.     California law bars discretionary clauses in any disability plan or policy that covers California residents, regardless of where the policy or plan was issued** ........ **66**

**2.     Choice of law provisions are generally enforceable in ERISA benefit plans** .... **66**

**B.     Hartford is stripped of any properly delegated discretionary authority because it violated ERISA** ................................................................................. **66**

**IV.     Mr. Mayer has demonstrated by a preponderance of the evidence that (1) his Rate of Basic Monthly Earnings, as defined by the LTD Plan, includes the average of his prior 2 years of earnings from RAI-Scarsdale ($151,842 in 2013, and $399,614.01 in 2014, and of his prior 2 years of SEP-IRA contributions ($50,000 in 2013, and $50,000 in 2014); and (2) Mr. Mayer personally bore the cost of premiums paid to Hartford on a post-tax basis** ................................................................................. **66**

**V.     Even if Hartford's benefit calculation determination were properly judged under an abuse of discretion standard, its decision was arbitrary and capricious** ................................. **66**

**A.     Hartford's improper actions and sharp practices – including violations of ERISA procedural regulations and refusing to share consulting broker/employer communications before rendering its decisions – warrant reduced deference to**

ii

Hartford's decision-making ................................................................................. 66

B.    Hartford acted arbitrarily when – despite substantial financial and tax evidence providing a sound basis for the conclusion that Mr. Mayer was employed by RAI-Scarsdale, received all income (draw and commissions) from RAI-Scarsdale, that his earnings from RAI-Scarsdale were $151,842 in 2013, and $399,614.01 in 2014, that SEP-IRA contributions were made by RAI-Scarsdale in the amount of $50,000 in 2013, and $50,000 in 2014  were properly included in income, – it refused to credit the evidence submitted by RAI Scarsdale but instead relied solely on statements and evidence produced by RAI ................................................................................. 67

C.    Hartford acted arbitrarily regarding Mr. Mayer's contributory status when it classified Mr. Mayer as a non-contributory employee without substantia evidence that he enrolled as such and despite evidence that his premiums were imputed to income in his W-2s ................................................................................................................. 67

VI.    Hartford must compensate Mr. Mayer for the difference between the benefits it paid and those it should have paid (with a proper calculation of his Monthly Rate of Basic Earnings), recognize that he participated in the LTD Plan on a contributory basis, and pay Mr. Mayer pre-judgment interest and his reasonable attorneys' fees ............... 68

A.    Mr. Mayer is entitled to an award of benefits, as opposed to remand, because the difficulty is not that the administrative record was incomplete, but that Hartford's denial of benefits based on the record was unreasonable ................................................. 68

B.    Mr. Mayer is entitled to his reasonable attorneys' fees and costs because he has had 'some degree of success on the merits'" ................................................................... 68

C.    Mr. Mayer is entitled to pre-judgment interest because of the equities, the need to fully compensate Mr. Mayer, and the remedial purposes of ERISA ............................. 68

Plaintiff, GREGORY MAYER, respectfully submits the following as proposed findings of fact and conclusions of law for the Court to determine on his FRCP Rule 56 (to be treated as Rule 52) Motion for Judgment on the Administrative Record:

**PROPOSED FINDINGS OF FACT**

## I.    THE PARTIES

1.      Plaintiff Gregory Mayer has at all relevant times been a resident of the state of New York.  (Complaint ¶2; Answer ¶2; AR700-771 [Earnings Payment Statements 2013 – 2015, reflecting New York address]; AR202 [Claim Notes, "Claim Management:  Initial SOAP," noting "NY residence"].[1])

2.      Mr. Mayer is a graduate of Manhattanville College and Pace Law School. (AR1173 *et seq.*, at 1177 [10-28-2016 Pasternak Vocational Evaluation Report]; AR1224 *et seq.* [11-01-2016 G. Mayer Statement].)  He has been a member in good standing of the New York bar since 1990, and of this court since 1993.  (*Id.*)  He is also a Certified Financial Planner (CFP), a Certified Structured Settlement Consultant (CSSC), and is licensed to sell annuities in all 50 states.  (*Id.*)

3.      In his legal career, Mr. Mayer served as an Assistant District Attorney in Bronx County, as a litigation associate at Bigham, Englar, Jones & Houston, and, from 2001 to the time of his disability, he was engaged in the sale of annuities to fund structured personal injury settlements.  (AR1224 *et seq.* [11-01-2016 G. Mayer Statement].)

---

[1] Reference citations are as follows:  "Complaint" refers to the plaintiff's Complaint, filed March 29, 2018 (ECF Document #1); "Answer" refers to defendants' Answer to the Complaint, filed June 1, 2018 (ECF Document #13);  "AR" refers to the Administrative Record filed in this action by defendants, and numbers refer to the Bates Stamped page numbers of that record. ADD followed by Bates Stamped page numbers refers to documents Mayer v Hartford Add 1619-1749, added to the record for the bench trial on the parties' motions by Stipulation of the parties.

4.      Ringler Associates, Incorporated ("RAI") is a corporation with its principal place of business at 27422 Aliso Creek Road, Suite 200, Aliso Viejo, CA 92656.  (Complaint, ¶5; Answer ¶5; AR AR31-32, 68-69, 105-106 LTD Booklet-Certificates – ERISA Information.)

5.      RAI has employees residing in California ("You work in NY and I'm in CA, AR1478-79 [Jan. 2016 Emails between Mr. Mayer and Ms. Carol Ferrari, RAI Operations Manager])

6.      RAI established the Ringler Associates Incorporated and Affiliates Long Term Disability Plan ("the Plan") on behalf of itself and its affiliated companies in or before 1999. (Complaint, ¶6; Answer ¶6; AR1-37, 38-74, and 75-111 [LTD Booklet-Certificates]; AR112-122 [Group LTD Policy, as Amended 08-27-2013].)

7.      The LTD Plan is an "employee welfare benefit plan" subject to ERISA and is subject to enforcement under ERISA.  (Complaint ¶8; Answer ¶8.)

8.      Ringler Associates Scarsdale, Inc. ("RAI-Scarsdale"), is a corporation with offices at 80 Maiden Lane, New York, New York.  (AR537 [RAI-Scarsdale Earnings Statement payments]; AR539 [RAI-Scarsdale 1099].

9.      RAI-Scarsdale is an independent contractor and an Affiliate of RAI.  (AR1404-05 [02-09-2016 RAI Email from C. Ferrari]; AR1571 [12-16-2015 G Mayer Fax to Hartford]; AR1234 [11-01-2016 G Mayer Statement]; AR395-96 [07-27-2017 Internal Hartford Emails: "Ringler brokers own their own brokerage firm under the Ringler name"].)

10.     Mr. Mayer was at all times employed as RAI-Scarsdale's sole employee and was compensated through RAI-Scarsdale.  (AR1126 [10-26-2016 Marglo Assocs. Accountant Statement]; AR955, 1118, 1139 [Corrected 2013 W-2]; AR 1119-20 [Corrected 2014 W-2]; AR1224 [11-01-2016 G. Mayer Statement]; AR588-91 [07-13-2017 G. Mayer Statement];

2

AR1404-05 [02-09-2016 RAI Email from C. Ferrari]; AR1473 [RAI Job Description showing

Mr. Mayer's "Job Title" as "Associate – Greg J. Mayer – R.A. Scarsdale, Inc."]; AR1487-90,

1522-23, 1530, 1539-40, 1557-58 [2013-14 W-2, 1099, and Payroll Stubs showing RAI-

Scarsdale as the Employer/Payor]; AR700-771 [2013-15 RAI-Scarsdale Earnings Statements to

G. Mayer]; AR1571 [12-16-2015 G Mayer Fax to Hartford].)

11.     All Mr. Mayer's W-2s and Payroll Stubs were paid under RAI-Scarsdale's

Employer Tax Identification Number.  (AR955, 1118, 1139 [Corrected 2013 W-2]; AR 1119-20

[Corrected 2014 W-2], and AR1487-90, 1522-23, 1530, 1539-40, 1557-58 [2013-14 W-2, 1099,

Payroll Stubs].)  The record contains no W-2 or 1099 issued by RAI to Mr. Mayer with respect

any of the relevant time periods.

12.     Defendant Hartford Life and Accident Insurance Company ("Hartford") is a

corporation, with its principal place of business at 200 Hopmeadow St., Simsbury, CT 06089,

engaged in the business of issuing and administering policies of group long term disability

insurance.  (Complaint, ¶7; Answer, ¶7; AR32 [LTD Booklet-Certificates – ERISA

Information]; AR112 [Group LTD Policy, as Amended 08-27-2013].)

## II.    PLAN DOCUMENTATION, AND PLAN ELIGIBILITY AND PARTICIPATION PROVISIONS

13.     The LTD Plan's coverage is provided through a Group Policy No. GLT-216897

(the "Group Policy"), issued by Hartford, and amended as of August 27, 2013.  (Complaint ¶7;

Answer ¶7; AR1-37, 38-74, and 75-111 [LTD Booklet-Certificates]; AR112-122 [Group Policy,

as Amended 08-27-2013].)

14.     The Group Policy incorporates Booklet-Certificates 216897(GL)3.5,

216897(GLT)1.32, 216897(GLT)2.27, and 216897(GLT)4.5.  (AR114 [Group Policy].)

15.     Booklet Certificates 1.32, 2.27, and 4.5 (the "LTD Booklet-Certificates") provide long-term disability benefits pursuant to the LTD Plan.[2]  (AR115 [Group Policy]; AR1-37, 38-74, and 75-111 [respectively, Booklet-Certificates 1.32, 2.27, and 4.5].)

16.     The LTD Plan identifies "Ringler Associates Incorporated and Affiliates" as the Policyholder.  (AR8, 45, and 82 [LTD Booklet-Certificates]; AR112 [Group Policy, as Amended 08-27-2013].)

17.     The LTD Plan identifies "Ringler Associates Incorporated and Affiliates" as the "Employer/Plan Sponsor" and as the "Plan Administrator."  (AR31, 68, and 105 [LTD Booklet-Certificates].)

18.     Mr. Mayer was at all relevant times an eligible, covered participant in the LTD Plan.  (Complaint ¶15; Answer ¶15.)

19.     Mr. Mayer was at all relevant times considered a "Producer."  (AR1508 [12-29-2015 RAI Email from C. Ferrari:  "Greg is a Producer"]; AR1473 [RAI Job Description:  "Responsibilities:  Shall comply with the rules and regulations of the Company as they pertain to producers and agents of the Company"].)

20.     Each LTD Booklet-Certificate provides coverage for a specific eligible class of LTD Plan participant:

    a.  LTD Booklet-Certificate 1.32 covers "All Active Full-time Producers, Managers, or Officers who are choosing to pay their premium who receive a W2 who are

---

[2] The LTD Booklet-Certificates are largely identical in terms of the relevant benefit and administration provisions.  The most significant difference for purposes of this motion between the LTD Booklet-Certificates is the "Eligible Class(es)" provision for each certificate.  Consequently, when plaintiff cites a common LTD Booklet-Certificate provision, he will provide the AR citation for each of the certificates.  When plaintiff cites a provision that varies between the LTD Booklet-Certificates, that variation will be specifically noted.

U.S. citizens or U.S. residents, excluding temporary and seasonal employees."

(AR82 [LTD Booklet-Certificate 1.32 Schedule of Insurance].)

    b.   LTD Booklet-Certificate 2.27 covers "All Active Full-time Employees who are

U.S. citizens or U.S. residents, excluding Producers, Managers, or Officers not

paying their own premium who receive a W2, temporary and seasonal

employees."  (AR7 [LTD Booklet-Certificate 2.27 Schedule of Insurance].)

    c.   LTD Booklet-Certificate 4.5 covers "All Active Full-time Employees who are

producers, managers, or officers not paying their premium who receive a W2,

who are U.S. citizens or U.S. residents, excluding temporary and seasonal

employees."  (AR45 [LTD Booklet-Certificate 4.5 Schedule of Insurance].)

    21.    RAI did not maintain/preserve enrollment records sufficient to establish Mr.

Mayer's formal enrolment in the LTD Plan and LTD Booklet-Certificate under which he was

insured.  (AR392-93 [08-01-2017 Internal Hartford Emails].)

    22.    Although LTD Booklet-Certificate 1.32 defines its covered class in terms of

"Producers … who are choosing to pay their premiums," each of the other LTD Booklet-

Certificates permits the Plan participant to contribute to the payment of premiums, as well:

> **Sources of Contributions** -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee.

(AR32 [LTD Booklet-Certificate 2.27]; AR69 [LTD Booklet-Certificate 4.5].)  Thus, an

employee may pay the premiums as contributory insurance, according to the arrangement with

that employee's employer, regardless of the certificate of insurance covering that individual.

(*Id.*)

    23.    All three LTD Booklet-Certificates provide that disability benefits are calculated

by "multiply[ing] Your Pre-disability Earnings by the Benefit Percentage shown in the Schedule

of Insurance."  (AR85 [LTD Booklet-Certificate 1.32]; AR11 [LTD Booklet-Certificate 2.27];

AR48 [LTD Booklet-Certificate 4.5].)

24.     All three LTD Booklet-Certificates provide a Benefit Percentage of 66 2/3% in

the Schedule of Insurance.  (AR82 [LTD Booklet-Certificate 1.32]; AR8 [LTD Booklet-

Certificate 2.27]; AR45 [LTD Booklet-Certificate 4.5].)

25.     All three LTD Booklet-Certificates state that "Pre-disability Earnings means your

Monthly Rate of Basic Earnings in effect on the day before you became Disabled."  (AR97 [LTD

Booklet-Certificate 1.32]; AR23 [LTD Booklet-Certificate 2.27]; AR60 [LTD Booklet-

Certificate 4.5].)

26.     All three LTD Booklet-Certificates define "Monthly Rate of Basic Earnings" with

the same language:

> **Monthly Rate of Basic Earnings** means your average monthly rate of pay,
> including Bonuses and Commissions, from the Employer for the 2 calendar
> year(s) ending just prior to the date you become Disabled, or over the number of
> calendar months of employment if less than this period:
> 1. including contributions you make through a salary reduction agreement with
>    the Employer to:
>    a) an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred
>       compensation arrangement;
>    b) an executive non qualified deferred compensation arrangement; or
>    c) a salary reduction arrangement under an IRC Section 125 plan; and
> 2. not including overtime pay or expense reimbursements for the same period as
>    above.

(AR96 [LTD Booklet-Certificate 1.32]; AR22 [LTD Booklet-Certificate 2.27]; AR59 [LTD

Booklet-Certificate 4.5].)

27.     All three LTD Booklet-Certificates provide a "Cost-of-Living" benefit increase

on January 1st of each year after the claimant has been disabled for 12 consecutive months, in an

amount that is the lesser of 3% or half the percentage change in the Consumer Price Index.

(AR88 [LTD Booklet-Certificate 1.32]; AR14 [LTD Booklet-Certificate 2.27]; AR51 [LTD Booklet-Certificate 4.5].)

28.     All three LTD Booklet-Certificates provide, in the section "How do You enroll?" that "Eligible Persons will be enrolled automatically by the Employer." (AR83 [LTD Booklet-Certificate 1.32]; AR9 [LTD Booklet-Certificate 2.27]; AR46 [LTD Booklet-Certificate 4.5].)

## III.    RESPONSIBILITIES OF HARTFORD, RAI, AND RAI-SCARSDALE UNDER THE LTD PLAN

29.     The LTD Plan provides that "Hartford Life will give the Policyholder an individual Booklet-certificate for each insured employee."  (AR120 [LTD Policy].)

30.     The LTD Plan provides that "[t]he Policyholder will give Hartford Life all information Hartford Life needs regarding matters pertaining to the insurance."  (AR120 [LTD Policy].)

31.     Hartford is empowered under the LTD Plan to "inspect any of the Policyholder's documents, books, or records which may affect the insurance or premiums of this policy" and "[i]f the Policyholder gives Hartford Life any incorrect information, the relevant facts will be determined to establish if insurance is in effect and in what amount."  (AR120 [LTD Policy].) Hartford is designated "as the claims fiduciary for benefits provided under the Policy" and is "granted … full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR105 [LTD Booklet-Certificate 1.32]; AR31 [LTD Booklet-Certificate 2.27]; AR68 [LTD Booklet-Certificate 4.5].)

32.     The LTD Plan provides that "[n]o person will be deprived of insurance to which he is otherwise entitled or have insurance to which he is not entitled, because of any misstatement of fact by the Policyholder" and that "[a]ny required adjustment may be made in premiums or benefits."  (AR120 [LTD Policy].)

33.     The LTD Plan provides that "[a]n employer may be included as a Participant

Employer if the Policyholder and Hartford Life so agree" and further states that "Hartford Life

will keep a list of accepted Participant Employers and the effective dates of coverage for each."

(AR113 [LTD Policy].)

34.     The Administrative Record contains no list of "Participant Employers" produced

by Hartford or RAI.

35.     The LTD Plan provides no definition of "Participant Employer."  (AR112-122

[LTD Policy]; AR1-111 [LTD Booklet-Certificates 1.32, 2.27, and 4.5].)

36.     The LTD Plan provides no definition of "Affiliate."  (AR112-122 [LTD Policy];

AR1-111 [LTD Booklet-Certificates 1.32, 2.27, and 4.5].)

37.     RAI confirmed, however, that RAI-Scarsdale is an Affiliate.  (AR1401-06 [02-09-

2016 C. Ferrari Email].)

## IV.     FACTS PERTAINING TO MR. MAYER'S EMPLOYMENT AND AFFILIATION WITH RAI/RAI-SCARSDALE, AND COMPENSATION

38.     Mr. Mayer and RAI-Scarsdale became affiliated with RAI on June 15, 2007.

(AR126 [12-23-2016 Claim Note, showing 06-15-2007 as date of hire]; AR944 [10-20-2016 G.

Mayer Amended Application for Long Term Disability Income Benefits, same]; AR1554 [12-17-

2015 RAI Application for Long Term Disability Income Benefits, same]; AR1173 *et seq.*, at

1177 [10-28-2016 Pasternak Vocational Evaluation Report].)

39.     RAI, RAI-Scarsdale, and Mr. Mayer were in the business of providing structured

settlement solutions and financial planning and investment services, and selling financial

planning products, annuities, structured settlements and similar insurance/investment products

nationwide.  (AR1473 [RAI Job Description]; AR1224-26 [11-01-2016 G. Mayer Statement];

ARAR1173 *et seq.*, at 1177, 1179-82 [10-28-2016 Pasternak Vocational Evaluation Report].)

8

40.     RAI paid commissions for work produced by RAI-Scarsdale (through Mr. Mayer) to an account maintained for RAI-Scarsdale every month.  (AR532 [07-13-2017 Mayer Supplemental Appeal].)

41.     Net commissions paid by RAI to RAI Scarsdale were $463,255.54 for 2013 and $448,499.51 for 2014.  (AR 0618-0620, AR 0622-0624 [7-13-2017 Mayer Supplemental Appeal].)

42.     Payments of bi-weekly draw were made to Mr. Mayer by RAI-Scarsdale from the RAI-Scarsdale account using an ADP payroll service set up and operated by RAI.  (AR532 [07-13-2017 Mayer Supplemental Appeal]; AR610 [07-05-2017 Mayer Appeal Letter].)  The amounts distributed to RAI Scarsdale from that account were determined by RAI-Scarsdale, which provided instructions to RAI, in its sole discretion.  (*Id.*)

43.     As the employee of RAI-Scarsdale, Mr. Mayer was also compensated through payments issued directly by RAI-Scarsdale on its own behalf.  Although RAI caused the issuance of regular salary and bonus checks, other income was issued by RAI-Scarsdale (AR1224 *et seq.* at 1233-34 [11-01-2016 G. Mayer Statement]; AR955, 1118, 1139 [Corrected 2013 W-2]; AR 1119-20 [Corrected 2014 W-2]; AR1404-05 [02-09-2016 RAI Email from C. Ferrari]; AR1403 [02-12-2016 G Mayer Email to RAI/C. Ferrari]; AR1487-90, 1522-23, 1530, 1539-40, 1557-58 [2013-14 W-2, 1099, and Payroll Stubs showing RAI-Scarsdale as the Employer/Payor]; AR700-771 [2013-15 RAI-Scarsdale Earnings Statements to G. Mayer].)

44.     RAI paid premiums for Mr. Mayer's coverage under the Plan to Hartford, and deducted the amount of those premiums each month from commissions RAI paid to the RAI-Scarsdale account.  (AR1401-06 [02-09-2016 C. Ferrari Email]; AR489 [RAI Ledger Summary showing LTD Plan premiums deducted by RAI from commissions paid to RAI-Scarsdale].)

9

A050

45.     RAI prepared 2013 and 2014 W-2 forms for Mr. Mayer that showed income to Mr. Mayer from RAI-Scarsdale in the amount of $150,000.16 and $100,000.16, respectively, for those years.  (AR1490 [2013 W-2]; AR1558 [2014 W-2].)

46.     RAI Scarsdale's accountants had previously reported the balance of RAI-Scarsdale's compensation to Mr. Mayer as 1099 compensation.  (AR1224 *et seq.* at 1231-34 [11-01-2016 G. Mayer Statement]; AR1465-66 [01-28-2016 G. Mayer email to Hartford]; AR1489 [2014 1099-MISC form].)

47.     As a result of questions raised by Mr. Mayer about the nature and appropriate tax characterization of compensation received from RAI-Scarsdale via 1099-MISC, RAI Scarsdale's accountants reviewed the corporation's filings, determined that it was appropriate to re-characterize the 1099-MISC as W-2 income, and filed amended W-2 forms on behalf of RAI-Scarsdale for 2013 and 2014 (reflecting corrected compensation in those years of $151,842.01 and $399,614.01, respectively) (AR855-68, at 864-65 [11-01-2016 Mayer Letter]; AR955, 1118, 1139 [Corrected 2013 W-2]; AR1119-20 [Corrected 2014 W-2].)

48.     Based on these corrected figures, Mr. Mayer's Monthly Rate of Basic Earnings, without consideration of retirement contribution adjustments, was $22,977.33, *i.e.,* ($151,842.01 + $399,614.01)/24 = $22,977.33.

49.     RAI-Scarsdale made contributions on behalf of Mr. Mayer to a SEP-IRA in 2013 and 2014, amounting to $50,000 each of those two years.  (AR416 [10-13-2017 Fidelity Letter confirming SEP-IRA Contributions by RAI-Scarsdale on behalf of Mr. Mayer for 2013-15]; AR940-42 [Feb. 2013 and Feb. 2014 Fidelity Investment Report Statements].)

50.     RAI-Scarsdale's contributions to Mr. Mayer's SEP-IRA should be included in his
Monthly Rate of Basic Earnings, resulting in an additional $4,166.66 in monthly earnings, or
$27,143.99 total.

51.     Premiums for the LTD coverage were attributed to Mr. Mayer by RAI-Scarsdale
and included in his W-2 income.  (AR1126 [10-26-2016 Marglo Assocs. Accountant
Statement].)  As a Producer who chose to pay his own premiums, Mr. Mayer was covered under
Plan Certificate 1.32. (AR82 [LTD Booklet-Certificate 1.32 Schedule of Insurance].)

## V.     MR. MAYER'S DISABILITY

52.     Mr. Mayer's last day of work was September 15, 2015.  (AR1571-78, at 1574
[12-15-2015 G. Mayer Application for Long-Term Disability Benefits]; AR202-04 [Hartford
Claim Notes, "Initial SOAP"]; AR 1554-55 [12-17-2015 RAI Employer Section of Application
for Long-Term Disability Benefits].)

53.     Mr. Mayer had an extensive surgical history including four left knee surgeries and
one right knee surgery.  (AR1371-78, 1361-68 [04-26-2016 Dr. Harrison Evaluation Report].)
He had undergone a microdiscectomy at L5-S1 in 2008, as well as a revision microdiscectomy at
L5-S1 in 2011, but due to worsening pain and instability, he underwent additional surgery – an
anterior lumbar interbody fusion at L5-S1 – on September 16, 2015.  (AR1052-59 [Dr. Cammisa
Medical Chart Notations, 08-05-15 to 12-10-2015].)

54.     After the surgery, Mr. Mayer attempted intermittent work activities on
approximately six days between October 19, 2015, and December 11, 2015, but ultimately
concluded he was unable to continue working and filed for long-term disability benefits under
the LTD Plan on December 16, 2015.  (AR1571-78, at 1574 [12-15-2015 G. Mayer Application
for Long-Term Disability Benefits]; AR202-04 [Hartford Claim Notes, "Initial SOAP"].)

11

55.     Thereafter, on March 13, 2015, Mr. Mayer made a further attempt to return to work, but this also failed.  (AR182-83 [03-11-2016 and 03-24-2016 G. Mayer emails to Hartford].)

56.     Mr. Mayer described his symptoms and their impact on his ability to work in detail, as follows:

> I did not make the progress I hoped for in physical therapy. Any time I would try to get to the next level I would have back pain and inflammation. My physical therapist who I have worked with for two decades said I have the perfect storm. Because of my poor feet and knees, tight hamstrings and inflexible hips all the stress is landing in my lower back. As much as I have tried to rehab this condition I have not been successful…. My lack of activity and slight depression have driven my weight up to as high as 225 pounds. I have constant knee, back and foot pain. If I sit too long or move to much I have pain that forces me to lie flat which is the only position that seems to improve the pain. After going to sleep I often seem to get into a position that aggravates my back and I wake up often between 2am to 4am in the morning with back pain. Sometimes I can get back to sleep with use of a flexeril or oxycodone or naturally; sometimes I am up to the next day. In those instances I usually sleep in the afternoon.
> I can no longer sit through court mediations, conferences or trials (where getting up, walking around, and shifting positions are not allowed for). I have trouble sitting long enough in any one position to get my work done. I can no longer travel, particularly with the portable office I carry that is essential to my productivity. And I can certainly no longer play golf or engage in the other social activity that is essential to cultivation of my client base. There is no way with my back, knees and feet that I can work the long hours and endure the travel I must in my occupation. Simply stated If I could physically do my job I would. I liked the job and enjoyed traveling with my clients most of which have become my friends.

(AR860-62 [11-01-2016 G. Mayer Statement.)

57.     By Notice of Award, dated March 2, 2019, the Social Security Administration determined that Mr. Mayer was disabled under its rules, retroactive to April 1, 2016. (ADD1622-1625.)  The initial/base monthly benefit awarded was $2574.60, commencing September, 2016.  (*Id.*)

## VI.     HARTFORD'S ADMINISTRATION OF MR. MAYER'S DISABILITY CLAIM

### A.     Hartford's Initial Claim Decision

58.     On December 16, 2015, Mr. Mayer initiated his LTD claim by faxing his initial

Application for benefits (AR1571-78, at 1574 [12-15-2015 G. Mayer Application for Long-Term

Disability Benefits]; AR202-04 [Hartford Claim Notes, "Initial SOAP"].)

59.     On December 17, 2015, RAI faxed additional information in support of Mr.

Mayer's claim, including the Employer's Section of the Application for LTD Benefits,

completed by Ms. Carol Ferrari, RAI Operations Manager (AR1552-55.); an RAI Job

Description (AR1556.); Mr. Mayer's final 09-11-2015 paycheck (AR1557.); a 2014 W-2

showing $100,000.16 paid to Mr. Mayer by RAI-Scarsdale (AR1558.); and a copy of Mr.

Mayer's 12-15-2015 initial Application (AR15590-65.)

60.     The section of the initial application completed by RAI Operations Manager

Ferrari reported to Hartford that there was a pension plan in which Mr. Mayer participated, and

the particular description of that plan was a "personal account."  (AR1554.)  It further reported

that Mr. Mayer worked 40 hours per week, and that there were no applicable requirements for

lifting or carrying objects in the job.  (AR1555.)  Finally, it reported that the LTD Plan benefit

was "100% taxable," that RAI "contribute[d] towards the cost of the LTD premium … 100%,"

and, in response to the question "Does the employee contribute towards the cost of the LTD

premium?," RAI Operations Manager Ferrari answered "No."  (AR1554.)

61.     The initial application also specifically required that "If salary is based on a W-2,

K-1, 1099, or a similar document, attach a copy of the document."(AR1555.)

62.     On December 21, 2015, Mr. Mayer faxed (AR1517, 1529.) additional information

in support of his claim, including the materials previously faxed by Ms. Ferrari on December 17th

(AR1519-23.), his own previously submitted initial Application (AR1524-28), a 2014 Form

1099-MISC showing $125,000.00 paid to Mr. Mayer by RAI-Scarsdale (AR1530.), and Fidelity

Investments Activity reports reflecting SEP-IRA contributions of $52,000 (2015) and $50,000 (2014) by RAI-Scarsdale in Mr. Mayer's behalf.  (AR1531-34.)

63.     In a cover note, Mr. Mayer explained that "As per my previous submissions annexed hereto please find my 1099 from Ringler Associates Scarsdale Inc for 2014 for $125,000 Bonus in addition to W2 already forwarded."  (AR1529.)

64.     In a series of emails in late December 2015 and early January 2016, Ms. Tonya Martinez (Hartford Ability Analyst) sought clarification from Ms. Ferrari (RAI Operations Manager) regarding Mr. Mayer's claim (AR1504-14.):

    a.  In response to Ms. Martinez's inquiry regarding Mr. Mayer's participation class, Ms. Ferrari wrote:  "Greg is a Producer who did NOT pay his LTD premiums, which means that his benefits ARE 100% taxable."  (AR1508 [12-29-2015 C. Ferrari Email].)  Via the same email, Ms. Ferrari also provided a completed Physical Demands Analysis ("PDA") form, dated December 29, 2015.  (*Id.*; AR1471-72 [01-26-2016 Corrected PDA[3]].)  Mr. Mayer immediately objected to the details of the PDA as submitted by Ms. Ferrari which stated that Mr. Mayer worked a 40 hour day (clearly an error) an 8-5 shift and did not have to lift or carry anything. Further the form was inaccurate as it did not conform with the Job Description submitted at the same time which stated the position is an outside sales position which requires extensive travel by auto and plane and (the employee) shall travel nationwide to attend mediations, court conferences and trial.  Ms. Ferrari refused to correct the form and resign it with the corrections Mr.

---

[3] The uncorrected original 12-29-2015 PDA is missing from the current administrative record produced by Hartford. Only the marked-up corrected 01-26-2016 PDA is in the file.

Mayer had made for her.  Ms. Ferrari advised him that she would forward his suggested revisions to Hartford and advise them to use those revisions as she is in CA and Mr. Mayer is in NY.  (AR1478-79.)  Instead of forthrightly acknowledging her error and telling Hartford to substitute Mr. Mayer's version, Ms. Ferrari on January 14 told Hartford that Mr. Mayer had advised her that her form was inaccurate, that he had made the attached corrections on her form, and that Hartford "should consider this in your determination of his claim." (ADD1741-42 [email C. Ferrari to T. Martinez Jan. 14, 2016].)  Ultimately, on or about January 26, 2016, Mr. Mayer himself signed, on behalf of RAI-Scarsdale, a corrected version of the PDA form showing 8 to 18 hour days, 5 + days per week of work, and significant lifting and carrying requirements for computer and suit cases up to 40 and 70 lbs, respectively which corresponds to the job description submitted by Ms. Ferrari.  (AR1471-72.)  Hartford, instead of adopting Mr. Mayer's job description as the sole correct one, found that there was a discrepancy which needed to be resolved by an Occupational Analysis (AR169), the result of which is described at ¶73, below.

b. Ability Analyst Martinez indicated that Mr. Mayer had submitted documentation of bonus pay and SEP-IRA contributions, quoted the LTD Plan definition of Monthly Rate of Basic Earnings, and asked whether Mr. Mayer had additional earnings beyond those previously provided by Ms. Ferrari.  (AR1507-08 [12-31-2015 T. Martinez Email].)

c. In response, RAI Operations Manager Ferrari provided a 2013 RAI-Scarsdale W-2 "showing his total salary of $150,000.16," a 2014 RAI-Scarsdale W-2 "showing

15

his total salary of $100,000.16," and reported, based upon her review of RAI's general ledger for RAI-Scarsdale, that the "general ledger … do[es] not show any contributions to a SEP Account or pension contributions," but Ms. Ferrari also went on to say that "[i]f he has made any of these contributions, … [h]e will have provide this to you himself."  (AR1506-07 [12-31-2015 C. Ferrari Email]; AR1490 [2013 RAI-Scarsdale W-2]; AR1448 [2014 RAI-Scarsdale W-2].)

    d.   In response to Ability Analyst Martinez's transmittal of Mr. Mayer's RAI-Scarsdale 2014 Form 1099, RAI Operations Manager Ferrari wrote "[w]e did not issue this Ringler Associates Scarsdale, Inc. 1099 for Greg," but "you may want to follow up with Greg and ask him for his 2014 tax return as supporting documentation," and then wrote a follow-up email inquiring "Also, as a side note we pay LTD premiums based on W2 GROSS Salaries.  Why would any additional income be considered?"  (AR1504-05 [01-04-2016 C. Ferrari Emails].)

    e.   There is no documentation of a response by Ms. Martinez to Ms. Ferrari's inquiry.

    65.   On December 31, 2015, Mr. Mayer spoke with Ability Analyst Martinez and explained that he is "the owner of Ringler Associates of Scarsdale" and "as the owner he uses the payroll for only his draw and not all of his bonuses/commission."  (AR201-02 [12-31-2015 Hartford Claim Notes, "LTD/PW Claimant Interview"].)

    66.   On January 4, 2016, Ability Analyst Martinez received a call from "Tom Farr (broker)" who "c/in [called in] to adv [advise] that he was reviewing a discrepancy of income in EEs [employee's] claim" and asked for Ms. Martinez to "call him back asap."  (AR201 [01-04-2016 Hartford Claim Notes].)  There are no notes of the content of any ensuing discussion between Ms. Martinez and Mr. Farr at that time, nor any explanation of the broker's authority to

participate in the claim administration or have access to information regarding Mr. Mayer's claim.

67.     On January 12, 2016, Dr. Frank Cammisa Jr. (Spinal Surgery), submitted an Attending Physician Statement of Functionality (AR1498-1501 [01-12-2016 Dr. Cammisa APS].), which included his opinion that Mr. Mayer was "markedly disable[d] and unable to work," together with his most recent office chart notation (AR1502-03 [12-09-2015 Cammisa Chart Note].)

68.     On January 28, 2016, Mr. Mayer wrote to Hartford, communicating that RAI-Scarsdale should be treated as the employer; that RAI-Scarsdale should complete the employer section of the claim forms, including the PDA; that Mr. Mayer was the sole employee of RAI-Scarsdale; and that RAI-Scarsdale had, itself, received $463,256.00 in commissions in 2013 from RAI and $448,491.00 in 2014 from RAI.  (AR1465-66 [01-28-2016 [G. Mayer Email].) Submitted with this email were:

    a.   A corrected PDA signed by Mr. Mayer (AR1471-72 [01-26-2016 Corrected PDA].);

    b.   Additional Fidelity Statements documenting the SEP-IRA contributions by RAI-Scarsdale on behalf of Mr. Mayer for 2013, 2014, and 2015 (AR1475-78, duplicate better copies at AR940-42.);

    c.   The correspondence between RAI Operations Manager Ferrari and Mr. Mayer reflecting Mr. Mayer's objections to the occupational description and PDA previously submitted by Ms. Ferrari, and the latter's intention to contact Hartford (AR1478-79 [Jan. 2016 Emails between Mr. Mayer and Ms. Ferrari].);

17

A058

d.   Documentation of Mr. Mayer's earnings, including the 2013 W-2 for $150,000.16 (AR1490.), the 2014 Form 1099-MISC for $125,000.00 (AR1489.), and the 2014 W-2 for $100,000.16 (AR1488.); and

e.   Mr. Mayer's completed Employer Section of the Application for Long Term Disability Benefits (AR1491-92 [01-26-2016 RAI-Scarsdale Employer Section].).

69.      On February 12, 2016, Mr. Mayer wrote Hartford to underscore that "[RAI] are not the accountants for me or [RAI-Scarsdale] and do not control the finances of [RAI-Scarsdale]" and to explain that he "run[s] expenses through [RAI-Scarsdale] which [RAI] sees but I also recover many of these expenses back from other sources which [RAI] may or may not be aware." (AR1403-04 [02-12-2016 G. Mayer Email].)

70.      On February 12, 2016, Mr. Mayer also forwarded to Hartford  an email he had received from RAI Operations Manager Ferrari, in which Ms. Ferrari stated that "[RAI] is the plan administrator," "the [LTD] plan covers [RAI] and Affiliates," "[RAI-Scarsdale] is an Affiliate," and "[t]he premium payments are our [RAI's] responsibility and the calculations are based on the payroll activity through our ADP payroll system." (AR1401-06 [02-09-2016 C. Ferrari Email].)  Ms. Ferrari wrote that Mr. Mayer's reported use of a briefcase and luggage for travel weighing 70 pounds total "seems … very unusual," but also admitted that "[o]f course, I don't have firsthand knowledge of the facts." (*Id.*)  Similarly, while pointing out that RAI did not create the 2014 Form 1099-MISC, reflecting $125,000.00 in compensation, Ms. Ferrari admitted that "[a]gain, I may not be aware of all of the activity of your corporation…." (*Id.*)

71.      In response to Mr. Mayer's February 12th email, Hartford's Ability Analyst Martinez wrote back that "[u]ltimately, we will send the decision to you, including the calculations for pre-disability earnings," "you will be able to appeal any decision," and, "[a]t this

time I cannot confirm the amount that we will be using."  (AR1402 [02-12-2016 T. Martinez Email to G. Mayer].)

72.    On February 12, 2016, Dr. Cammisa submitted additional medical records, including his chart notations from August, 2015, through December, 2015, together with MRIs performed during that period, and the Operative Record associated with Mr. Mayer's 09-16-2015 spinal surgery.  (AR1407-60 [Dr. Cammisa 2015 Medical Chart].)

73.    Notwithstanding Ms. Ferrari's endorsement of the use of job demands reported by Mr. Mayer, based on a purported "discrepancy between the physical demands reported by the ER [employer] and the physical demands reported by EE [employee]," Hartford performed an "Occupational Analysis" (AR195 [02-23-2016 "OA"].), which concluded, *inter alia*, that:

   a.   "EE's own occupation … is a combination of Sales Representative, Financial
        Services (D.O.T. 250.257-022) and Financial Planner/Financial Consultant
        (D.O.T. 250.257-014) as defined and classified in the Dictionary of Occupational
        Titles, 1991 edition" (*Id.*);

   b.   "[T]he position involves outside sales with extensive travel by auto and plane"
        and that "travel is an essential duty" (*Id.*);

   c.   "Per the information provided by EE, O/O/ER [own occupation with employer] is
        classified by D.O.T as Heavy" (*Id.*);

   d.   "[L]ift[ing] 70 pounds of luggage when traveling … would not be material to the
        occupation" because "[a]lthough EE travels to the client worksite, any luggage for
        travel can be moved with assistance and/or can be limited in terms of weight"
        (*Id.*); and, consequently,

19

A060

e.   "Without the lifting of more than 70 pounds, EE's O/O, as he describes it, would
     also be classified by the D.O.T as Light." (*Id.*)

74.   On February 25, 2016, Nurse Olga Gurevich, a Hartford Medical Case Manager,
reviewed the existing file and was of the opinion that Mr. Mayer's functionality remained
unclear, and that it would be helpful to discuss the matter with treating physician Dr. Cammisa
and to obtain Mr. Mayer's physical therapy records.  (AR193-94 [02-25-2016 Hartford Internal
Notes, "CCM Functional Assessment" and "CCM Case Management Plan"].)

75.   Nurse Gurevich was unable to reach Dr. Cammisa, and Hartford received no
response to its requests for records from Mr. Mayer's physical therapy provider.  (AR187-191
[Hartford Claim Notes from 03-03-2016 to 04-05-2016].)

76.   On March 24, Mr. Mayer emailed Tonya Martinez reporting that his treating
physician, Dr. Leonard Harrison, that day had advised him not to travel, lift or sit for extended
periods of time.  He informed Ms. Martinez that Dr. Harrison was doing a full report and it
would be submitted on completion.  (ADD1748.)

77.   On April 14, 2016, a "rush" peer medical records review was initiated by
Hartford.  (AR184 [04-14-2016 Hartford Claim Notes, "Miscellaneous"]; AR1398-1400 [04-13-
2019 Medical Peer Review Referral Form, and Medical Consultant Cover Letter questions].)

78.   The items provided to the peer consultant were:  "1. New App - EE statement,
APS [Attending Physician Statement]; 2. MR [Medical Records] – Dr. Cammisa office notes
12/9/15, 8/3/15-12/2015; 3. MR- Dr. Lee office notes 6/2015-7/2015; MRI 6/2015; 4. APS- Dr.
Cammisa 1/12/16; 5. LTD claimant interview 12/31/15."  (AR1397 [Medical Packet Content].)

20

A061

79.     On April 18, 2016, the designated peer consultant, Vicki Kalen, M.D.

(Orthopaedic Surgery) issued a report based on her review of the records provided by Hartford

(AR1394-96 [04-18-2016 Kalen Peer Consultant Report].):

> a. Although Dr. Kalen was charged to "contact the claimant's Primary Attending
>
> Physician [Dr. Cammisa]" (AR1398 [Medical Consultant Cover Letter].), and was
>
> referred the case on April 14, 2016, she did not attempt to contact Dr. Cammisa
>
> until April 18th at 10AM EDT, spoke only to "Dr. Cammisa's PA-C," at 4:20PM
>
> EDT, and her report was thereafter finalized and faxed by MES Solutions to
>
> Hartford at 8:52PM EDT that same day.  (AR1394 [04-18-2016 Kalen Peer
>
> Consultant Report].)
>
> b. Although Dr. Kalen acknowledged that Mr. Mayer "does have a physical
>
> condition that is functionally impairing … [f]rom the date of 9/16/15 to present
>
> date and beyond," he summarily rejected Dr. Cammisa's reported restrictions and
>
> limitations because "there is no documentation of functional impairment" and Dr.
>
> Cammisa based his restrictions and limitations on "only the claimant's self-
>
> reports that he has pain with prolonged sitting and lifting heavy suitcases."
>
> (AR1395-96 [04-18-2016 Kalen Peer Consultant Report].)
>
> c. According to Dr. Kalen, "clinically supported" restrictions and limitations
>
> (without consideration of Mr. Mayer's pain) were that he could "lift 20 pounds
>
> occasionally, 10 pounds frequently, bend occasionally, and sit, stand and walk
>
> without restriction," and that he could do so "in an 8 hour day for 40 hours per
>
> week," but Dr. Kalen did not explain precisely how these restrictions and
>
> limitations derived from the findings she cited, namely "uncomplicated healing by

21

A062

X-ray and neurologically normal examinations with full strength and normal

gait."  (AR1395-96 [04-18-2016 Kalen Peer Consultant Report].)

d.  Dr. Kalen acknowledged that Mr. Mayer's records reflected that his "pain relief

was 50% from his pre-op status," that "[h]e was taking an occasionally [sic]

oxycodone and Flexeril," and that "when traveling for work [during Mr. Mayer's

failed attempts to return to work, *see* ¶¶54-55, *supra*] he noted back spasm with

sitting," Dr. Kalen gave no consideration to Mr. Mayer's reported pain and spasm,

or to the deleterious effects of flexeril and oxycodone on work functioning.

(AR1395-96 [04-18-2016 Kalen Peer Consultant Report].)

e.  Dr. Kalen's report was not based on any personal examination or observation of

Mr. Mayer.  (*Id.*)

80.    On April 21, 2016, Hartford received an invoice from Westchester Sports

Physical Therapy for obtaining Mr. Mayer's physical therapy records.  (AR1379-80 [04-21-2019

Westchester PT Invoice].)

81.    On April 26, 2016, Mr. Mayer faxed and emailed a detailed 8-page medical

evaluation report prepared by Leonard R. Harrison, M.D., Jr. (Orthopaedic Surgery), based on

his review of the records and examining Mr. Mayer on February 18, 2016, and March 24, 2016.

(AR1371-78, 1361-68 [04-26-2016 Dr. Harrison Evaluation Report].)  Dr. Harrison concluded

that "[t]he patient has significant disability of the low back" and that "there is no conceivable

way that he can continue frequent and massive travel as his job demands."  (*Id.*)  Contrary to Dr.

Kalen, Dr. Harrison identified a number of relevant abnormal findings, including, *inter alia*,

"chronic myofascitis and derangement," "peridural scarring," "mechanical back pain with L5-S1

and L4-L5 canal stenosis and with foramina, involvement," "daily … bilateral leg paresthesias

with numbness of the left foot," "2+ spasm," "pain to palpation in both paralumbar and iliolumbar regions," "no left ankle reflex," and, moreover, "the condition of his knees … do[es] not help the situation."  (*Id.*, with regard to the latter, Dr. Harrison noted that Mr. Mayer had already undergone 4 knee surgeries, and X-rays from February 18, 2016, revealed further "degenerative changes".)

82.     The record contains no evidence that Hartford asked Dr. Kalen to review Dr. Harrison's report or issue any supplemental report prior to its decision on Mr. Mayer's claim.

83.     Without any apparent consideration of Dr. Harrison's report (either by Hartford or by Dr. Kalen), and without any effort to obtain the Westchester Sports PT records, a Hartford Manager recommended on May 2, 2016, that "AA [Ability Analyst Martinez] … proceed with denial recommendation and refer for sign-off."  The Manager determined that it was unnecessary to send a summary of Dr. Kalen's review to the attending physician because Dr. Kalen had "made contact with the AP [Attending Physician] (AR180 [05-02-2016 Hartford Claim Note, "Initial Triage Recommendation"].), when in fact Dr. Kalen had only spoke with the PA – Physician's Assistant in Dr. Camissa's office, and no one had made any effort to contact Dr. Harrison. (AR 1394.).

84.     On May 2, and May 4, 2016, Thomas Farr from Suregard Insurance Agency attempted to reach Ability Analyst Martinez to discuss Mr. Mayer's income, explaining that he was "[w]ith ER [employer], many EEs [employees] are producers, so income can vary based on productivity," and "[m]ay get commissions and bonuses."  (AR179-80 [05-02-2016 and 05-04-2016 Hartford Claim Notes, "Phone Call"].]

85.     On May 6, 2016, a "Denial Recommendation" was made on Mr. Mayer's claim. AR178-79 [05-06-2016 Hartford Claim Notes, "Denial Recommendation SOAP"].)  On May 10,

2016, a Hartford Manager reviewed and "agreed with denial."  (AR176-77 [05-10-2016 Hartford Claim Notes, "TL Sign-Off Addendum"].)

86.     On May 13, 2016, Hartford issued a letter denying Mr. Mayer's claim for benefits under the LTD Plan.  (AR269-72 [05-13-2016 Hartford Denial Letter].)  The denial letter was based on the 02-23-2016 OA and the 04-16-2016 Kalen Peer Consultant Report.  (*Id.*).  No mention was made of Dr. Harrison's report, nor was Dr. Harrison's report mentioned in any of the Hartford claim notes proposing the denial of Mr. Mayer's claim.  (*Id. See also*, AR178-79 [05-06-2016 Hartford Claim Notes, "Denial Recommendation SOAP"]; and AR176-77 [05-10-2016 Hartford Claim Notes, "TL Sign-Off Addendum"].)

87.     Hartford's denial letter made no determination with regard to Mr. Mayer's Monthly Rate of Basic Earnings.  (AR269-72 [05-13-2016 Hartford Denial Letter].)

88.     The denial letter incorrectly advised Mr. Mayer regarding Plan benefits by providing a misquoted definition of disability: that the Plan affording benefits for disability from "Your Occupation" for only twenty-four months, and thereafter only if one was disabled from "Any Occupation."  (*Id.* at AR269.)

89.     On June 16, 2016, Westchester Sports PT faxed its medical chart for Mr. Mayer (AR1330-48 [06-16-2016 Westchester Sports PT Fax].)

**B.     Mr. Mayer's First Request for Plan Documents**

90.     On January 19, 2016, Mr. Mayer wrote to RAI Operations Manager Ferrari by email and requested "a copy of the long term disability master group policy."  (ADD1760 [01-19-2016 G. Mayer Email to RAI].)

91.     On May 10, 2016, Mr. Mayer wrote by email to Hartford Ability Analyst Martinez indicating that "I have asked Ringler Associates HR to send me the complete

plan/policy but they referred me to the Ringler Website which only has the plan description" and directing that request to Hartford: "Could you please send me a copy of the plan." (ADD 1739 [05-10-2016 G. Mayer Email to RAI].)

92.     By email, dated May 13, 2016, Ability Analyst Martinez responded to Mr. Mayer's May 10th request – "Please find the Ringler Policy attached" – and at the same time transmitted a copy of Hartford's 05-13-2016 Denial Letter. (ADD1739 [05-13-2016 T. Martinez Email to G. Mayer].) The attached LTD Plan document was LTD Booklet-Certificate 1.32. (ADD1619 [Stipulation Regarding Trial Record, ¶2(a)].)

**C.     Hartford's First Production of the Administrative Record**

93.     On May 18, 2016, Attorney Mark Scherzer requested a copy of documents relevant to Mr. Mayer's claim. (AR1350-54 [05-18-2016 Scherzer AR Request].) Mr. Scherzer's letter included a request for "insurance policies, summary descriptions and/or other documents constituting, comprising or describing the Plan, including, but not limited to, any contracts or agreements between The Hartford and any other agent involved in the administration or processing of Mr. Mayer's claim." (*Id.*)

94.     By letter, dated May 25, 2016, Hartford responded to Mr. Scherzer's request, providing "a copy of the claim file you requested," except "that to protect materials such as private third-party information or privileged communications, certain documents may have been withheld or appropriately redacted." (AR268 [05-25-2016 Hartford Cover Letter].)

95.     Included in Hartford's claim file production was a copy of LTD Booklet Certificate 1.32. (ADD1619 [Stipulation Regarding Trial Record, ¶2(a)].)

96.     On July 21, 2016, RAI Operations Manager Ferrari submitted a corrected Physical Demands Analysis to Hartford and asked Hartford Ability Analyst Martinez to "[p]lease

25

A066

review the attached corrected Physical Demands Analysis and reevaluate the denial of [Mr.

Mayer's] claim.  [AR878-80 [07-21-2016 C. Ferrari Email and 07-21-2016 PDA].)

      97.      On July 28, 2016, Attorney Scherzer wrote on behalf of Mr. Mayer to Hartford,

requesting clarification of several aspects of Hartford's claim denial and claim file production:

(a) Hartford's assertion that it was withholding privileged and third-party materials violated

ERISA regulations and the fiduciary exception to privilege; (b) Hartford's citation of an "any

occupation" definition of disability in its May 13th denial letter that had not appeared in any LTD

Plan document (including LTD Booklet-Certificate 1.32 produced with the claim file); and (c)

Hartford's apparent failure to address the disputed issue of Mr. Mayer's Monthly Rate of Basic

Earnings.  (AR1327-29 [07-28-2016 M. Scherzer File Production Follow-up Letter].)

      98.      By letter, dated August 24, 2016, Hartford responded to Mr. Scherzer's requests

for clarification, to wit:  (a) Hartford asserted that it only redacted Social Security numbers,

spouse identifying information, and bank account numbers; (b) Hartford acknowledged that it

used the wrong definition of disability in its denial letter; and (c) Hartford recited the definition

of Monthly Rate of Basic Earnings (but did not state its determination or calculation of Mr.

Mayer's particularized Monthly Rate of Basic Earnings).  (AR265 [08-24-2016 Hartford Denial

Clarification Letter].)

      **D.**     **Mr. Mayer's Appeal of Hartford's Denial of his Disability Claim and**
                 **Hartford's Overturn Decision and Approval of LTD Benefits.**

      99.      Mr. Mayer initiated an appeal of Hartford May 13th denial determination on

November 7, 2016, by submitting the following:

        a.     An Appeal Letter, summarizing the evidence in support of Mr. Mayer's disability

               and identifying the flaws in Hartford's denial decision (AR963-70 [11-07-2016 G.

               Mayer Appeal Letter].);

b. Mr. Mayer's Personal Statement, dated November 1, 2016 (AR883-96.),

    including, *inter alia*, the following attachments:

      i. Westchester Sports Physical Therapy payment records, 2011-2012 (AR1029-31.);

      ii. Equinox Wall Street physical therapy records 2014-2015 (AR972.);

      iii. Acupuncture treatment records, 2015 (AR973-84.);

      iv. Pro Sports Westchester Physical Therapy Records, April – June, 2015 (AR985-1016);

      v. Record of MRI and Epidural injection by Dr. Lee, July, 2015 (AR1017-26.);

      vi. Photo of post-surgical allergic burns (AR1027-28)

      vii. Westchester Sports Physical Therapy Records, December, 2015, to May, 2016 (AR1029-44.)

      viii. Evidence regarding Hartford's class action settlement over structured settlements (AR872.);

      ix. Message from Carol Ferrari to Tonya Martinez submitting a corrected signed employer statement regarding job duties dated July 21, 2016 (AR1211-13.);

c. Vocational Evaluation Report of Unlimited Potential Resources, by Andrew J. Pasternak, M.A., CRC, dated October 28, 2016 (AR911-20.), with supporting documents:

      i. Wikipedia entry for Structured Settlements (AR921-22.);

      ii. Description of Sales Representative, Financial Services (AR923.);

      iii. Excerpts from medical opinions regarding. Mr. Mayer (AR924-30.);

      iv. Andrew Pasternak C.V. (AR931-36.);

d.   Corrected wage and tax statements for 2013 and 2014 (AR937-39.);

e.   Fidelity Investments records of SEP Contributions for 2013, 2014, and 2015 (AR940-42.);

f.   Letter of Marc L. Rubin (Marglo Associates Accounting Firm) dated October 26, 2016 (R943.), with Amended Section D of application for benefits (AR944-50.);

g.   Forms 1040-X for 2013 and 2014 as filed with the Internal Revenue Service (AR951-62.);

h.   Report of Physiatric Examination by John S. Vlattas, M.D. (Physical Medicine and Rehabilitation, Pain Medicine), dated September 12, 2016 (AR1045-47.)

i.   Letter of Richard M. Steiner, D.P.M. (Podiatry/Foot Surgery), dated September 13, 2016 (AR1048.);

j.   Letter of Leonard R. Harrison, Jr., M.D. (Orthopaedic Surgery), dated October 14, 2016 (AR971.)

100.   Mr. Mayer supplemented the initial appeal, by letter dated November 9, 2016 (AR802.), with additional evidence (material provided to and reviewed by Dr. Leonard Harrison in relation to his April 26, 2016 and October 14, 2016, letters):

a.   Diagnostic evaluations from the Hospital for Special Surgery (AR803 [03-10-2016 Lumbar Spine X-Ray]; AR804-05 [03-10-2016 Lumbar CT Scan].);

b.   Medical chart of Frank Cammisa, Jr., M.D. (Orthopaedic Surgery) (AR806-814.);

c.   RAI Job Description (AR815.);

d.   Medical records of Dr. Alexander Lee (AR816-823.); and

e.   Hospital for Special Surgery operative record from August, 2015 (AR824-854.)

101.   The principal points of Mr. Mayer's appeal were:

28

A069

a.  Hartford improperly failed to credit the heavy travel and carry demands reported by Mr. Mayer and Ms. Ferrari on the corrected PDA, as demonstrated by Mr. Pasternak's Vocational Evaluation Report (AR965-66, 968-69 [11-07-2016 G. Mayer Appeal Letter].);

b.  Hartford improperly failed to credit Mr. Mayer's pain, the side effects of his pain medications, and the restrictions and limitations set forth by his treating physicians, as reinforced and reiterated by the two opinion letters of Dr. Harrison (Orthopaedic Surgery), as well as that of Dr. Vlattas (Physical Medicine and Rehabilitation/Pain) (AR966-68 ([11-07-2016 G. Mayer Appeal Letter].); and

c.  Hartford should have addressed, and the appeal included additional evidentiary support for, Mr. Mayer's entitlement to have his full earnings (including commissions and SEP-IRA contributions) counted as part of his Monthly Rate of Basic Earnings.

102.    On November 30, 2016, Hartford conducted an Occupational Analysis – in light of the arguments raised in Mr. Mayer's appeal – "to review the OA which was completed on 2/23/16 by RCM [Rehabilitation Case Manager] DSF to determine whether the correct occupations were identified to represent EE's [Employee's] own occ as an Associate in the general workplace."  (AR167 [11-30-2016 Hartford Claim Note "CCM Occupational Analysis"].)  The 11-30-2016 OA "agree[d] with the original OA."  (*Id.*)

103.    In the 11-30-2016 OA, the appeal-level Rehabilitation Case Manager states that she "reviewed the JD and PDA which were provided by the policy holder," but does not state whether it was the original or corrected PDA, nor does she state that she reviewed Mr. Pasternak's 10-page Vocational Evaluation Report (or its exhibits).  The 2-paragraph 11-30-2016

29

A070

OA nowhere addresses or responds to the evidence and opinion set forth in Mr. Pasternak's

report.  (AR167 [11-30-2016 Hartford Claim Note "CCM Occupational Analysis"].)

     104.    Hartford also obtained an appeal-level medical records review by Stuart Rubin,

M.D. (Physical Medicine and Rehabilitation/Pain Medicine), dated December 6, 2016 (AR786-

93 [12-06-2016 Rubin Peer Consultant Review].), which concluded, *inter alia*, that:

    a.    Mr. Mayer "has significant clinical abnormalities" (AR791.);

    b.    Mr. Mayer's restrictions and limitations include:  "Sit half hour at a time up to 3
        hours per day with the ability to change position every 15 minutes; stand/walk
        half hour time at a time up to 1 hour per day with the ability to change position
        every 15 minutes; lift, carry, push, pull up to 10 pounds occasionally; reach
        above shoulder level never; reach below desk level never; reach at desk level
        frequently; use of hands unrestricted; twisting, crawling, crouching, climbing
        never…" (AR791.);

    c.    "[T]he claimant should never carry, lift, push or pull while standing and, if he
        experiences any weakness or instability while standing and walking, he should sit
        down, use an assistive device or appropriately deemed orthosis" (AR791.); and

    d.    "[T]here is sufficient clinical evidence to support significant physical impairment
        as noted above" and "the subjective reports are consistent with the clinical
        findings" (AR791.).

     105.    Hartford's appeal examiner, upon receipt of Dr. Rubin's report, determined that

"with the additional medical evidence provided upon appeal along with a review of the medical

evidence already on file and the Peer review by Dr. Rubin, Appeals finds claimant would be

unable to perform his Own Occupation" (AR165-66 [12-09-2016 Hartford Claim Note, "Appeal

Specialist Recommendation"].), and issued a decision approving Mr. Mayer's claim for disability

benefits.  (AR261 [12-09-2016 Hartford Appeal Decision Letter].)

106.    The 12-09-2016 Hartford Appeal Decision Letter did not result in immediate

payment of benefits.  The appeal decision did not address Mr. Mayer's Monthly Rate of Basic

Earnings.  (AR261 [12-09-2016 Hartford Appeal Decision Letter].)

**E.    Hartford's Determination of Mr. Mayer's Monthly Rate of Basic Earnings**

107.    On December 21, 2016, Hartford Ability Analyst Martinez notified RAI

Operations Manager Ferrari and Suregard Insurance Agency's Tom Farr by email that Mr.

Mayer's LTD claim had been approved, "which brings us back to the matter of his earnings and

the taxability of his claim," and asked them to confirm the correctness of the information

supplied by Mr. Mayer, *i.e.*, "He provided a corrected W2 for 2014 that indicated his earnings

were $399,614.01" and "[i]n addition, he asserts that the cost for the LTD benefit is added in to

his taxable income for each year and, as such, should not be taxable."  (AR675-76 [12-21-2016

Hartford Email to Farr/Ferrari re: Outstanding Earnings/Taxability Issues].)

108.    In a follow-up email to Ms. Ferrari and Mr. Farr on December 23, 2016, Ability

Analyst Martinez summarized the issues "we need to resolve" (AR669-70 [12-23-2016 Hartford

Email to Farr/Ferrari re: Outstanding Earnings/Taxability Issues].):

    a.  First, Ms. Martinez instructed that "we have to use the definition for monthly rate

        of basic earnings," and the quoted the entirety of the definition for Monthly Rate

        of Basic Earnings (AR669.);

    b.  Then, Ms. Martinez instructed that "Employer means the Policyholder…, [w]hich

        lists only one tax id number and it doesn't match the W2's provided by Mr.

        Mayer," and inquired "Do you also provide a W2 to him?" (AR669.)

c.  While Ms. Martinez correctly noted that Employer is defined as the Policyholder (*see* AR21 [LTD Booklet-Certificate 2.27]; AR58 [LTD Booklet-Certificate 4.5]; and AR95 [LTD Booklet-Certificate 1.32]), she did not explain that both the Employer and the Policyholder are defined/identified as RAI ***and Affiliates*** (*see* ¶¶16-17, *supra*.);

d.  With regard to "Taxability," Ms. Martinez reported that "Mr. Mayer indicated that the cost of LTD was included in his fringe benefits on his W2 (AR669.).

109.  Meanwhile, Ability Analyst Martinez summarized the outstanding issues and evidence regarding Mr. Mayer's monthly earnings in an internal notation for managerial review (AR162-64 [12-23-2016 Hartford Claim Notes, "Examiner Approval/Denial Recommendation"].):

a.  The monthly "PDE [pre-disability earnings] … based on original W2's for 2013 & 2014," showing annual amounts of $150,000.16 and $100,000.15, respectively, was $10,416.68 (AR162.);

b.  However, "EE [employee] provided a corrected W2 for 2013 and 2014 as follows:  2013 $151,842 (which includes 'fringe B') as the adjustment; 2014 $399,614.01 (which also includes 'fringe b' $1,841.85?)" (AR162.);

c.  Although Ms. Martinez recommended "review with account manager to determine if W2's are used for this class or use definition" (AR163.), elsewhere, the Analyst paraphrased the definition – "Monthly rate of pay + bonuses and commissions for 2 calendar years ending just prior to LDW [last day worked]" – and indicated that (i) "[t]his would include 2013 & 2014," (ii) "[t]he definition is

not based on W2 wages," and (iii) consequently, "we need to get 'bonus and commission' information" (AR162-63.);

d.   Ms. Martinez commented that "there is a significant difference in the benefit if we use the adjusted W2" (AR164.), and additionally remarked that "this is a self admin bill and as such we don't know what benefit the ER was paying for this EE" (AR164.);

e.   With regard to premium payments and SEP-IRA contributions, the Ability Analyst noted "EE is indicating that he paid taxes on the fringe benefits, including LTD, and as such they are not taxable" but that RAI "indicated that the Ringler Associates Scarsdale general ledger did not indicate any contributions to a SEP account" (AR162.);

f.   Throughout the assessment, Hartford's Analyst appeared to equate "Affiliate" status with parent-subsidiary status, referring at one point to RAI as the "parent company," and commenting that "[t]he subsidiaries do not list 'Scarsdale'" (AR163-64.).

110.   Neither RAI nor Hartford have ever produced a listing, data set, or other compilation which identifies the covered subsidiaries, affiliates, employees, or participants. (*See*,¶¶21, 33, 34, *supra*, and 142, 147, 151, 158(3), *infra*.)

111.   A Hartford Manager approved Ability Analyst Martinez's recommendation on December 28, 2016, approving payment of benefits based on the lower, uncorrected W2's, with the proviso that "we do still need to clarify the PDE [pre-disability earnings] and taxable percent." (AR161 [12-28-2016 Hartford Claim Notes, "TL Sign Off"].)

112.     On January 3, 2017, Attorney Mark Scherzer telephoned Hartford on behalf of

Mr. Mayer regarding the lag time between Hartford's approval on December 9, 2016, and its

payment of benefits.   (AR161 [01-03-2017 Hartford Claim Note, "Phone Call"].)

113.     On January 4, 2017, Attorney Mark Scherzer, faxed a letter to Hartford again

protesting Hartford's failure to pay benefits despite its approval of Mr. Mayer's claim on

December 9, 2016.  (AR775-77 [01-04-2017 Scherzer Letter Protesting Delayed Payment].)

Additionally, Mr. Scherzer protested Hartford's apparent misunderstanding that RAI was Mr.

Mayer's employer:

> The associate with whom I spoke yesterday advised me that the payment delay
> resulted from your difficulty in reaching personnel at Ringler Associates to
> ascertain the income base from which to compute benefits due. This gives me
> grave concern that Hartford still does not understand that Mr. Mayer's employer is
> one of Ringler Associates' affiliated companies covered under the policy: Ringler
> Associates Scarsdale, Inc. Mr. Mayer is employed by Ringler Associates
> Scarsdale, Inc., of which he is the President and sole shareholder. Ringler
> Associates does not control, manage or oversee the compensation paid by Ringler
> Associates Scarsdale, Inc. nor does Ringler Associates have access to its financial
> records or filings of Ringler Associates Scarsdale, Inc. You have Mr. Mayer's
> W2's and Tax Returns for the relevant years as well as clear proof of his SEP
> Contributions for the relevant years, all representing his income from Ringler
> Associates Scarsdale, Inc. That is the basis on which his compensation should be
> determined.

(*Id.*)

114.     Simultaneously, on January 4, 2017, Hartford prepared and issued a letter by mail

that set forth its benefit calculation.  (AR254-60 [01-04-2017 Hartford Benefit Calculation

Letter].)  The Benefit Calculation Letter stated that benefits had been sent under separate cover

(AR 254), but on January 6, 2017, Hartford prepared and issued a further letter saying more

information was required and his initial payment had been corrected (AR 253.).

115.    The January 4, 2017, Benefit Calculation Letter repeatedly characterized RAI as

Mr. Mayer's "Employer" and ignored that Mr. Mayer was an employee solely of RAI-Scarsdale.

For example,

    a.   Hartford observed that "[t]here are discrepancies between the information

        regarding the Pre-disability Earnings reported by you and the Employer," thus

        casting RAI as the "Employer," and Mr. Mayer/RAI-Scarsdale as the "Employee"

        (AR255.);

    b.   Hartford reported that "[w]e have received the following information from your

        Employer:  2013 W2 $150,000.16, 2014 W2 $100.000.15" – referring to the W2's

        received from RAI – but ignoring (and not reciting or addressing) the corrected

        W2's submitted by Mr. Mayer on behalf of RAI-Scarsdale, and concluded that

        "We have estimated your monthly Pre-disability Earnings as $10,416.68, based

        upon the information provided by your Employer, pending confirmation"

        (AR256.);

    c.   Hartford ignored and did not address the information submitted by Mr. Mayer

        (indicating that RAI-Scarsdale paid the Hartford premiums charged to it by RAI

        with Mr. Mayer's post-tax dollars), but instead stated that it would follow up with

        "your Employer," *i.e.*, RAI, to determine the taxability issue:

            We have requested the following from your Employer: … Please confirm
            the taxability of Mr. Mayer's benefit. You previously indicated he enrolled
            in the 100% taxable benefit. If Mr. Mayer elected to enroll in the non-
            taxable group, please provide evidence of the date he enrolled and
            approval from Hartford underwriting if he was not enrolled when he was
            originally eligible. (AR256.)

    d.   Finally, and despite Hartford's acknowledgment of a discrepancy between the

        information provided by RAI versus that provided by Mr. Mayer/RAI-Scarsdale,

Hartford's Benefit Calculation Letter contained no appeal rights for Mr. Mayer to challenge the determination, and stated only that "[o]nce we receive additional information from your Employer, we will notify you of any potential adjustments to your LTD benefit payments" (AR258.).

116.   On January 5, 2017, Hartford Ability Analyst Martinez cited Mr. Mayer's corrected W2's as a "red flag" and referred the claim to "SIU," *i.e.*, Hartford's "Special Investigations Unit."  (AR159-60 [01-05-2017 Hartford Claim Note, "Examiner Claim Management Plan"].)

117.   Later that day, Ability Analyst Martinez convened a conference call with RAI Operations Manager Ferrari (identified as "Carol") and Suregard Insurance Agency's Thomas Farr (identified as "Broker Tom") (AR159 [01-05-2017 Hartford Claim Notes, "Phone Call"].), which Ms. Martinez summarized as follows:

a.   "Ringler [RAI] has contracted with the Broker [*i.e.*, Mr. Mayer] to sell annuities for Ringler [RAI]," but "[Mr. Mayer] is not precluded from earning other money from other sources and he may do this under his company name Ringler Associates of Scarsdale [RAI-Scarsdale]" (*Id.*);

b.   "General premium is based on monthly rate of [RAI-Scarsdale] pay from Ringler [RAI] and not any other income from any other source," "Ringler [RAI] is charging it to him as business expense not as premium," and "His corporation [RAI-Scarsdale] is paying the premium for his benefit" (*Id.*); and

c.   "Ringler [RAI] doesn't show any SEP in 2013 and 2014."  (*Id.*)

36

A077

    d.   There is no evidence in the Claim Notes that Ms. Martinez inquired as to the

         source of Ms. Ferrari's information that "His corporation [RAI-Scarsdale] is

         paying the premium for his benefit."

118.   RAI Operations Manager Ferrari emailed "Greg Mayer's pay statements for Jan.

2013 – Sept. 2015" to Hartford Ability Analyst Martinez on January 6, 2017.  (AR696-98 [01-

06-2017 C. Ferrari email to Hartford]; AR700-71 [01-2013 to 09-2015 Earnings Statements for

Mr. Mayer]; and AR772-74 [General Ledger Transactions Printout reflecting LTD Premium

Payments associated with Mr. Mayer].)  No EIN is included on the Earnings Statements, but the

Employer/Payer is identified as "RA Scarsdale."  (AR700-71 [01-2013 to 09-2015 Earnings

Statements for Mr. Mayer].)

119.   RAI Operations Manager Ferrari wrote by email to Mr. Mayer on January 6,

2017, confirming her January 5th conference call with Ability Analyst Martinez, and subsequent

emailing of pay statements for the period 2013 – 2015 to Ms. Martinez.  (ADD 1719 [01-06-

2017 C. Ferrari Email to G. Mayer].)  Ms. Ferrari reported that "I also told her that she would

need to contact you directly for any additional information regarding your wages" because "[o]ur

records only show what was paid to you through our Ringler ADP Payroll service."  (*Id.*)

120.   On January 6, 2017, Hartford Ability Analyst Martinez logged in her proposed

determination (AR157-58 [01-06-2017 Hartford Claim Note, "Examiner Claim Management

Plan"].):

    a.   Because "Ringler Associates has 2 policies for producers and we have confirmed

         several times that EE elected the Taxable plan LTD 1 Class 1" and "[t]here is no

         option on this plan to 'gross up' the W2 for the plan premium," consequently,

         "this is a taxable benefit" (*Id.*);

    b. Ms. Martinez conceded that "Pre-Disability Earnings will be calculated using policy language [reciting the definition of Monthly Rate of Basic Earnings]" and that "[t]here is no language in the policy to use the W2's…," but nonetheless recited as evidence of income only Mr. Mayer's compensation from RAI-Scarsdale, as reported on the initial W2's submitted by RAI, rather than the compensation from RAI-Scarsdale, as reported on the corrected W2's submitted by Mr. Mayer/RAI-Scarsdale.  (*Id.*)

121.    A Hartford Manager approved Ability Analyst Martinez's recommendation (AR158 [01-06-2017 Hartford Claim Note, "Claim Management"].), and Hartford issued a formal determination letter, dated January 6, 2017.  (AR250-52 [01-06-2017 Hartford Benefit Calculation Letter].)  Hartford's letter, which included appeal rights, largely followed the rationale set forth in Ability Analyst Martinez's recommendation:

    a. Hartford acknowledged that Mr. Scherzer "provided a copy of Mr. Mayer's 2013 and 2014 [corrected] W2's for the calculation of his Monthly Rate of Basic Earnings…," but stated "[h]owever, the benefit is not calculated based on W2's" (AR250.);

    b. Hartford then recited the definition of Monthly Rate of Basic Earnings, summarized the RAI-Scarsdale compensation to Mr. Mayer distributed by RAI, and concluded that this resulted in $10,416.68 as the Monthly Rate of Basic Earnings (AR250-51.);

    c. Hartford offered no explanation why only the RAI-Scarsdale compensation to Mr. Mayer on the payroll managed by RAI should be counted under the definition of Monthly Rate of Basic Earnings, but the RAI-Scarsdale compensation to Mr.

Mayer distributed directly by RAI-Scarsdale should be excluded (whether documented by W2 or otherwise) (*Id.*);

d. Hartford wrote that "[w]e have confirmed with [RAI] that Mr. Mayer elected to be covered under the policy with the taxable benefit" although it cited no election form or other written documentation of Mr. Mayer's purported election (AR251.);

e. Hartford did not address the issue of Mr. Mayer's SEP-IRA contributions (AR250-52).

122.    Also on January 6, 2017, a Hartford SIU Analyst indicated that Mr. Mayer's claim had been "accepted for investigation," as a consequence of Ability Analyst Martinez's January 5th request.  (AR157 [01-06-2017 Hartford Claim Note, "Investigative Analyst Plan"]; AR1579-83, at 1579 [Case Information Form]; ¶116, *supra*.)

123.    In authorizing an investigation of Mr. Mayer's claim, the SIU Analyst made a number of misstatements:

a. Although Ability Analyst Martinez cited RAI-Scarsdale's corrected W2 as the only "red flag" justifying investigation, the SIU Analyst added his own embellishment that this "would possibly indicate secondary income not associated with employer" (AR1579-83, at 1579, 1581 [Case Information Form].) – not only reflecting the improper understanding that RAI was Mr. Mayer's employer (rather than RAI-Scarsdale), but also ignoring that Ms. Martinez had already established that "secondary income" was entirely proper (*see* ¶117(a), *supra*.);

b. The SIU Analyst invented a further red flag out of whole-cloth, *i.e.*, "[r]estrictions and limitations remain excessive based on the objective medical provided" (AR1579-83, at 1579, 1581 [Case Information Form].) – even though Hartford

39

A080

had just conducted an appeal-level "independent" medical review substantiating

that Mr. Mayer's restrictions and limitations were consistent with the objective

medical evidence (*see* ¶¶104-105, *supra*.), which the analyst, himself, recited

(AR1579-83, at 1581 [Case Information Form].).

c.   The SIU analysis cited the erroneous two-year Own Occupation standard of

disability as governing Mr. Mayer's claim (AR1579-83, at 1580 [Case

Information Form].).  It also referred to his occupational responsibilities as "light

work" (AR1579-83, at 1581 [Case Information Form].), although Hartford's own

vocational analysis conceded that if his self-reported carrying and lifting

requirements were accurate it would constitute "heavy work." (AR195

[Occupational Analysis, Feb. 23, 2016].)

124.   After running a LEXIS-NEXIS Accurint Comprehensive Database Report on

January 7, 2017 (AR1586-97.), and conducting four days of surveillance, on January 19 and 20,

2017, and February 8 and 13, 2017 (AR1598-1615.), the SIU Analyst concluded that "the

evidence developed to this point is not enough to impact the claim at this time – based on overall

lack of continuous activity – individual's documented activity was not grossly outside of noted

restrictions/limitations," that "[s]urveillance/observations did not indicate any secondary

employment," and that "SIU is unable to identify any evidence warranting a continued

investigation.  (AR1579-83, at 1583 [Case Information Form].)

125.   On January 12, 2017, Mr. Mayer wrote an email to RAI Operations Manager

Ferrari seeking to enlist her cooperation in correcting Ability Analyst Martinez's

misunderstanding regarding the relationship between RAI and RAI-Scarsdale (as most recently

reflected in Hartford's January 4th letter, *see* ¶¶114-15, *supra*.):

Throughout this claim Ms. Martinez keeps referring to [RAI] as the Employer. She refers to me and [RAI-Scarsdale] as the employee – It is simply wrong. [RAI-Scarsdale is an independent contractor of [RAI].  [RAI-Scarsdale] is the employer of Gregory J. Mayer.  Further, [RAI-Scarsdale] is solely responsible the payment of Gregory J. Mayer and all financial records and taxation issues regarding same. [RAI-Scarsdale] is a named insured under the policy and is a separate and distinct company to [RAI]….  I would respectfully request that you send the following to the Hartford …:

> "You have asked whether Mr. Mayer was covered for NYS statutory benefits, about the taxability of his benefit, contributions to a retirement program, and monthly payroll records. Mr. Mayer was not an employee of ours, but was rather employed by our affiliated company, [RAI-Scarsdale]. Accordingly, we did not cover him for NY Statutory benefits and did not contribute to a retirement program for him. The details of any New York statutory coverage and retirement contributions would have to be obtained from [RAI-Scarsdale]. As to taxability of benefits, Ringler billed [RAI-Scarsdale] for the premiums paid to Hartford for Mr. Mayer's coverage. How [RAI-Scarsdale] treated those payments for tax purposes is something only [RAI-Scarsdale] can answer. As to payment of compensation, as Mr. Mayer was an employee of [RAI-Scarsdale], that information would have to be obtained from [RAI-Scarsdale] as well."

(AR528 [01-12-2017 G. Mayer Email to C. Ferrari].)

126.    In an email dated January 12, 2017, Suregard Insurance Agency's Tom Farr wrote to RAI Operations Manager Ferrari and advised against providing the requested information to Hartford:

> As the administrator of the Disability policy Ringler is required to provide certain specific information which you have done. If the Insurance carrier needs additional information from you they will request it Sending this piece that Mr. Mayer and or his attorney wrote strikes me as editorializing. The carrier has not asked you to explain or comment on the relationship between Ringler Associates and Ringler Associates Scarsdale, Inc.

(AR687-88 [01-12-2017 T. Farr Email to C. Ferrari and T. Martinez].)  Additionally, Mr. Farr wrote that "I discussed this matter directly with the Hartford claims adjuster Tonya Martinez, and by copy of this email to her I am asking that she respond and indicate if I am on solid ground with my recommendation."  (*Id.*)  Mr. Farr did not advise against providing the requested

41

A082

information because it was incorrect or inaccurate, but because "the carrier has not asked" and because "the unsolicited commentary could have an unknown impact on his claim." (*Id.*)

127.    Hartford's Claim Notes contain no record of the telephone call between Ms. Martinez and Mr. Farr. (*See* AR157 [Hartford Claim Notes, jumping from 01-06-2017 to 01-07-2017, without record of a telephone call with Mr. Farr.)

128.    Hartford Ability Analyst responded to Mr. Farr's January 12th email on January 13, 2017, notifying them that Hartford personnel had "finalized our decision regarding the earnings and taxability of his claim" and confirming that "Tom is correct," that "[a]ny additional editorializing would have an unknown impact on his claim," that "[y]ou have provided the information we have asked for and no additional information is needed at this time," and that "[w]e have adjudicated his claim based upon policy language and the policy he elected as an affiliate of Ringler Associates." (AR678 [01-13-2017 T. Martinez Email to T. Farr and C. Ferrari].)

129.    On January 17, 2017, Hartford again recorded receipt of Mark Scherzer's January 4, 2017, letter stating that benefits still had not been received, and Hartford's claim notes of January 18, 2017, reflect that payment had already been made. (AR 156-157 [Hartford Claim Notes].)  Hartford's first payment of benefits was over one year from the end of Mr. Mayer's elimination period and from notice of his claim.

**F.    Hartford's Second Production of the Administrative Record**

130.    On January 26, 2017, Attorney Mark Scherzer requested a copy of documents relevant to Hartford's administration of Mr. Mayer's claim. (AR690-93 [01-26-2017 Scherzer AR Request].)  Mr. Scherzer's letter included a request for "insurance policies, summary descriptions and/or other documents constituting, comprising or describing the Plan, including,

but not limited to, any contracts or agreements between The Hartford and any other agent involved in the administration or processing of Mr. Mayer's claim."  (*Id.*)

131.    By letter, dated February 10, 2017, Hartford responded to Mr. Scherzer's request, providing "a copy of the claim file you requested," except "that to protect materials such as private third-party information or privileged communications, certain documents may have been withheld or appropriately redacted."  (AR248 [02-10-2017 Hartford Cover Letter].)

132.    Included in Hartford's claim file production was a copy of LTD Booklet-Certificate 4.5.  (ADD1619-20 [Stipulation Regarding Trial Record, ¶2(b)].)

133.    Mr. Mayer did not receive any records from Hartford's Summary Detail Report (Claim Notes) as part of that administrative record.  (ADD1619-20 [Stipulation Regarding Trial Record, ¶2(b)].)

134.    By letter, dated May 2, 2017, Attorney Mark Scherzer identified several discrepancies in Hartford's claim file production and requested supplemental responses and clarification (AR645-47 [05-02-2017 M. Scherzer File Production Follow-up Letter].):

   a.    Mr. Scherzer pointed out that Hartford had previously provided LTD Booklet-Certificate 1.32, but in its most recent production provided LTD-Booklet-Certificate 4.5, and asked Hartford to "clarify how it determined any election by Mr. Mayer of one policy/certificate form or the other," which "should include any written proof of said election by Mr. Mayer," and, in addition, "we would like confirmation that both policies/certificates where in effect at the time of Mr. Mayer's disability and complete copies of the policies/certificates."  (AR645-66.)

   b.    Mr. Scherzer pointed out that no Claim Notes were provided, and requested that these be produced.  (AR646.)

43

A084

c.  With regard to Hartford's determination regarding the Monthly Rate of Basic Earnings and taxability, Mr. Scherzer identified instances of *ipso facto* conclusions unsupported by any underlying reasoning and requested that Hartford provide documentation of the underlying rationale:

i.  Hartford focused on RAI's EIN as a basis for counting only a portion of Mr. Mayer's earnings, but didn't explain how this justified its conclusion that only RAI was covered, when the policy was clearly issued to RAI "and Affiliates," or why it made sense to count only income processed through RAI, when all income (whether processed through RAI or RAI-Scarsdale) was under RAI-Scarsdale's EIN – not RAI's (AR646.);

ii.   While Hartford's most recent production included LTD Booklet-Certificate 4.5 that covered "active full-time Employees who are producers not paying their premiums who receive a W2," Hartford provided no documentation that Mr. Mayer had elected coverage under LTD Booklet-Certificate 4.5, nor did it explain why it determined that Mr. Mayer wasn't subject to the Booklet-Certificate's provision that "[t]he Employer … may allocate part of the cost to the employee" but had instead determined that "no gross up" was permitted under that LTD Booklet-Certificate (AR646.).

135.    Although Hartford Ability Analyst Martinez forwarded Mr. Scherzer's request to a Team Leader on May 5, 2017 (AR149 [05-05-2017 Hartford Claim Note, "Examiner Claim Management Plan"].), no response was received by June 20, 2017, when Mr. Scherzer wrote a follow-up letter.  (AR640 [06-20-2017 M. Scherzer Follow-up Letter].)

44

A085

136.    Hartford Ability Analyst Daniel Maxwell contacted Mr. Scherzer by telephone to "discuss what is still outstanding" and, after that conversation, again "emailed TL [Team Leader] for response."  (AR147-48 [06-21-2017 Hartford Chart Notes].)

137.    On June 27, 2017, after still receiving no response, Mr. Scherzer wrote a further follow-up letter to Hartford, and – observing the imminent appeal deadline – noted that "[Hartford's] failure repeatedly to respond to legitimate requests for information are prejudicing Mr. Mayer's rights to full and fair review."  (AR637 [06-27-2017 M. Scherzer Follow-up Letter].)

**G.    Mr. Mayer's Benefit Calculation Appeal and Hartford's Appeal Process**

138.    After still receiving no response to the request for Hartford's underlying rationale, and facing an uncertain appeal deadline, Attorney Scherzer initiated an appeal by submitting a letter – the factual accuracy of which was subscribed to by Mr. Mayer – On July 5, 2017. (AR608-12 [07-05-2017 Mayer Appeal Letter].)  Submitted with the letter were:

   a.    A RAI-Scarsdale General Ledger print-out documenting commissions received by RAI-Scarsdale for the period from January, 2013, through December 31, 2015 (AR597-607);

   b.    A duplicate copy of Mr. Mayer's corrected 2013 tax return, as well as copies of his corrected 2013 and 2014 W2's (AR592-96.)

139.    On July 13, 2017, Mr. Mayer supplemented his appeal, with additional argumentation and evidentiary documentation.  (AR529-34 [07-13-2017 Mayer Supplemental Appeal].)  The additional documentation consisted of:

   a.    A supplemental statement from Mr. Mayer, dated July 13, 2017 (AR535-38.);

b. An RAI Ledger Summary showing LTD Plan premiums deducted by RAI from commissions paid to RAI-Scarsdale for 2015 (AR489.);

c. An RAI-Scarsdale General Ledger Report for 2013-2014, showing LTD Plan premium charges ("LTD Mayer") paid by RAI-Scarsdale via deductions to RAI (AR490-92.);

d. A copy of LTD Booklet-Certificate 1.32, provided to Mr. Mayer by Hartford on two previous occasions and under which all previous claim decisions were purported to be made. (AR493-527. *See also*, ¶¶92, 95, *supra*);

e. A copy of Mr. Mayer's January 12, 2017 Email to RAI Operations Manager Ferrari, requesting that she affirm the facts pertaining to the corporate relationship between RAI, RAI-Scarsdale, and Mr. Mayer (AR528. *See also*, ¶125, *supra*.).

140. In the July 5th and July 13th letter, Attorney Scherzer set forth several arguments in support of Mr. Mayer's appeal:

a. Hartford's interpretation of the LTD Plan – as establishing RAI as the sole Employer/Policyholder – contradicted the very terms of the plan, which identified RAI "***and Affiliates***" as the Employer and Policyholder (AR533 [07-13-2017 Mayer Supplemental Appeal]; AR610 [07-05-2013 Mayer Appeal Letter].);

b. Even if Hartford's interpretation of the LTD Plan were correct and only amounts paid under RAI's tax identification number could count as compensation, then the logical conclusion was that amounts paid as commission by RAI to RAI-Scarsdale as a result of Mr. Mayer's work, as evidenced by the 2013-2015 General Ledger – Commissions, should determine Mr. Mayer's Basic Rate of

Monthly Earnings under the Policy, thus entitling him to the policy's maximum $20,000 per month benefit (AR532 [07-13-2017 Mayer Supplemental Appeal].);

c.  Hartford should have recognized (and Mr. Mayer repeatedly attempted to explain to Hartford and RAI Operations Manager Ferrari) that RAI-Scarsdale was an Affiliate of RAI, and that RAI-Scarsdale was Mr. Mayer's employer, not RAI (AR532 [07-13-2017 Mayer Supplemental Appeal].);

d.  If Hartford did not want to accept a benefit based on commissions paid to RAI Scarsdale, then it must recognize that Mr. Mayer was an employee of RAI Scarsdale, an insured entity as an Affiliate of RAI, and income derived from Mr. Mayer's actual employer RAI-Scarsdale had to be the Basic Rate of Monthly Earnings as defined by the Policy.  (AR532 [07-13-2017 Mayer Supplemental Appeal] AR610 [07-05-2013 Mayer Appeal Letter].);

e.  All LTD Booklet-Certificates reflect the intention to include deferred retirement compensation in calculating the Monthly Rate of Basic Earnings, and, consequently, Mr. Mayer's SEP-IRA contributions should be counted as part of his pre-disability earnings (AR533 [07-13-2017 Mayer Supplemental Appeal] AR611 [07-05-2013 Mayer Appeal Letter].);

f.  Given that all LTD Booklet-Certificates produced by Hartford and RAI either required post-tax premium payments by the plan participant or permitted such payments, Hartford's determination of the taxable status of Mr. Mayer's LTD benefits should be dictated by the actual facts surrounding the payment of the premiums for Mr. Mayer's coverage, *i.e.*, that the payments were billed to RAI-Scarsdale, which, in turn, charged these to Mr. Mayer on a post-tax basis,

47

A088

(AR533-34 [07-13-2017 Mayer Supplemental Appeal] AR611 [07-05-2013

Mayer Appeal Letter].).

141.    Although internal logs reflect the receipt of the appeal and supplement letters on

July 5th and July 13th, respectively (AR146 07-05-2016 and 07-13-2017 Hartford Claim Notes,

"FaxReceipt – Legal EDM – Appeals DCN"].), Hartford did not assign an appeal examiner until

July 24, 2017 (AR145 [07-24-2017 Hartford Claim Note, "Appeal Assigned to EMS"].), at

which point an acknowledgment letter was sent.  (AR240 [07-25-2017 Hartford Appeal

Acknowledgment Letter].)

142.    On July 25, 2017, the assigned Appeal Examiner Erik Solem initiated an internal

inquiry through the Hartford Underwriter for the LTD Plan, Brandon Johnson, reported that there

is an "issue … regarding what LTD coverage [Mr. Mayer] elected between the 2 Policy's (Class

1 or 2)," where "Class 1 is taxable and fully funded by the Employer," but "Class 2 is non-

taxable and funded by Claimant," and asked Mr. Johnson to "look up [Mr. Mayer's] election

form."  (AR412–14 [07-25-2017 E. Solem Email to B. Johnson].)  Ultimately, it was reported

back to Appeal Examiner Solem that neither Hartford nor RAI had any record to establish

whether Mr. Mayer had elected enrollment in the non-contributory, taxable Class 1 coverage, or

the contributory, non-taxable Class 2 coverage.  (AR406 [08-01-2017 B. Johnson Email to E.

Solem:  "Looks like we don't have a means of verifying if this employee is in fact paying the

premium on a post-tax basis"].

143.    The determination that there was a record of Mr. Mayer's enrollment in Class 1

that had been lost was based on a false representation by the broker (Thomas Farr)  that Mr.

Mayer had enrolled "maybe 20 years ago" before Ringler switched to paperless records (AR407

[08-01-2017 H. van Buren Email to B. Johnson:  "[T]his employee enrolled maybe 20 years ago

they do not have anything on file because the group switched from paper to online a couple of years back"].) Mr. Van Buren did not state whether Farr purported to be speaking from personal knowledge.

144.    Hartford had information demonstrating that the broker was an unreliable informant in that both RAI and Mr. Mayer reported that he enrolled in June, 2007.  (*See* ¶38, *supra*.)  The broker also appears to have told Mr. Van Buren, incorrectly, that Mr. Mayer owned "Ringler Manhattan."  (AR396.)

145.    Disability Analyst Martinez's statement that "we have confirmed several times that EE elected the Taxable plan LTD 1 Class 1" (¶120, *supra*.) was without basis in documentary evidence.

146.    Appeal Examiner Solem then turned to Hartford's Group Benefit Disability Claim Practices/Strategy Department for further guidance (AR405 [08-01-2017 E. Solem Email to J. O'Polka].), but in rendering the opinion that Mr. Mayer's benefit is "100% taxable," Senior Claim Strategy Consultant Jeff O'Polka started from two incorrect premises (AR403-04 [08-02-2017 J. O'Polka Email to E. Solem].):

    a.  He assumed it was a [non]contributory[4] plan" in which Mr. Mayer had enrolled (AR404.), when, in fact, Appeal Examiner Solem had just established that there was no record of whether Mr. Mayer was enrolled in non-contributory Class 1 vs. contributory Class 2;

---

[4] The opening sentence of the email asserts that "this is an Employer funded benefit, which falls in the first row as 'non-contributory' and 100% taxable."  Later, Mr. O'Polka asserts that "Employees do not have the option to pay premiums back to their Employer and make a non-contributory benefit a contributory benefit." (AR404.)  In this respect, his conclusion is contrary to the language of Certificates which permits allocation of premiums between Employers and Employees.  (¶22, *supra*.)

    b.  He assumed the employer paid the premium (AR404.) – which assumes both (i) that RAI was "the Employer" (when the record establishes that RAI-Scarsdale was Mr. Mayer's employer), and (ii) that RAI paid the premium (when the record establishes that RAI-Scarsdale paid the premiums via deductions from the commissions paid out by RAI).

147.    Appeal Examiner Solem appeared to understand that Senior Claim Strategy Consultant O'Polka's guidance proceeded from an inaccurate premise – pointing out that whether Mr. Mayer was enrolled in the contributory or non-contributory plan was precisely the dispute ("According to [RAI] and Broker it was non-contributory but that is what is being argued by the Atty that CLMT didn't elect that coverage") and that there was no evidence to support RAI's position ("UW [underwriter] was not able to secure the CLMT Election form for LTD coverage").  (AR402-03 [08-02-2017 E. Solem Email to J. O'Polka].)  Rather than clearly responding to these facts, Mr. O'Polka instead presented his opinion as a conditional statement proceeding from the same false premise that it was an established fact that Mr. Mayer was enrolled in the non-contributory Class 1:  "If an employer has a non-contributory benefit [Class 1], that's just what it is."  (AR402 K. O'Polka Email to E. Solem].)

148.    On August 24, 2017, Hartford mailed an extension notice to Mr. Mayer, "because we are still awaiting information from the Employer needed to fully investigate your client's claim."  (AR230 [08-24-2017 Hartford Extension Notification].)  This notice was sent 50 days after Hartford received the July 5th Appeal.  (*Id.*)  Although there was no further explanation provided in the notice letter, Hartford's internal notations state that Appeal Examiner Eric Solem was "[s]till awaiting response from Broker/Employer regarding election forms for CLMT [claimant] as well as Law Dept assessment."  (AR144 [08-24-2017 Hartford Claim Note,

"Appeal Specialist Recommendation].)  However, Mr. Solem had already received responses to his internal inquiries regarding election forms, and neither Hartford's Claim Notes, nor its Privilege Log, show any appeal activity or email in the period between August 1, 2017, and August 24, 2017.  (*See*, ¶¶142-147, *supra*; Hartford Privilege Log; and AR144-45 [Hartford Claim Notes, 07-28-2017 to 08-24-2017].)

149.     By letter, dated September 14, 2017, Attorney Scherzer wrote on behalf of Mr. Mayer to demand that – in addition to materials previously requested in his letters dated January 26th, May 2nd, June 20th and June 27th, 2017, he be provided any correspondence or evidence arising out of the communications between Hartford and RAI, as well as an opportunity to respond, as appropriate, to any such new material developed in the course of the appeal. (AR482-84 [09-14-2017 M. Scherzer New Evidence Demand Letter].)  The record contains no response to this request.

150.     October 3, 2017, was 90 days after Hartford received Mr. Mayer's initial appeal letter, on July 5, 2017.

151.     On October 4, 2017, Attorney Scherzer wrote to Hartford and again demanded access to previously requested documentation, together with any new evidence developed on appeal.  (AR450-52 [10-04-2017 M. Scherzer Follow-up Record Request Letter].)  Enclosed with the letter were copies of email correspondence with RAI's Geoffrey Hunt, who reported that no later than September 20, 2017, Appeal Examiner Solem had confirmed to him that "Hartford was looking for the original enrollment cards for the policy," had "confirmed that those cards no longer exist," "confirmed with me that Hartford is not waiting for any information from Ringler or our broker," and "noted that there are some open issues that do not require

51

Ringler's involvement and that the matter is with the Hartford's legal department for further handling."  (AR465-76, at 474 [Email chain with RAI's G. Hunt].)

152.    Appeal Examiner Solem's statement that Hartford had confirmed that the cards no longer exist was false in that it had not determined they ever had existed.

153.    On October 6, 2017, Appeal Examiner Solem sent a duplicate of the email inquiry previously sent to Hartford Underwriter Johnson on July 25, 2017 for enrollment information, but directed this time to Small Business Post Sales Specialist Brett Tripp, who responded similarly to Mr. Johnson:  "[W]e do not collect enrollment forms" and "The group is responsible for keeping all documents related to enrollment on file."  (AR440-42 [10-06-2017 Emails between E. Solem and B. Tripp].)

154.    October 11, 2017, was 90 days after Mr. Mayer's supplemental appeal letter, on July 13, 2017.

155.    Between September 14, 2017, and October 18, 2017, Appeal Examiner Solem engaged in a series of email exchanges with Stephanie Johnson (of Hartford's Talcott and Group Benefits Law), and Cheryl Sauerhoff (of Hartford's Group Benefits and Worker's Compensation Claims), the contents of which have been redacted/withheld by Hartford as attorney-client privileged and protected by the attorney work product doctrine.  (Privilege Log; AR377-83, 385-386, 389-91 [Redacted Emails between E. Solem, S. Johnson, C. Sauerhoff, and "lsr171015335@thehartford.app.onit.com"].)

156.    By letter, dated October 23, 2017, Attorney Scherzer wrote again on behalf of Mr. Mayer, demanding that Hartford render a decision in light of the apparent lack of additional information/documentation to be anticipated from RAI.  (AR421-23 [10-23-2017 M. Scherzer Decision Demand Letter].)  In addition, Attorney Scherzer:

a.  Pointed out that neither Hartford nor RAI had produced any evidence that Mr. Mayer elected contributory coverage, and that while "there is a statement in a communication to Hartford by Carol Ferrari that Mr. Mayer's benefits are taxable because the premiums were paid by [RAI], her statement is contradicted by the actual evidence, previously submitted by Mr. Mayer to the Hartford, showing that the amount of the premium was deducted each month from the remittances made by [RAI] to [RAI-Scarsdale]," and, "[a]s reflected in the letter of Mr. Mayer's accountant, those premiums were included in Mr. Mayer's gross income in the W-2 issued by Scarsdale to Mr. Mayer" (AR422.);

b.  Reiterated that, in light of the Affiliate and independent contractor status of RAI-Scarsdale, RAI-Scarsdale (and not RAI) was the only appropriate and reliable source of determining Mr. Mayer's Monthly Rate of Basic Earnings (AR422.);

c.  Underscored the inequity to Mr. Mayer, in that "Mr. Mayer was told he did not have to buy disability insurance because he would be covered by [RAI's] Plan," "[h]e reasonably understood it would cover 2/3 of his salary including bonuses and commissions he received from Scarsdale," but "[h]e was never told by Ringlet or by Hartford upon enrollment he would have to, make any particular payroll arrangement nor how premiums were computed and collected on the policy" (AR423.); and

d.  Submitted an additional statement from Fidelity Investments, which set forth the contributions made to Mr. Mayer's SEP-IRA by RAI-Scarsdale for the years 2013-2015 (AR416 [10-13-2017 Fidelity Letter].).

157.    Attorney Scherzer faxed a letter on November 9, 2017, protesting the lateness of Hartford's decision on Mr. Mayer's appeal.  (AR376 [11-09-2017 M. Scherzer Late Decision Letter].)

158.    On November 9, 2017 (127 days after Mr. Mayer's July 5th appeal submission), Appeal Specialist Solem entered an "Appeal Specialist Recommendation – Final Appeal Review – Uphold Decision" in Hartford's Claim Notes and issued a decision letter.  (AR136-38 [11-09-2017 Hartford Claim Note]; AR233-38 [11-09-2017 Hartford Appeal Denial Letter].)  Both the Claim Note and the Appeal Denial Letter follow the same format and rationale:

a.    Appeal Specialist Solem first summarized the prior determination, Mr. Mayer's arguments on appeal, and the documentary evidence submitted by Mr. Mayer in support of his appeal.  (AR136-37 [11-09-2017 Hartford Claim Note]; AR233-34 [11-09-2017 Hartford Appeal Denial Letter].)

b.    The Appeal Denial Letter then recited selected provision from an unidentified LTD Booklet-Certificate (apparently LTD Booklet-Certificate 4.5).  (AR234-35 [11-09-2017 Hartford Appeal Denial Letter].)

c.    Appeal Specialist Solem recited the LTD Plan provision identifying the Plan Administrator as "Ringler Associates Incorporated *and Affiliates*" (emphasis supplied), and dutifully included parentheticals throughout the Chart Note and Appeal Denial Letter that purport to underscore his understanding that the Employer, Policyholder and Plan Administrator is "Ringler Associates Incorporated *and Affiliates*."  (Emphasis supplied)  (AR137 [11-09-2017 Hartford Claim Note:  "The earning documentation/paystubs provided by the Employer/Plan Administrator shows Mr. Mayer earned $3,846.16 bi-weekly from

54

A095

the Employer (Ringler Associates Incorporated and Affiliates)"]; AR236 [11-09-2017 Hartford Appeal Denial Letter:  same].)

d.   Nonetheless, it is clear that Appeal Specialist Solem understood and interpreted "Ringler Associates Incorporated and Affiliates" to mean RAI (exclusive of RAI-Scarsdale or any other affiliate), for example (i) he identified RAI Operations Manager Ferrari as "Operations Manager for Ringler Associates Incorporated ***and Affiliates***") (AR137 [11-09-2017 Hartford Claim Note]; AR236 [11-09-2017 Hartford Appeal Denial Letter].), even though Ms. Ferrari is clearly employed only by RAI (*e.g.*, AR1552 [C. Ferrari Business Card, identifying her as "Operations Manager, Ringler Associates Incorporated"].), and (ii) he discounted the RAI-Scarsdale General Ledger because it "shows no commissions paid to Mr. Mayer by the Employer (Ringler Associates Incorporated)" (AR137 [11-09-2017 Hartford Claim Note]; AR236-37 [11-09-2017 Hartford Appeal Denial Letter].).

e.   Relying on his interpretation of Employer, Policyholder, Plan Administrator, and "Ringler Associates Incorporated and Affiliates" as signifying RAI only (exclusive of RAI-Scarsdale or any other affiliate), Appeal Examiner Solem deferred entirely to RAI to determine Mr. Mayer's enrollment, reasoning that the LTD Plan is "self-administered … by the Employer [*i.e.,* RAI] with respect to eligibility and enrollment," that Hartford "attempted to obtain enrollment forms from Employer [*i.e.,* RAI] but they were not able to provide,"[5] and that "[t]herefore, The Hartford must adjudicate claims based on the information

---

[5] Noted only in Hartford Claim Note.

provided by the Employer/Plan Administrator [*i.e., RAI*]."  (AR137 [11-09-2017 Hartford Claim Note]; AR235 [11-09-2017 Hartford Appeal Denial Letter].)

f.   While acknowledging that RAI provided no enrollment forms, and without identifying any other election or enrollment documentation, Appeal Specialist Solem nevertheless asserted that "[a]ccording to the documentation provided by the Employer/Plan Administrator [*i.e.* RAI], Mr. Mayer is an LTD Class 1 Employee ("producer") in which the Employer/Plan Administrator [*i.e.*, RAI] paid 100% of his premiums for LTD coverage and his LTD benefits are 100% taxable."  (AR137 [11-09-2017 Hartford Claim Note]; AR235 [11-09-2017 Hartford Appeal Denial Letter].)

g.   Extrapolating from the non-existent documentation purporting to show that "Mr. Mayer is an LTD Class 1 Employee" and that RAI "paid 100% of his premiums for LTD coverage," Appeal Specialist Solem concluded that "Mr. Mayer is covered under the Ringler Associates Incorporated and Affiliates LTD Policy (GLT-216897)," citing an Eligible Class provision that makes it clear he is referring to LTD Booklet-Certificate 4.5.  (AR137 [11-09-2017 Hartford Claim Note]; AR235 [11-09-2017 Hartford Appeal Denial Letter].)

h.   In rejecting Mr. Mayer's argument that his coverage was contributory and therefore not taxable, Appeal Specialist Solem mischaracterized facts.  He asserted that RAI "paid 100% of his premiums" and "charged back the premiums … to [RAI-Scarsdale]" (AR138 [11-09-2017 Hartford Claim Note]; AR237 [11-09-2017 Hartford Appeal Denial Letter].), when in fact the evidence presented by Mr. Mayer demonstrated that RAI used RAI-Scarsdale commissions to pay Mr.

Mayer's LTD premiums and reflected those payments as reductions to the

commissions payable to Mr. Mayer.  (*See* ¶139(d) and (e), *supra.*)  He asserted

that "Employees do not have the option to pay premiums back to their Employer

and make a non-contributory benefit a contributory benefit."  (AR138 [11-09-

2017 Hartford Claim Note].);

i.   Mr. Solem also falsely claimed that the alleged payment of premiums by RAI

was "further substantiated" by the letter of RAI Scarsdale's accountant, Mr. Marc

Rubin, dated October 26, 2016.  He selectively quoted the section of the Rubin

letter which said that  'Mr. Mayer's long term disability was paid by the

company'" (AR138 [11-09-2017 Hartford Claim Note]; AR237 [11-09-2017

Hartford Appeal Denial Letter].) while ignoring the sentence which said that the

premium payments were then added to Mr. Mayer's taxable income in his W-2.

And Mr. Solem falsely implied that the company to which Mr. Rubin's letter

attributed the premium payment was RAI, when, in fact, Mr. Rubin's letter clearly

identifies "the company" paying the premiums as RAI-Scarsdale – not RAI (and,

indeed, RAI is not even mentioned in the letter):

> We have been the accountants for Ringler Associates *Scarsdale*, Inc. since
> the inception of ***the company*** in 2005….  Mr. Mayer's long term disability
> policy was paid by ***the company***.  However, the premium payments were
> added to Mr. Mayer's W-2 as a taxable fringe benefit to him.  So
> accordingly, he has been personally paying for the premiums with after tax
> dollars and has paid tax on the premium payments for at least the last three
> years.

(AR943 [10-26-2016 Marglo Accounting Letter], emphasis supplied.)

j.   In rejecting Mr. Mayer's argument that his SEP-IRA contributions should be

counted, Appeal Specialist Solem reasoned that the contribution did not fit within

any specific itemized category of retirement contribution (even though the

provision does not purport to be exclusive) and inaccurately asserted that the

available documentation demonstrated "no contributions by Mr. Mayer or the

Employer [*i.e.*, RAI] and the ledger from Fidelity showing Mr. Mayer's own

personal contributions to his SEP IRA."  (AR138 [11-09-2017 Hartford Claim

Note]; AR237 [11-09-2017 Hartford Appeal Denial Letter].).  In fact, the

documentation showed that the contributions *were* made by his actual and only

employer, RAI-Scarsdale.  (*See*, ¶¶49, 68(b), 156(d), *supra*; AR416 [10-13-2017

Fidelity Letter confirming SEP-IRA Contributions by RAI-Scarsdale on behalf of

Mr. Mayer for 2013-15]; AR940-42 [Feb. 2013 and Feb. 2014 Fidelity Investment

Report Statements]; and AR1531-34 [Additional Fidelity Investment Report

Printouts].)

k. Appeal Specialist Solem – having interpreted the terms Employer, Policyholder,

Plan Administrator, and "Ringler Associates Incorporated and Affiliates" to refer

solely to RAI – relied exclusively on documentation supplied by RAI to

determine Mr. Mayer's Monthly Rate of Basic Earnings:  "The Employer

Statement completed by Ms. Carol Ferrari-Rogers … dated December 17, 2015,

documents Mr. Mayer's annual salary from the Employer as $100,000/per year,"

"[t]he earning documentation/paystubs provided by the Employer/Plan

Administrator shows Mr. Mayer earned $3,846.16 bi-weekly from the Employer

… for the 2 calendar year(s) period ending just prior to the date he became

Disabled" and "also documented that Mr. Mayer received one bonus from the

Employer during the same period on December 20, 2013 in the amount of

$50,000," "[t]his appears to be consistent with Mr. Mayer's [uncorrected] W2's [as provided by RAI] showing he earned $150,000.16 in 2013 and $100,000.16 in 2014," and "paystubs from [sic] did not show Mr. Mayer earned any commissions from the Employer…."  (AR137 [11-09-2017 Hartford Claim Note]; AR236 [11-09-2017 Hartford Appeal Denial Letter].)

l.   Appeal Specialist Solem ignored, and failed to address or reconcile, the evidence submitted by Mr. Mayer:

    i.   Appeal Specialist Solem did not discuss or address the corrected 2013 and 2014 W2's submitted by Mr. Mayer, or Mr. Mayer's corrected 2013 tax return, either in his Claim note or the Appeal Denial Letter;

    ii.   Appeal Specialist Solem did not address facts – that RAI-Scarsdale was an independent contractor and RAI Affiliate, that he was employed solely by RAI-Scarsdale, that all compensation was paid by (and attributable to), RAI-Scarsdale (not RAI, who simply acted as collector and distributor of RAI-Scarsdale income) – averred by Mr. Mayer in his in his July 13th Statement (AR535-38.), his 11-01-2016 Statement (AR1231-34.); substantiated by other communications and numerous pieces of evidence (*see* ¶¶43-49, 65-70, 125, and 156, *supra*.); and either affirmed or not refuted by Ms. Ferrari, Mr. Farr, and others consulted by Hartford (*e.g.*, ¶¶70, 125, *supra*.);

    iii.   Although Appeal Specialist Solem acknowledged one piece of evidence submitted by Mr. Mayer, "the general ledger … from Mr. Mayer's business, Ringler Associates Scarsdale, for the period of January 1, 2014 through December 31, 2015," he dismissed that evidence because it "shows no

commissions paid to Mr. Mayer by the Employer (Ringler Associates Incorporated)" (AR137 [11-09-2017 Hartford Claim Note]; AR236-37 [11-09-2017 Hartford Appeal Denial Letter].) – even though the latter conclusion is erroneous/incomplete in multiple respects:  (a) RAI was not Mr. Mayer's "employer" (rather, he was employed by Affiliate RAI-Scarsdale); (b) no ledger, W2, tax return, earnings statement, or any other document showed payments by RAI to Mr. Mayer – whether regular/draw payments, or bonus/commission payments – and, indeed, all payments are documented to have been paid by RAI-Scarsdale to Mr. Mayer.

**H.    Hartford's Post-Appeal Claim File Production and Additional Administration of Mr. Mayer's LTD Claim**

159.    By letter, dated December 4, 2017, Attorney Scherzer requested a copy of documents relevant to Mr. Mayer's claim.  (AR359-61 [12-04-2017 M. Scherzer Claim File Request].)  Mr. Scherzer's letter included a request for "insurance policies, summary descriptions and/or other documents constituting, comprising or describing the Plan, including, but not limited to, any contracts or agreements between The Hartford and any other agent involved in the administration or processing of Mr. Mayer's claim."  (*Id.*)

160.    By letter, dated December 18, 2017, Hartford responded to Mr. Scherzer's request, providing "a copy of the claim file you requested," except "that to protect materials such as private third-party information or privileged communications, certain documents may have been withheld or appropriately redacted."  (AR232 [12-18-2017 Hartford Cover Letter].)

161.    Included in Hartford's claim file production an  LTD Booklet-Certificate for "HARLOW-HRK SALES & MARKETING INC."  (ADD 1620 [Stipulation Regarding Trial Record, ¶2(c).]

VII.   **MR. MAYER'S LAWSUIT, HARTFORD'S LITIGATION PRODUCTION OF THE ADMINISTRATIVE RECORD, AND THE POLICY'S CHOICE OF CALIFORNIA LAW**

162.   On March 29, 2018, Mr. Mayer initiated this lawsuit.  (ECF No. 1 [03-29-2018 Complaint].)

163.   On or about July 27, 2018, Hartford produced a copy of the administrative record for purposes of this lawsuit.  For the first time, Hartford produced a copy of the Group LTD Policy document (AR112-122 [Group LTD Policy, as Amended 08-27-2013].).  (ADD1620 [Stipulation Regarding Trial Record, ¶2(d).]

164.   The Group LTD Policy document states that the "place of delivery" of the policy was California.  (AR112 [Group LTD Policy].)

165.   The Group LTD Policy has a choice of law provision that chooses California law.  (AR120 [Group LTD Policy:  "Jurisdiction:  This policy is governed by the laws of the state where it is delivered"].)

166.   The Group LTD Plan covers California residents, as reflected in required disclosures to California insureds.  (AR121-22 [LTD Group Policy]; AR6, 15, 23 [LTD Booklet-Certificate 2.27]; AR43, 52, 60 [LTD Booklet-Certificate 4.5]; AR80, 89, 97 [LTD Booklet-Certificate 1.32].)

167.   RAI Operations Manager Ferrari was employed by RAI in California and identified herself as "in California."  (AR1552 [C. Ferrari Business Card]; ¶5, *supra.*)  Another employee, Paula Woodruff, is also identified as employed in California.  (AR1568 [P. Woodruff Business Card].)

168.   Hartford's Claim Notes reflect that it identifies the "situs" of the LTD Plan as California.  (*E.g.*, AR202 [12-28-2015 Hartford Claim Note, "Initial SOAP"].)

169.    Hartford's decision letters direct disgruntled claimants to "have the matter reviewed by the California Department of Insurance."  (*E.g.*, AR233-238, at 238 [11-09-2017 Hartford Appeal Denial Letter]; AR250-52, at 252 [01-06-2017 52 [01-06-2017 Hartford Benefit Calculation Letter]; AR269-72, at 272 [05-13-2016 Hartford Claim Denial Letter].)

## VIII.  EVIDENCE OF HARTFORD'S BIAS AND CLAIM HANDLING IMPROPRIETIES

170.    Hartford evidenced bias in its handling of Mr. Mayer's claim by repeatedly refusing to consider information he or RAI-Scarsdale offered in support of the claim, including:

a.   Refusing to accept Mr. Mayer's job description on its initial consideration of his claim, even when instructed to do so by RAI (¶64(a), *supra.*);

b.   Failing and refusing to consider the letter of Dr. Leonard Harrison in support of Mr. Mayer's claim, or to provide that letter to its consulting medical reviewer, prior to initially denying Mr. Mayer's claim (¶81-83, *supra.*);

c.   Failing to supply its medical reviewer's medical report to Mr. Mayer's treating physician for comment prior to denying his claim, on the false premise that the medical reviewer had spoken with the doctor prior to issuing her report, when she had not done so (¶83, *supra.*);

d.   Referring Mr. Mayer's claim to the Special Investigations Unit for investigation based on pretextual or false "red flags" (amended W-2s, activity inconsistent with reported limitations) (¶¶116, 123, *supra.*);

e.   After reversing its initial denial of Mr. Mayer's claim, failing and refusing to consider in the calculation of benefits the W-2s generated by Mr. Mayer's employer, RAI-Scarsdale, and relying only on the W-2s submitted by RAI, even

62

A103

after RAI urged Hartford to look to Mr. Mayer for additional income information
(¶¶64(d),158(k), *supra,* and *passim.*);

f.  Assuming, in considering Mr. Mayer's amended W-2s and tax returns, that the
amendments were undertaken for the purpose of inflating his claim
("Background… It seems now he is trying to increase the benefit by using this tax
situation to increase his benefit." (AR 409-410 [email Herman Van Buren,
Hartford Group Benefits Client Relationship Manager, to Brandon Johnson,
Group Benefits Risk Management, July 27, 2017]), when Mr. Mayer had
explained that they were amended to properly include income previously reported
on 1099 forms (¶47, *supra.*);

g.  Cherry picking evidence to support its desired conclusion, as when Scott Solem
quoted part of RAI-Scarsdale's accountant's letter to suggest that RAI had paid
Mr. Mayer's premiums, and ignoring the parts of the letter that made clear that
payments borne by RAI-Scarsdale were included in Mr. Mayer's W-2 as income
to him (¶158(i), *supra.*);

h.  Claiming to have documentation that Mr. Mayer elected non-contributory
coverage on a lost form, when in fact Hartford had acknowledged its inability to
verify such an election and the Certificate Booklets provided for automatic
enrollment. (¶¶158(f),142-144, 28, *supra.*);

i.  Misrepresenting that Mr. Mayer's SEP_IRA contributions could not be included
in income because he made them personally, when in fact they had been made by
his employer, RAI-Scarsdale (¶158(j), *supra.*).

171.   Hartford acted inconsistently and/or arbitrarily in the determination of Mr.

Mayer's claim in:

   a.   Deciding Mr. Mayer's claim under Booklet Certificate 1.32 and repeatedly

      representing to him that he was covered under that certificate, and then switching

      Certificate forms when he insisted upon tax reporting consistent with that of a

      person who paid his own premiums (¶¶ 92, 95, 97, 98, 132, *supra.*);

   b.   When initially denying his claim, misrepresenting to Mr. Mayer that he was

      subject to a two year limit on "own occupation" benefits (¶88, *supra.*), hence

      reducing his incentive to appeal the denial;

   c.   When it decided his second appeal on the amount of benefits due, representing to

      Mr. Mayer that W-2s are not the measure of income under the Plan (¶122(a),

      *supra.*) when in fact Hartford relied on W-2 information from RAI to determine

      his pre-disability income (¶¶61, 64(c), 109, 158(k), *supra.*);

   d.   When deciding whether he was a contributory or non-contributory participant in

      the plan, claiming that if he were covered under Certificate 4.5 he could not be a

      contributory participant (¶158(h).), when the Sources of Contribution provisions

      of plan language permitted allocation of premiums between employer and

      employee (¶22, *supra.*).

172.   Hartford repeatedly failed to make complete and/or timely decisions on Mr.

Mayer's appeals and provide full and fair review when it:

   a.   Missed deadlines for decision without any articulated or reasonable excuse

      (¶¶148, 150, 154, 157, 158*, supra.*);

64

A105

    b.   Failed to consider issues the amount of the benefits due, an issue raised which were fully raised in Mr. Mayer's appeal but which Hartford did not begin to address until after it reversed it claim denial (¶99, 106, *supra.*);

    c.   As it continuing even to withhold the undisputed base benefit based on the W-2s generated by RAI, it advised Mr. Mayer that it was awaiting further information from "his employer', when it had told RAI that no further information was required (¶148, 151, 152, *supra.*);

    d.   Failed to provide all information requested and to which Mr. Mayer was entitled regarding the claim (¶130, 134, 135, 137, 138, 148, 149, 151, 159-160, *supra.*); and

    e.   Failed to provide information developed on appeal for Mr. Mayer to respond to before a final decision was made (¶149, *supra.*).

## PROPOSED CONCLUSIONS OF LAW

I.   The LTD Plan is an ERISA plan and is subject to ERISA law and regulations.  ERISA §§ 3(1), 3(3), 4(a), 502(a)(1)(B), and (a)(3), 29 U.S.C. §§ 1002(1), (3), 1003(a), 1132(a)(1)(B), and (a)(3).

II.  Jurisdiction and venue in this court are proper under ERISA, 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1331.

III. The LTD Plan is subject to *de novo* review.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

    A.  The LTD Plan is barred by California law from conferring discretionary authority.

    Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, 856 F.3d 686, 695

(9th Cir. 2017).

1. California law bars discretionary clauses in any disability plan or policy that covers California residents, regardless of where the policy or plan was issued.  California Insurance Code §10110.6.

2. Choice of law provisions are generally enforceable in ERISA benefit plans.  *E.g.*, Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2016); Barnes v. American Int'l. Life Assur. Co., 681 F. Supp. 2d 513, 520 (S.D.N.Y. 2010).

B. Hartford is stripped of any properly delegated discretionary authority because it violated ERISA "full-and-fair review" procedural regulations.  Halo v. Yale Health Plan, 819 F.3d 42, 57-58 (2d Cir. 2016); Schuman v. Aetna Life Ins. Co., 2017 WL 1053853, 2017 U.S. Dist. LEXIS 39388, *40-42 (D. Conn. Mar. 20, 2017).

IV. Mr. Mayer has demonstrated by a preponderance of the evidence that (1) his Rate of Basic Monthly Earnings, as defined by the LTD Plan, includes the average of his prior 2 years of earnings from RAI-Scarsdale ($151,842 in 2013, and $399,614.01 in 2014, and of his prior 2 years of SEP-IRA contributions ($50,000 in 2013, and $50,000 in 2014); and (2) Mr. Mayer personally bore the cost of premiums paid to Hartford on a post-tax basis;

V. Even if Hartford's benefit calculation determination were properly judged under an abuse of discretion standard, its decision was arbitrary and capricious.  Miles v. Principal Life Ins. Co., 720 F.3d 472, 487 (2d Cir. 2013).

A. Hartford's improper actions and sharp practices – including violations of ERISA procedural regulations and refusing to share consulting broker/employer communications before rendering its decisions – warrant reduced deference to Hartford's decision-making.  Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105, at 117-19

66

A107

(2008); <u>Brown v. J.B. Hunt Transport Svcs.</u>, 586 F.3d 1079, 1086-87 (8th Cir. 2009);

<u>Yancy v. United of Omaha Life Ins. Co.</u>, 2015 U.S. Dist. LEXIS 172233, *59-60 (C.D.

Cal. Dec. 18, 2015); <u>Collins v. Liberty Life Assur. Co.</u>, 988 F. Supp. 2d 1105, 1127 (C.D.

Cal. 2013); <u>Lemon v. E. A. Miller, Inc.</u>, 2005 WL 925656, 2005 U.S. Dist. LEXIS

32539, *28 (D. Utah Apr. 18, 2005); <u>Cherene v. First Am. Fin. Corp. Long-Term

Disability Plan</u>, 303 F. Supp. 2d 1030 (N.D. Cal. 2004).

B. Hartford acted arbitrarily when – despite substantial financial and tax evidence providing

a sound basis for the conclusion that Mr. Mayer was employed by RAI-Scarsdale,

received all income (draw and commissions) from RAI-Scarsdale, that his earnings from

RAI-Scarsdale were $151,842 in 2013, and $399,614.01 in 2014, that SEP-IRA

contributions were made by RAI-Scarsdale in the amount of $50,000 in 2013, and

$50,000 in 2014  were properly included in income, – it refused to credit the evidence

submitted by RAI Scarsdale but instead relied solely on statements and evidence

produced by RAI.  <u>Ricciardi v. Metro. Life Ins. Co.</u>, 2019 U.S. Dist. LEXIS 25240, *27-

30 (S.D.N.Y. Feb. 15, 2019).

C. Hartford acted arbitrarily regarding Mr. Mayer's contributory status when it classified

Mr. Mayer as a non-contributory employee without substantial evidence that he enrolled

as such and despite evidence that his premiums were imputed to income in his W-2s.

<u>Zuckerbrod v. Phoenix Mut. Life Ins. Co.</u>, 78 F.3d 46, 49 (2d Cir. 1996) It was also

arbitrary when it ignored the Source of Contributions provisions in the Certificate it

claimed covered Mr. Mayer which permitted allocation of premiums to employees.  <u>Gallo

v. Madera</u>, 136 F.3d 326, 330-31 (2d Cir. 1998); <u>Am. Fed'n of Musicians and

Employers' Pension Fund v. Atl. Recording Corp.</u>, 203 F. Supp. 3d 301, 310 (S.D.N.Y.

2016)

VI. Hartford must compensate Mr. Mayer for the difference between the benefits it paid and those it should have paid (with a proper calculation of his Monthly Rate of Basic Earnings), recognize that he participated in the LTD Plan on a contributory basis, and pay Mr. Mayer pre-judgment interest and his reasonable attorneys' fees.

A. Mr. Mayer is entitled to an award of benefits, as opposed to remand, because the difficulty is not that the administrative record was incomplete, but that Hartford's denial of benefits based on the record was unreasonable  Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 51 n.4 (2d Cir. 1996); Zervos v. Verizon N.Y., 277 F.3d 635, 648 (2d Cir. 2002); Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 779 (7th Cir. 2010).

B. Mr. Mayer is entitled to his reasonable attorneys' fees and costs because he has had 'some degree of success on the merits'"  Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 254-255 (2010; Donachie v. Liberty Life Assur. Co., 745 F.3d 41, 46 (2d Cir. 2014); Alfano v. CIGNA Life Ins. Co., 2009 U.S. Dist. LEXIS 28118, at *2-3 (S.D.N.Y., Apr. 2. 2009).

C. Mr. Mayer is entitled to pre-judgment interest because of the equities, the need to fully compensate Mr. Mayer, and the remedial purposes of ERISA.  Fairbaugh v. Life Ins. Co. of N. Am., 737 F. Supp. 2d 68, 89 (2d Cir. 2010).

Dated:  New York, New York
          May 31, 2019

Respectfully submitted,

68

A109

MARK SCHERZER, ESQ. (MS-2622)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Fourth Floor
New York, New York 10038
Tel: (212) 406-9606
Email:  markscherzerlaw@verizon.net

Of Counsel:  Mark Scherzer, Esq.
            A. Christopher Wieber, Esq.

69

A110

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x
                                          :

GREGORY MAYER,                         :

                              :    Case No. 7:18-cv-02789-VB

               Plaintiff,         :

                              :

            -against-          :

                              :

RINGLER ASSOCIATES INC. AND AFFILIATES :
LONG TERM DISABILITY PLAN and HARTFORD :
LIFE AND ACCIDENT INSURANCE COMPANY,    :

                              :

            Defendants.       :

                              :
-------------------------------------------------------------------- x

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

ROBINSON & COLE LLP
Attorneys for Defendant
1055 Washington Boulevard
Stamford, CT 06901
(203) 462-7500

A111

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

PROPOSED FINDINGS OF FACT ............................................................. 1

    I.     The Parties ..................................................................................... 1

    II.    The Policy ...................................................................................... 1

    III.   Plaintiff's LTD Claim .................................................................... 5

          A.     Hartford Life Approved Plaintiff's Claim for LTD Benefits ................... 5

          B.     Hartford Life Calculated Benefits Based On the Earnings Information Provided by Ringler Associates ........................... 9

          C.     Hartford Life Upheld Its Determination on Administrative Appeal ........ 10

PROPOSED CONCLUSIONS OF LAW ...................................................... 15

    I.     Standard of Review ....................................................................... 15

          A.     Hartford Life's Determinations Must Be Reviewed Under the Discretionary Standard to Determine Whether They Were Arbitrary and Capricious .......................................................... 15

               1.    California law does not change the standard of review in this action ...................................................................... 16

               2.    Hartford Life Complied with Claim Procedures ........................ 19

                      i.     Hartford Life's Extension Letter Was Timely and Sufficient .............................................................. 20

                      ii.    Hartford Life Did Not Violate 29 C.F.R. § 2560.503-1 By Not Producing "Any Information Developed" In Connection With Plaintiff's Appeal Prior to Making a Determination on Appeal ................... 22

                      iii.   Even if Hartford Life Violated Claim Procedures, De Novo Review is not Warranted ................................. 27

    II.    Hartford Life's Determination Was Within its Discretion ................. 28

          A.     Hartford Life Did Not Change Its Rationale ........................... 30

          B.     Hartford Life's Determination of Plaintiff's Pre-Disability Earnings was Within Its Discretion ....................................... 31

          C.     Hartford Life's Determination was Not Affected By Any Structural Conflict .................................................................. 34

          D.     Hartford Life Reasonably Determined that Plaintiff's Benefits Are Taxable ......................................................................... 38

A112

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baker v. The Hartford Life Ins. Co.*,
   No. 08-CV-6382FLW, 2010 WL 2179150, *aff'd*, 440 Fed. Appx. 66 (3d Cir.
   2011) ................................................................................................................30

*Billinger v. Bell Atl.*,
   240 F. Supp. 2d 274 (S.D.N.Y. 2003), *aff'd* 124 Fed. Appx. 669 (2d Cir.
   2005), *cert. denied*, 546 U.S. 843 (2005)......................................................36

*Campbell v. Hartford Life & Accident Ins. Co.*,
   2018 WL 4963118 (S.D. Fla. Oct. 15, 2018)..............................................17, 19

*Celardo v. GNY Auto. Dealers Health & Welfare Trust*,
   318 F.3d 142 (2d Cir. 2003)..............................................................................16

*Durakovic v. Building Service 32 BJ Pension Fund*,
   609 F.3d 133 (2d Cir. 2010)..............................................................................34

*Frazier v. Life Ins. Co. of N. Am.*,
   725 F.3d 560 (6th Cir. 2013) ............................................................................30

*Glazer v. Reliance Std. Life Ins. Co.*,
   524 F.3d 1241 (11th Cir. 2008) ...................................................................22, 23

*Hafford v. Aetna Life Ins. Co.*,
   2017 WL 4083580 (S.D.N.Y. Sept. 13, 2017)..................................................21

*Halo v. Yale Health Plan*,
   819 F.3d 42 (2d Cir. 2016)................................................................................27

*Hancock v. Aetna Life Ins. Co.*,
   251 F. Supp. 3d 1363 (W.D. Wash. 2017)........................................................21

*Hines v. First Unum Life Ins. Co.*,
   2016 U.S. Dist. LEXIS 37766 (S.D.N.Y. Mar. 23, 2016) ................................37, 38

*Hobson v. Met. Life Ins. Co.*,
   574 F.3d 75 (2d Cir. 2009)....................................................................15, 16, 34

*Hodges v. Life Ins. Co. of N. Am.*,
   920 F.3d 669 (10th Cir. 2019) ..........................................................................37

*Hughes v. Hartford Life & Acc. Ins. Co.*,
   368 F. Supp. 3d 386 (D. Conn. 2019)............................................23, 24, 25, 26

A113

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ingravallo v. Hartford Life Ins. Co.*,
    563 Fed. Appx. 796 (2d Cir. Apr. 24, 2014)..........................................................36

*Kinstler v. First Reliance Std. Life Ins. Co.*,
    181 F.3d 243 (2d Cir. 1999)...............................................................................15

*MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia*,
    32 F. Supp. 2d 600 (W.D.N.Y. 1999) ..................................................................37

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105, 128 S. Ct. 2343 (2008)............................................................34, 37

*Metzger v. UNUM Life Ins. Co. of Am.*,
    476 F.3d 1161 (10th Cir. 2007) ...............................................................22, 23, 27

*Midgett v. Washington Group Int'l LTD Plan*,
    2009 WL 8186025 (8th Cir. June 3, 2009) ......................................................22, 23

*Orzechowski v. Boeing Co. Non-Union LTD Plan, Plan No. 625*,
    856 F.3d 686 (9th Cir. 2017) .............................................................................19

*Pfenning v. Liberty Life Assurance Co.*,
    No. 3:14-CV-471, 2015 WL 9460578, at *8 (S.D. Ohio Dec. 28, 2015),
    *vacated and remanded by agreement*, 16-3068 (6th Cir. Aug. 2, 2016) ...........17, 19

*Ricciardi v. Metro. Life Ins. Co.*,
    No. 16-CV-3805(CM), 2019 WL 652883 (S.D.N.Y. Feb. 15, 2019)......................36

*Rotondi v. Hartford Life & Accident Grp.*,
    2010 U.S. Dist. LEXIS 99502, at *31-32 (S.D.N.Y. Sep. 22, 2010)......................36

*Sanford v. Life Ins. Co. of N. Am.*,
    1 F. Supp. 3d 829 (M.D. Tenn. 2014), *aff'd*, 591 Fed.Appx. 511
    (6th Cir. 2015)..................................................................................................30

*Schewitz v. Aetna Life Ins. Co.*,
    No. 18-CV-6119, 2019 WL 2189263 (N.D. Ill. May 21, 2019)............................37

*Schrom v. Guardian Life Ins. Co. of Am.*,
    2013 U.S. Dist. LEXIS 38039 (S.D.N.Y. Mar. 19, 2013) ....................................38

*Sullivan v. LTV Aero. & Def. Co.*,
    82 F.3d 1251 (2d Cir. 1996).............................................................................16

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

*Tedesco v. I.B.E. W. Local 1249 Ins. Fund*,
   674 F. App'x 6 (2d Cir. 2016) ...............................................................3, 6, 27, 28

*Wilson v. Aetna Life Ins. Co.*,
   2016 U.S. Dist. LEXIS 135396 (N.D.N.Y. Sep. 30, 2016) ...............................27, 28

**Statutes**

15 U.S.C. § 1012(b) ...................................................................................................18

29 U.S.C. § 1002(16)(A)........................................................................................29, 33

29 U.S.C. § 1132(a)(1)(B) ........................................................................................15

29 U.S.C. § 1133(2) ...................................................................................................23

**Other Authorities**

29 C.F.R. § 2560.503-1 ....................................19, 20, 21, 22, 23, 24, 25, 26, 27

65 Fed. Reg. 70,246 ..................................................................................................20

65 Fed. Reg. 70,252 .............................................................................................25, 26

81 Fed. Reg. 92316 .............................................................................................20, 22

Cal. Ins. Code § 10110.6(a) ...........................................................................16, 17, 18

50 Ill. Admin. Code § 2001.31 ..............................................................................18

Internal Revenue Code § 401(k), 403(b) .................................................................3, 13

Mich. Admin. Code R 500.2202 ...............................................................................18

28 Tex. Admin Code § 3.1203....................................................................................18

*Frequently Asked Questions – Life Insurance & Disability Insurance Proceeds 1*,
   Internal Revenue Service, https://www.irs.gov/faqs/interest-dividends-other-
   types-of-income/life-insurance-disability-insurance-proceeds/life-insurance-
   disability-insurance-proceeds-1 (last updated Mar. 8, 2019)..................................38

Defendants, Hartford Life and Accident Insurance Company ("Hartford Life"), and the Group Long Term Disability Plan for Employees of Ringler Associates Incorporated and Affiliates (the "Plan" and collectively with Hartford Life, "Defendants"), respectfully submit the following as proposed findings of fact and conclusions of law:

**PROPOSED FINDINGS OF FACT**

## I.     The Parties

1.     Plaintiff Gregory Mayer has at all relevant times been a resident of the State of New York. *See* Answer ¶ 2 ("Plaintiff's last known residence was in Scarsdale, New York); AR253,[1] 269, 285, 287, 295, 306, 311, 319, 881, 897, 907, 909, 1154, 1168, 1171, 1222; AR1175; AR869, 985, 1029, 1192, 1286, 1318, 1322.

2.     Ringler Associates Incorporated ("Ringler Associates") established the Group Long Term Disability Plan for Employees of Ringler Associates Incorporated and Affiliates in 1999 (hereinafter the "Plan"). *See* Answer ¶ 6; AR45.

3.     Hartford Life issued the Long Term Disability policy at issue in this action to insure certain benefits payable under the Plan. *See* Answer ¶ 7; AR7, 44, 81.

## II.     The Policy

4.     The Policy incorporates several different "Booklets" that provided different coverages to different classes of employees:

      a.     Booklet 2.27, AR1-37, provided coverage for "All Active Full-time Employees … excluding Producers, Managers, or Officers not paying their own premium who receive a W2," AR8;

---

[1] The Administrative Record is Bates stamped "Mayer v. Hartford 0001 – 1618." This Proposed Finding of Facts and Conclusions of Law will cite it as "AR___."

1

    b.  Booklet 4.5, AR38-74, provided coverage for "All Active Full-time Employees who are producers, managers, or officers not paying their premium who receive a W2," AR45; and

    c.  Booklet 1.32, AR75-111, provided coverage for "All Active Full-time Producers, Managers, or Officers who are choosing to pay their premium who receive a W2," AR82.

5.    There is no dispute that the terms of the Plan give Hartford Life "full discretion and authority to determine eligibility benefits and to construe and interpret all terms and provisions of the Policy." AR31, 34; AR68, 71; AR105, 108.

6.    All three Booklets provide: "The Plan has designated and named [Hartford Life] as the claims fiduciary for benefits provided under the Policy. The Plan has granted [Hartford Life] full discretion and authority to determine eligibility benefits and to construe and interpret all terms and provisions of the Policy." AR31, 34; AR68, 71; AR105, 108.

7.    Booklets 4.5 and 1.32 are substantially identical, and differ only in whether the insured Producers, Managers, or Officers pay their own premiums.[2] Both Booklets define disability the same, and have identical provisions for how to calculate benefits. *See* AR48, 85. *See also* AR61, 98; AR59, 96; AR60, 97; AR45, 82; AR48, 85.

8.    Booklet 4.5 governs plaintiff's claim. *See* AR901. *Accord* AR61.

9.    Booklet 4.5 (hereinafter the "Policy") provides for a gross Long Term Disability benefit of 66 2/3% of Plaintiff's "Pre-disability Earnings." AR45, 48.

---

[2] Plaintiff agrees that "[t]he LTD Booklet-Certificates are largely identical in term of the relevant benefit and administration provisions." Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. 30; "Pl. PFF"), ¶ 15 n.2.

10.     The Policy defines Pre-disability Earnings as "your Monthly Rate of Basic Earnings on the day before you became disabled." AR60.

11.     The Policy defines Monthly Rate of Basic Earnings as:

> your average monthly rate of pay, including Bonuses and Commissions, from the Employer for the 2 calendar year(s) ending just prior to the date you become Disabled[:]
>
> 1. including contributions you make through a salary reduction agreement with the Employer to:
> a) an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement;
> b) an executive non qualified deferred compensation arrangement; or
> c) a salary reduction arrangement under an IRC Section 125 plan; and
>
> 2. not including overtime pay or expense reimbursements for the same period as above.

AR59.

12.     The Policy defines "Bonuses" and "Commissions" as follows:

> Bonuses means the monthly average of bonuses paid to you by the Employer over the 2 calendar year(s) ending just prior to the date you become Disabled[.]
> Commissions means the monthly average of commissions paid to you by the Employer over the 24 calendar month period ending just prior to the date you become Disabled[.]

AR58.

13.     The Policy defines "Employer" as "the Policyholder." AR58.

14.     The Policy defines "Policyholder" as "Ringler Associates Incorporated and Affiliates." AR45.

15.     The Policy contains a section for "ERISA Information," which states that the "Employer/Plan Sponsor" is "Ringler Associates Incorporated and Affiliates," with a single address of 27422 Aliso Creek Road, Aliso Viejo, CA 92656-5337, *i.e.* Ringler Associates. The

A118

same information is given for the identity and address of the Plan Administrator, and the agent for service of legal process on the Plan. AR68, 69.

16.     Ringler Associates' address is also listed in the Policy as the Plan Sponsor's exclusive address, and the Plan's exclusive address for service of legal process. AR68-98.

17.     The Policy identifies the Employer Identification Number for Ringler Associates (95-3862316). AR68.

18.     The Policy states that "[a] copy of the Plan is available for your review during normal working hours in the office of the Plan Administrator." AR68.

19.     The Plan "is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan." AR69.

20.     The Policy states that the "Employer" is responsible for paying premiums to Hartford Life. *See* AR69 ("Sources of Contribution -- The Employer pays the premium for the insurance…").

21.     The Policy states: "[a]n employer may be included as a Participant Employer if the Policyholder and Hartford Life so agree. … The Policyholder may act for or on behalf of all Participant Employers in all matters of the policy. … An employee of a Participant Employer will be deemed to be an employee of the Policyholder for insurance purposes." AR113.

22.     With respect to the Policy and Plan, there is no dispute that:

  a. Ringler Associates is a Policyholder and Employer under the terms of the Plan;

  b. Ringler Associates considered itself the Employer under the Policy, as well as the plan administrator of the Plan, responsible for complying with

4

A119

ERISA and with a duty "to ensure that all claims are submitted properly and to clarify any ambiguity." AR470, 1405.

    c.   under the Policy, "Eligible Persons will be enrolled automatically by the Employer," AR46;

    d.   Ringler Scarsdale did not establish, sponsor or maintain the Plan, and did not even exist at the time the Plan was established in 1999, AR45;

    e.   neither plaintiff nor Ringler Scarsdale generated or maintained records of his enrollment in the Plan (which records plaintiff now asserts are critical to his claim); and that

    f.   neither plaintiff nor Ringler Scarsdale have any documentation for or explanation of how Ringler Scarsdale did enroll – or even could have enrolled – plaintiff in the Plan.

## III.    Plaintiff's LTD Claim

### A.    Hartford Life Approved Plaintiff's Claim for LTD Benefits

23.    On December 16, 2015, plaintiff claimed he was disabled from his job as an Associate Development Consultant due to "pain and greatly reduced movement [in his] lower back. *See* AR1572

24.    On December 17, 2015, Carol Ferrari-Rogers, the Operations Manager of Ringler Associates, sent Hartford Life: (1) plaintiff's application for LTD benefits; (2) an Employer Statement completed by Ms. Ferrari-Rogers on December 17, 2015; (3) plaintiff's job description; (4) plaintiff's most recent earnings statement showing gross earnings of $73,077.04 through September 11, 2015; and (5) plaintiff's 2014 W-2 reporting a salary of $100,000.16. AR1552-1565.

5

A120

25.    On the Employer's Section of the application for benefits provided by Ms. Ferrari-Rogers on December 17, 2015, Ms. Ferrari-Rogers stated that plaintiff's "Basic salary or wage immediately prior to cessation of work because of disability" was $100,000 annually. AR1555.

26.    On December 21, 2015, plaintiff sent Hartford Life a 1099-MISC for 2014 showing "Nonemployee compensation" of $125,000, which plaintiff asserted as a "Bonus in addition to W2 already forwarded," AR1529-30; and excerpts from Fidelity Investments statements showing various deposits and withdrawals, AR1531-33, which plaintiff asserted documented "Sep contributions [of] [$]52,000 and [$]50,000 for the last two years," AR1529. According to plaintiff, these documents demonstrated that his "total payment from Ringler Associates Inc., in 2013 was $200,000.00 and for 2014 [$]277,000." AR1529.

27.    Hartford Life notified plaintiff on December 28, 2015 that it was seeking "a Physical Demands Analysis and confirmation of your regular monthly rate of pay as well as bonuses and commission for the calendar year 2013 and 2014[,]" and advised plaintiff that it had requested this information "directly from your Employer. … Please urge your Employer to send us the requested information as soon as possible." AR319.

28.    On December 28, 2015, Hartford Life contacted Ms. Ferrari-Rogers at Ringler Associates to request: (1) plaintiff's monthly rate of pay inclusive of bonuses and commissions (*i.e.*, plaintiff's Pre-disability Earnings) for 2013; (2) a completed Physical Demands Analysis for plaintiff's occupation; and (3) confirmation as to whether plaintiff paid his own LTD premium. AR1509.

29.    Ms. Ferrari responded to Hartford Life the following day, providing the requested information and confirming that "[plaintiff] is a Producer who did NOT pay his LTD premiums, which means that his benefits ARE 100% taxable." AR1508 (emphasis in original).

30.    On December 31, 2015, Hartford Life followed up with Ms. Ferrari-Rogers for clarification of plaintiff's Pre-disability Earnings, and particularly the disparity between the earnings reported by Ringler Associates and the earnings reported by plaintiff. Hartford Life explained: "Mr. Mayer indicated that he received additional bonuses that aren't indicated on the information you sent. He indicated another $100,000 in bonuses and $50,000 in SEP plan contributions." AR1507.

31.    Ms. Ferrari-Rogers responded to Hartford Life on December 31, 2015. AR1506. In her response, Ms. Ferrari-Rogers supplied plaintiff's 2013 W-2 showing earnings of $150,000.16, and plaintiff's 2014 W-2 showing earnings of $100,000.16, AR1506, and explained:

> I have also reviewed his Ringler Associates Scarsdale, Inc. general ledger and [it] do[es] not show any contributions to a SEP account or pension contributions. If he has made any of these contributions it was not through his Ringler business. He will have to provide this to you himself. (if he does show you the documentation, I would also like to see that copy).

AR1506-07.

32.    Hartford Life provided Ms. Ferarri-Rogers with the 2014 1099-MISC plaintiff submitted, AR1506, and Ms. Ferrari-Rogers responded, confirming that Ringler Associates did not issue the 1099-MISC. AR1505. Ms. Ferrari-Rogers wrote on January 4, 2016: "we pay LTD premiums based on W2 GROSS Salaries. Why would any additional income be considered?" AR1504.

33.     In February 2016, plaintiff forwarded to Hartford Life a February 9, 2016 email he had received from Ms. Ferrari-Rogers. AR1403-06. In that February 9, 2016 email, she:

      a.  confirmed that "Ringler Associates, Inc. (the home office) is the plan administrator of the Hartford Long Term Disability Policy[.]" AR1404-05;

      b.  stated that, "as the administrator of the plan, our duty to the plan and to those who are insured is to ensure that all claims are submitted properly and to clarify any ambiguity." AR1405; and

      c.  explained how Ringler Associates calculated and paid premiums: "The premium payments are our responsibility and the calculations are based on the payroll activity through our ADP payroll system which we keep for the corporations of all Associates. Since we are the plan administrators, we need to ensure that the premium calculations are correct and are paid in a timely manner." AR1405.

34.     When plaintiff forwarded that February 9, 2016 email to Hartford Life, he confirmed that the extra income apparently came through various "side" ventures that did not involve Ringler Associates:

> As to the source of my funds I have previously stated they came from the general accounting of Ringler Associates Scarsdale inc. (sic). I was paid 448k in commissions in 2014. I run expenses through Ringler Associates Scarsdale, inc. (sic) which Ringler Associates sees but I also recover many of these expenses back from other sources which Ringler may or may not be aware. For example, Rent (sic) and office expenses go fully through Ringler Associates Scarsdale, inc. (sic), which Ringler Associates processes, but I recover them back from the tenants I have in my office. I have small office and rent out the main corner offices and two other offices. Further, I do joint marketing where Ringler Associates again sees the expenses and does not see the money coming back into Ringler Associates Scarsdale, Inc.

AR1403.

35.     Hartford Life approved plaintiff's claim for LTD benefits on January 4, 2017, subject to a determination as to the correct amount and taxability of benefits payable to Plaintiff pursuant to the Policy. AR254-59.

**B.     Hartford Life Calculated Benefits Based On the Earnings Information Provided by Ringler Associates**

36.     Hartford Life spoke to Ms. Ferrari-Rogers and Ringler Associates' broker on January 5, 2017, who told Hartford Life that plaintiff "sell[s] annuities for Ringler [Associates]. He is not precluded from earning other money from other sources and he may do this under his company name Ringler Associates of Scarsdale. … **General premium is based on monthly rate of pay from Ringler [Associates] and not any other income from any other source.**" AR159 (emphasis added). They also told Hartford Life that Ringler Associates "doesn't show any SEP in 2013 and 2014." AR159.

37.     On January 6, 2017, Ringler Associates provided to Hartford Life copies of plaintiff's bi-weekly pay statements for 2013, 2014 and 2015. AR696-771.

38.     The bi-weekly pay statements provided by Ringler Associates showed regular earnings of $3,846.16, paid every two weeks, for annual earnings of $100,000.16. AR696-771. They also showed a bonus of $50,000 paid in December 2013. AR746. There was no bonus of $125,000 in 2014, which plaintiff had claimed he had received as "nonemployee compensation." AR1530.

39.     On January 6, 2017, Hartford Life notified plaintiff's attorney that it had confirmed the calculation of monthly Pre-disability Earnings of $10,416.68. AR250-52. It explained that the pay statements Ringler Associates had provided showed that plaintiff "received a bi-weekly payroll in the amount of $3,846.16 for the time period 01/01/2013-12/31/2014. He received one bonus in the amount of $50,000 on 12/20/2013. There were no

9

A124

other bonuses or commissions paid during this time period." AR251. Hartford Life continued: "The total pay for the 2 calendar years prior to your Disability was $250,000.32. The Monthly Rate of Basic Earnings is calculated as $250,000.32 / 24 = $10,416.68." AR251. Plaintiff's gross monthly disability benefits was 66-2/3 of his Pre-disability Earnings, or $6,944.45.

        **C.**      **Hartford Life Upheld Its Determination on Administrative Appeal**

40.       On July 5, 2017, plaintiff wrote Hartford Life "to confirm Mr. Mayer's request for review and the general grounds thereof" and asserted that he intended "to supplement this appeal initiation with additional argument and evidence by the actual appeal deadline of July 13." AR630, 634.

41.       Plaintiff then submitted the material in support of his appeal on July 13, 2017, AR529-591, which is the day Hartford Life designated as the commencement of the appeal.

42.       On appeal, plaintiff contended that his Pre-disability Earnings were far higher than he had previously asserted to Hartford Life. For example, plaintiff claimed that Ringler Scarsdale received more than $900,000 in commissions from Ringler Associates in 2013 and 2014, as supposedly reflected in a "report" from Ringler Scarsdale's "general ledger," which appears to be a document he created in 2017 from unknown data, and which shows payments from entities other than Ringler Associates. AR610, 618-28.

43.       Plaintiff also argued on appeal that he should receive his benefit tax free because "the taxability of the benefit should be governed by the reality of the premium payments, … as reflected by his inclusion of the premium in his taxable income..." AR611. In support of this contention, plaintiff directed Hartford Life to a 2016 letter from Ringler Scarsdale's accountant which stated that plaintiff "has been the sole employee of the company for the past 3 years and is currently still the only employee[,]" and that "Mr. Mayer's long term disability policy was paid

10

A125

by the company." AR943. *See also* AR418 ("[Ringler Scarsdale] has no employees other than Mr. Mayer.").

44.     Plaintiff claimed income of $151,842.01 in 2013 and $399,614.01 in 2014, plus SEP contributions of $50,000 in each year, for total earnings in those two years of $651,456.02, rather than $250,000.01. AR611.

45.     It appears that Plaintiff was relying on "amended" W-2 forms that he apparently caused Ringler Scarsdale to issue, without any clear indication whether they were issued before or after he submitted his disability claim. AR615-16; AR937-38. Moreover, there was no longer any apparent indication of the $125,000 in 2014 "nonemployee compensation" that plaintiff previously asserted should be counted. *See* AR1529-30. *Compare* AR937-38.

46.     Plaintiff did not provide any explanation why his 2017 assertions about his 2013 and 2014 earnings were greater than his earlier assertions of those same earnings. Nor did plaintiff contend that Ringler Scarsdale or Ringler Associates paid premiums to Hartford Life in 2013 or 2014 based on the earnings he was now claiming for those years.

47.     Hartford Life investigated plaintiff's enrollment and election, including reaching out to Ringler Associates and its broker in July and August 2017. See, e.g., AR392-414.  As of August 24, 2017, however, Hartford Life was still waiting for Ringler Associates and/or its broker to respond to Hartford Life's request for information and/or documentation regarding plaintiff's enrollment and earnings. AR144.

48.     Consequently, on August 24, 2017, Hartford Life notified plaintiff by letter: "We are unable to make a decision on your client's appeal during the initial 45 day period because we are still awaiting information from the Employer needed to fully investigate your client's claim." AR239.

49.     On September 20, 2017, Ringler Associates confirmed in an email to plaintiff (which was subsequently forwarded to Hartford Life by Ringler Associates), that Ringler Associates considered that it was the "Employer," not Ringler Scarsdale. AR470.

50.     Ringler Associates also confirmed that its group is "a self administered group" and that Ringler Associates "is responsible for keeping all documents related to enrollment on file." AR441.

51.     It is undisputed that neither plaintiff nor Ringler Scarsdale generated or maintained records of his enrollment in the Plan. It is also undisputed that, even during his claim, plaintiff continued to rely on Ringler Associates for submission of claims documents to Hartford Life. *See, e.g.*, AR1552-65.[3] *See also* Pl. Proposed Findings of Fact and Conclusions of Law, Doc. 30 ("Pl. PFF") ¶ 96 (stating that plaintiff relied on Ringler Associates to submit "a corrected Physical Demands Analysis to Hartford.") Similarly, plaintiff relied and continues to rely on representations by Ringler Associates – not Ringler Scarsdale – regarding the nature of his employment. As support for the assertion that he was a "Producer" under the terms of the Policy, Pl. PFF, ¶ 19, plaintiff cites to a Ringler Associates email and a Ringler Associates job description. AR1508 ("Greg is a Producer."); AR1473 ("Responsibilities [of job]: Shall comply with the rules and regulations of the Company as they pertain to producers and agents of the Company").

52.     On November 9, 2017, Hartford Life upheld its determination of Pre-Disability Earnings and the monthly benefit. AR233-38. Hartford Life explained that, because the Plan was

---

[3] In fact, plaintiff *admits* that he relied on Ringler Associates to provide this information: "Ms. Ferrari also provided a completed Physical Demands Analysis ('PDA') form, dated December 29, 2015." Pl. Proposed Findings of Fact and Conclusions of Law, Doc. 30, ¶ 64(a). Then, when plaintiff disagreed with some of Ringler Associates' statements in the PDA, plaintiff sought to convince Ringler Associates to change it. *Id.* ("Ms. Ferrari refused to correct the form and resign it with the corrections Mr. Mayer had made for her.").

self-administered, the "Employer/Plan Administrator is responsible for keeping all documents related to employee's eligibility, enrollment and cost to be paid by the employee with respect to the LTD coverage under the Policy. Therefore, The Hartford must adjudicate claims based on the information provided by the Employer/Plan Administrator." AR235.

53.     Hartford Life next confirmed that the documents and information it had received from Ringler Associates confirmed that plaintiff's annual salary was $100,000, paid $3,846.16 bi-weekly, and that he was paid a $50,000 bonus in 2013. AR236. Hartford Life stated that the paystubs provided by Ringler Associates did not show payment of any commissions, nor did they indicate that plaintiff had made any deferred compensation contributions through a salary reduction agreement with Ringler Associates. AR236. Further, Hartford Life noted that the general ledger report plaintiff had provided for Ringler Scarsdale "shows no commissions paid to Mr. Mayer by the Employer (Ringler Associates Incorporated)." AR236-37.

54.     Hartford Life explained that plaintiff's SEP contributions could not be included in the calculation of his earnings under the Plan because a "SEP-IRA is considered a 408(k) plan. As such, pursuant to the provisions of the Policy, such personal contributions to a SEP-IRA would not be included in the calculation of his Monthly Rate of Basic Earnings since it is not a salary reduction agreement with the Employer to an Internal Revenue Code (IRC) Section 401(k), 403(b) or 457 deferred compensation arrangement; an executive non-qualified deferred compensation arrangement; or a salary reduction arrangement under an IRC Section 125 plan." AR237; *see also* AR59.

55.     Hartford Life summed up its conclusion: "Therefore, based on the contractual provisions of the Ringler Associates Incorporated and Affiliates Long Term Disability Policy, and the documentation contained in your client's claim file, taken as a whole, our determination

remains that that the initial calculation of Mr. Mayer's Monthly LTD Benefit … was appropriate and as such, the decision will stand." AR237.

56.     Hartford Life confirmed on multiple occasions, with Ringler Associates and its broker, that Ringler Associates paid premiums on the Policy. *See, e.g.*, AR159 (call with Ringler Associates and broker confirming that "LTD premiums in 2013 were $859.96" and "in 2014 were $1274.96"); AR697 (email from Ms. Ferrari-Rogers regarding LTD premium payment history) AR1404-05 (email from Ms. Ferrari-Rogers stating that "[t]he premium payments are our responsibility and the calculations are based on the payroll activity through our ADP payroll system which we keep for the corporations of all Associates" and stating that Ringler Associates is responsible for ensuring that "the premium calculations are correct and are paid in a timely manner."); AR1504 (email from Ms. Ferrari-Rogers stating that Ringler Associates "pay[s] LTD premiums based on W2 GROSS Salaries."); AR1508 (email from Ms. Ferrari-Rogers stating that "Greg is a Producer who did NOT pay his LTD premiums."). In light of this, Hartford Life determined that plaintiff's benefit was 100% taxable. AR251.

57.     There can be no genuine dispute that plaintiff treated Ringler Associates as the Policyholder and Employer through his date of disability, and until the time he sought to increase his disability benefit. The Policy provides that "[t]he Employer pays the premium for the insurance" and plaintiff has admitted that "RAI [Ringler Associates] paid premiums for Mr. Mayer's coverage under the Plan[.]" AR69.  Any assertion by plaintiff that Ringler Associates subsequently deducted from Ringler Scarsdale's "account," if accurate, does not change the fact that it was Ringler Associates that engaged in the Employer function of calculating and paying those premiums in the first place.

14

A129

58.     Hartford Life also upheld its decision that the benefits were taxable. In so doing, Hartford Life explained that Ringler Associates, which kept all records regarding eligibility, enrollment and costs to be paid by employees, reported that Ringler Associates paid 100% of plaintiff's premium for the coverage under the Policy. AR235. Hartford stated that it must adjudicate claims based on that information. AR235. Hartford Life stated that, if it were accurate that Ringler Associates somehow charged plaintiff or Ringler Scarsdale for premiums after Ringler Associates paid those premiums to Hartford Life, "this would need to be resolved between the employer and your client, Mr. Mayer, regarding any type of refund for premium payment since employees do not have the option to pay premiums back to their Employer in order to make a non-contributory benefit a contributory benefit." AR237.

## PROPOSED CONCLUSIONS OF LAW

**I.      Standard of Review**

> **A.      Hartford Life's Determinations Must Be Reviewed Under the Discretionary Standard to Determine Whether They Were Arbitrary and Capricious**

1.      ERISA governs the Plan, plaintiff's claim, and this action. 29 U.S.C. § 1132(a)(1)(B).

2.      There can be no dispute that the Plan gave Hartford Life "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." AR31, 34; AR68, 71; AR105, 108. This language is sufficient to vest discretionary authority in Hartford Life. *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 251 (2d Cir. 1999). "[W]here, as here, written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [courts] will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Hobson v. Met. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quotation marks omitted).

15

A130

3.      "Under the arbitrary and capricious standard of review, [courts] may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law. This scope of review is narrow; thus, we are not free to substitute our own judgment for that of the insurer as if we were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83 (quotation marks and brackets omitted). Thus, "the question for this court is not whether [the insurer] made the 'correct' decision but whether [it] had a reasonable basis for the decision that it made." *Hobson*, 574 F.3d at 89 (brackets and quotation marks omitted).

4.      "Substantial evidence" in this context is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quotation marks, brackets and ellipses omitted).

5.      A discretionary administrative determination is entitled to a "presumption of correctness[.]" *Sullivan v. LTV Aero. & Def. Co.*, 82 F.3d 1251, 1258 (2d Cir. 1996).  Thus, plaintiff must prove by a preponderance of the evidence that Hartford Life abused its discretion. *Sullivan*, 82 F.3d at 1259-60.

### 1.      California law does not change the standard of review in this action

6.      There is no dispute that the Policy was delivered in California, and that California law applies. California law, however, does not bar discretionary clauses in all policies issued in California.

7.      Plaintiff argues that his claim was subject to *de novo* review under California Insurance Code § 10110.6(a), which provides, in pertinent part:

16

A131

> If a policy … offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage **for any California resident** contains a provision that reserves discretionary authority to the insurer … to determine eligibility for benefits or coverage, to interpret the terms of the policy, … or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable. [emphasis added].

California law, however, does not bar discretionary clauses in all policies issued in California. Rather, by its plain terms, Cal Ins. Code § 10110.6(a) precludes enforcement of discretionary clauses *against California residents*. Plaintiff admits that he is *not* a California resident. Pl. PFF ¶ 1 (plaintiff "has at all relevant times been a resident of the State of New York."). Accordingly, this law, by its plain terms, does not impact the language of the Plan as applied to plaintiff. *See, e.g.*, *Campbell v. Hartford Life & Accident Ins. Co.*, 2018 WL 4963118, at *8 n.8 (S.D. Fla. Oct. 15, 2018) ("by its own express terms, the statute applies only to California residents"); *Pfenning v. Liberty Life Assurance Co.*, No. 3:14-CV-471, 2015 WL 9460578, at *8 (S.D. Ohio Dec. 28, 2015), *vacated and remanded by agreement*, *Pfenning v. Liberty Life Assurance Co.*, 16-3068 (6th Cir. Aug. 2, 2016) ("Liberty further argues that this discretionary clause is valid because the California law only applies to California residents. The Court agrees. The code explicitly states that the policy with the discretionary clause is void if it provides or funds life insurance or disability insurance coverage for *any California resident*.").[4]

8.     Plaintiff's interpretation of California Insurance Code § 10110.6(a) is wrong. If the statute were to be interpreted the way plaintiff contends it should be, it would represent an

---

[4] On appeal, the parties in *Pfenning* agreed (for unstated reasons) that *de novo* review applied, and the matter was therefore vacated and remanded. *Pfenning v. Liberty Life Assurance Co.*, 16-3068 (6th Cir. Aug. 2, 2016). The Court of Appeals did not address the scope or application of California law.

17

A132

intolerable overreach by California into the authority of the rest of the states to regulate the business of insurance. The McCarran-Ferguson Act reserves to each state the power to regulate insurance. 15 U.S.C. §1012(b). As part of this regulatory power, states typically require that insurance policies be filed and approved before they can be sold within their territory, and they impose requirements or restrictions on the contents of those policies. If a state wants to ban or restrict the use of discretionary clauses, it has essentially two paths to follow: (1) it can require that any policy issued in that state not contain a grant of discretion; or (2) it can preclude the use of the clause against a citizen or resident of the state, regardless of where the policy is issued. As noted above, California chose the second option, because Section 10110.6(a) states that it applies regardless of where the "policy, contract, certificate or agreement, [is] offered, issued, delivered or renewed[.]" Instead, as noted, California chose to regulate the terms of a policy to the extent that it insures a California resident. *Id.*

9.      Other states that have imposed a limitation on discretionary clauses chose the first option. *See, e.g.*, 50 Ill. Admin. Code §2001.3 (precluding discretionary clauses in a policy "offered or issued in this State"); 28 Tex. Admin Code § 3.1203 (prohibiting "[i]nclusion of a discretionary clause in any form" in policies required to be filed with the Texas Department of Insurance); Mich. Admin. Code R 500.2202 ("an insurer shall not issue, advertise, or deliver to any person in this state a policy … that contains a discretionary clause"). Had California chosen to prohibit discretionary clauses in any policy issued in California, then plaintiff could legitimately assert that the Policy did not contain an enforceable discretionary clause. Plaintiff does not contend that New York has an enforceable ban on discretionary clauses.

10.      Plaintiff does not cite a single case in which any court has applied the California law to require *de novo* review in a claim brought by someone who is not a California resident.

18

A133

Plaintiff cites *Orzechowski v. Boeing Co. Non-Union LTD Plan, Plan No. 625,* 856 F.3d 686 (9th Cir. 2017), but the plaintiff in *Orzechowski* was a California resident. *See* Complaint, *Orzechowski v. Boeing Co. Non-Union LTD Plan, Plan No. 625, et al.*, C.D. Cal. 8:12-cv-01905-CJC-JDE, Doc. 1, Nov. 11, 2012 at ¶ 6 ("Orzechowski … is a resident of the County of Los Angeles, California."). And *Orzechowski* merely holds that "*if any discretionary provision is covered by the statute*, 'the courts shall treat that provision as void and unenforceable.'" *Orzechowski*, 856 F.3d at 692 (emphasis added). In contrast, two cases have held that the California law bans enforcement of discretionary clauses only against California residents. *Campbell*, 2018 WL 4963118, at *8 n.8 ("by its own express terms, the statute applies only to California residents. Plaintiff claims to be a resident of Palm Beach County, Florida, not California. DE 1, ¶ 2. Accordingly, the holding in *Orzechowski* does not apply here. "); *Pfenning*, 2015 WL 9460578, at *8 ("Liberty further argues that this discretionary clause is valid because the California law only applies to California residents. The Court agrees.").

11.     Interpreting the California law as plaintiff contends would allow California to determine the terms of insurance policies issued in other states, and that insure residents of other states, as long as a single insured is a resident of California. Plaintiff has not attempted to explain, he cannot legitimately justify, and no court has endorsed, such an all-encompassing expansion of California's regulatory power. Because plaintiff is not a California resident, the California statute at issue does n

## 2.     Hartford Life Complied with Claim Procedures

12.     Plaintiff argues that Hartford Life failed to comply with various provisions in 29 C.F.R. § 2560.503–1 ("Section 503-1"), which requires a loss of deference. The Court disagrees.

13.     It should be noted that Section 503-1 was substantially revised, but the revisions only govern claims filed on or after April 1, 2018. 29 C.F.R. § 2560.503–1(p)(3); 81 Fed. Reg. 92316. The version of Section 503-1 applicable to plaintiff's claim was issued in 2000. 65 Fed. Reg. 70,246.

### i. Hartford Life's Extension Letter Was Timely and Sufficient

14.     Plaintiff argues that Hartford was five days late in providing notification of special circumstances justifying an extension of time to decide his appeal under Section 503–1(i)(3). It was not. Hartford Life's records indicate that it received plaintiff's administrative appeal on July 13, 2017. AR146, 233-34. Section 503-1(i)(3) requires an extension notice to be delivered within 45 days of receipt of the appeal. Forty-five days from July 13, 2017 is August 27, 2017. Hartford Life provided its extension notice on August 24, 2017. AR239. Hartford Life's notification therefore was timely.

15.     The basis of plaintiff's contention that he commenced his appeal on July 5, 2017 appears to be that he wrote on that day "to confirm Mr. Mayer's request for review and the general grounds thereof" and asserted that he intended "to supplement this appeal initiation with additional argument and evidence by the actual appeal deadline of July 13." AR630, 634. Plaintiff then submitted the material in support of his appeal on July 13, 2017, AR529-591, which is the day Hartford Life designated as the commencement of the appeal. Given that plaintiff asserted on July 5 that the full set of appeal materials would be submitted on or before July 13, it was entirely reasonable for Hartford Life to conclude that plaintiff's appeal was filed when that additional material actually was received on July 13, 2017.

16.     Moreover, Section 503-1(i)(4) provides that the time to decide an appeal is tolled while waiting for the claimant to submit "information necessary to decide a claim[.]" Thus, even

20

A135

if the appeal was deemed filed on July 5, 2017, the clock would not have started to run until July 13, 2017.

17.     Plaintiff also argues that Hartford Life "cited no special circumstances, whatsoever" for the extension of the deadline to decide the appeal. The Court does not agree. Hartford Life's August 24, 2017 letter states: "We are unable to make a decision on your client's appeal during the initial 45 day period because we are still awaiting information from the Employer needed to fully investigate your client's claim." AR239. Plaintiff acknowledges that Hartford Life was "awaiting response from Broker/Employer regarding election forms for CLMT, " but dismisses Hartford Life's need to obtain such response as "not 'special'".

18.     Under Section 503-1, a "special circumstance" is something beyond the control of the claim administrator. *Hafford v. Aetna Life Ins. Co.*, 2017 WL 4083580, at *5 (S.D.N.Y. Sept. 13, 2017) ("the Department of Labor's preamble to Subsection 503-1(i)(1)(i)… states that 'special circumstances' refers to "reasons beyond the control of the plan"); *Hancock v. Aetna Life Ins. Co.*, 251 F. Supp. 3d 1363, 1373 (W.D. Wash. 2017) ("the DOL's preamble and regulations contemplate that a situation beyond the control of the plan constitutes a special circumstance that necessitates an extension.").

19.     The fact that Hartford Life needed to wait for Ringler Associates to respond to its request for information and/or documentation regarding plaintiff's enrollment and earnings is beyond Hartford Life's control, and therefore constitutes a "special circumstance." In fact, a critical reason Hartford Life needed additional time to obtain enrollment information from Ringler Associates was that neither plaintiff nor Ringler Scarsdale provided it.

20.     Hartford Life had no obligation to maintain enrollment records. To the contrary, the Plan states that the Employer is responsible for completing and maintaining enrollment

records, AR46, which is typical for a self-administered plan. If Ringler Scarsdale had acted at plaintiff's Employer with respect to the Plan, the Ringler Scarsdale would have had plaintiff's enrollment records.

> ### ii. Hartford Life Did Not Violate 29 C.F.R. § 2560.503-1 By Not Producing "Any Information Developed" In Connection With Plaintiff's Appeal Prior to Making a Determination on Appeal

21.     Plaintiff argues that he is entitled to *de novo* review because his counsel "repeatedly requested that Hartford provide – prior to its final decision – *any* information developed in Hartford's investigation of Mr. Mayer's employment, plan enrollments, sources of compensation, etc." The Court disagrees. Plaintiff was not entitled to a continuous feed of "any information developed" by Hartford Life in connection with an administrative appeal prior to entry of a decision on that appeal.

22.     The revision to Section 503-1 applicable to claims filed on April 1, 2018 – which is not applicable to plaintiff's claim – requires enhanced disclosure of evidence and rationales developed on administrative appeal. *See, e.g.*, 29 C.F.R. § 2560.503-1(h)(4). But the Department of Labor cautioned that even that new procedure does not require the kind of constant disclosure of new information that plaintiff contends the old regulation requires. 81 FR 92316, 92326 ("The provision does not require that the plan provide the claimant with information in a piecemeal fashion without knowing whether, and if so how, that information may affect the decision.").

23.     The version of Section 503-1 applicable to plaintiff's claim does *not* require a disability plan to disclose to the claimant, before a decision on an administrative appeal, evidence that was generated or received as part of the administrative appeal. *Metzger v. UNUM Life Ins. Co. of Am.,* 476 F.3d 1161 (10th Cir. 2007), *Glazer v. Reliance Std. Life Ins. Co.,* 524 F.3d 1241 (11th Cir. 2008); *Midgett v. Washington Group Int'l LTD Plan,* 2009 WL 8186025

22

A137

(8th Cir. June 3, 2009). Each of those decisions held that the plain text of Section 503-1(h)(2)(iii) (2000) did not require disclosure before a decision on administrative appeal is issued. *Metzger*, 476 F.3d at 1167 ("In light of the sum procedural requirements of 29 C.F.R. § 2560.503-1 and the Department's explanation of those regulations, we hold that subsection (h)(2)(iii) does not require a plan administrator to provide a claimant with access to the medical opinion reports of appeal-level reviewers prior to a final decision on appeal."); *Glazer,* 524 F.3d at 1245 ("Glazer's argument [that disclosure is required before a decision is made] is contrary to the plain text of the regulations."); *Midgett,* 561 F.3d at 896 ("The amendments to § 2560.503-1 enacted in 2000 … indicate that the full and fair review to which a claimant is entitled under 29 U.S.C. § 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal.").

24.     Plaintiff relies on a contrary holding in *Hughes v. Hartford Life & Acc. Ins. Co.*, 368 F. Supp. 3d 386 (D. Conn. 2019), but that decision is not binding on this Court and should not be followed here. In *Hughes*, the District of Connecticut rejected the clear appellate authority found in *Metzger*, *Glazer*, and *Midgett*, on the ground that the report of an independent medical examination conducted during administrative appeal was a "relevant" document that a claimant is entitled to review prior to a determination on administrative appeal.

25.     *Hughes* erred, in relevant part, by misconstruing the meaning of the term "relevant" as used in Section 503-1. *Hughes*, 368 F. Supp. 3d at 394–95 (opining that "it is artificial to suggest" that "relevant" information to which an claimant was entitled pending a decision on appeal under the 2000 version of Section 503-1 was limited to material relied on, submitted, considered, *etc.* in connection with the *initial* adverse determination, and not materials "submitted, considered or generated" in connection with the as-yet unmade determination on

23

A138

review). The *Hughes* Court's conclusion was clearly contradicted by the text of the 2000 regulation.

26.    Among the provisions added to Section 503-1 in 2000 were the following subsections:

> **(h) Appeal of adverse benefit determination.**
> **(2) Full and fair review.** … [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures- …
> (iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section; …

27.    Section 503-1(h)(2)(iii) expressly incorporated (m)(8), which read in pertinent part: "A document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information (i) Was relied upon in making the benefit determination; [or] (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination[.]"

28.    Thus, by the express terms of the 2000 regulation a document becomes "relevant" to a particular benefit determination, and subject to disclosure on request, only *after* the particular benefit determination had been made. For example, (m)(8) could easily have stated that a "relevant" document is one that "*is* generated in the course of making a benefit determination," but it used the past tense *was*, and included a consideration of the role that the document did or did not play in "the benefit determination[.]" If the Department of Labor meant to allow claimants to demand at any time any documents that a plan had generated in connection

with a claim, then it surely could have said so. However, as noted above, even in amending Section 503-1 as of 2018 to provide for additional disclosure on administrative appeal, the Department of Labor did not require the disclosure that *Hughes* held, and plaintiff claims, is required.

29.     Indeed, under the 2000 regulation, (h)(2)(iii) *must* be interpreted to include the claimant's right to obtain documents relevant to the *initial* adverse determination, because there was no other provision in the 2000 regulation that allowed the claimant to request those materials. In particular, subsections (a) through (g) did not give the claimant the right to demand production of the materials that the plan relied on, considered, or generated in making the initial adverse determination. 65 Fed. Reg. 70,265-70,268. Because (h)(2)(iii) and (m)(8) must be read together to allow the claimant to demand disclosure of material relied on, submitted, considered, *etc.* in connection with the *initial* adverse determination, these provisions cannot also be interpreted to address materials "submitted, considered or generated" in connection with the as-yet unmade determination on review.

30.     The DOL's preamble to the 2000 regulation confirms this interpretation of (h)(2)(iii), by explaining its rationale for proposing the requirement for the production of "relevant" documents:

> The proposal [that became the 2000 regulation] attempted to clarify the 1977 regulation's requirement that claimants be afforded access, after a benefit denial, to "pertinent documents." … [T]he Department believed that these changes would make clear that claimants must be provided access to all of the information present in the claims record, whether or not that information was relied upon by the plan ***in denying the claim***[.] … Such full disclosure, which is what the 1977 regulation contemplated, is necessary ***to enable claimants to understand the record on which the decision was made and to assess whether a further appeal would be justified.***

25

A140

65 Fed. Reg. 70,252 (emphasis added). The DOL said nothing about obtaining and rebutting evidence generated during the administrative appeal.

31.     The plain language of the 2000 version of Section 503-1, as further explained by the DOL's preamble to the 2000 regulation, confirms that a claimant has two opportunities to obtain "relevant" documents: after the initial adverse determination ((h)(2)(iii)), and after the adverse determination on review ((j)(3)).

32.     The DOL's 2018 amendment to Section 503-1, which governs claims filed on or after April 1, 2018, further confirms this. As discussed above, the 2018 regulation added a new subsection (h)(4) requiring "plans providing disability benefits" to disclose new or additional evidence generated during administrative appeal, and to give claimants an opportunity to respond to that evidence, *before* making a decision on the appeal. 29 C.F.R. § 2560.503-1(h)(4). If the 2000 regulation had already required *all* plans to make such a disclosure prior to deciding an administrative appeal, then it would make no sense for the DOL to create this new obligation in the 2018 regulation, and to limit its application to "plans providing disability benefits." Accordingly, the Court should, reject the flawed analysis and conclusion of *Hughes*.

33.     Even if this Court were to adopt the reasoning in *Hughes*, plaintiff's theory still fails because plaintiff does not claim he was deprived of the opportunity to respond to a discrete, relevant document; rather, he claims he was entitled to a continual download of *any* information developed by Hartford Life on administrative appeal regarding plaintiff's "employment, plan enrollments, sources of compensation etc." Indeed, plaintiff expressly leaves open the classes of documents to which he is entitled using the phrase "etc." in his description. Plaintiff thus advocates a standard that no Court – including *Hughes* – has endorsed, whereby a claimant is

entitled to receive and rebut all information generated in the course of an administrative appeal without limitation.

34.     The procedure plaintiff advocates would contravene the goals of ERISA by "set[ing] up an unnecessary cycle of submission, review, re-submission, and re-review." *Metzger*, 476 F.3d at 1166. As demonstrated by the dearth of authority in plaintiff's brief, there is simply no precedent that plan administrators must afford a claimant the opportunity to review and rebut any piece of information generated on appeal.

### iii.  Even if Hartford Life Violated Claim Procedures, De Novo Review is not Warranted

35.     Even if Plaintiff were able to establish some violation of Section 503-1 (he did not), it would not necessarily support elimination of discretion under *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016). Since *Halo,* the Second Circuit has declined to hold that all violations of Section 503-1 necessarily result in a loss of discretion. *See, e.g.*, *Tedesco v. I.B.E. W. Local 1249 Ins. Fund,* 674 F. App'x 6 (2d Cir. 2016) ("We remand so that the district court may consider in the first instance whether, under *Halo,* these procedural deficiencies warrant *de novo* review of Tedesco's denial-of-benefits claim"). Similarly, *Wilson v. Aetna Life Ins. Co.,* 2016 U.S. Dist. LEXIS 135396 (N.D.N.Y. Sep. 30, 2016), declined to find that a violation of Section 503-1 compelled *de novo* review. *Wilson* considered *Halo,* and explained: "in *Halo,* the plan's denials of coverage were not only repeatedly untimely, but also failed to provide an explanation as to why the plan was denying coverage. As such, it was impossible for the plaintiff and the reviewing court to determine the reason for the denial of coverage." *Id.* at *8. In contrast, *Wilson* involved "a single denial of plaintiff's claim that, while untimely, provided the specific reason for the denial and was otherwise in full conformity with the applicable regulations and the

27

A142

Plan. ... Further, plaintiff has not alleged that she was in any way harmed by the delay, nor could she." *Id.*

36.    The Court concludes that any violation of claim regulations is insufficient to warrant *de novo* review.

## II.    Hartford Life's Determination Was Within its Discretion

37.    Plaintiff contends that Hartford Life was precluded from accepting information regarding his Pre-disability Earnings provided by Ringler Associates, despite the fact that Ringler Associates was the entity that administered the plan. Instead, plaintiff asserts that Hartford Life was obligated to accept plaintiff's own assertions about what his Pre-disability Earnings were for 2013 and 2014, even though: those assertions increased during the course of his claim and the documentation he provided was entirely within his personal control.

38.    Plaintiff's contention regarding the calculation of his Pre-disability Earnings centers on the fact that the Policy defines "Employer" as the "Policyholder," and identifies the Policyholder as Ringler Associates Incorporated and Affiliates. Thus, plaintiff contends that Ringler Scarsdale has the power to calculate and report his Pre-disability Earnings after he submits a disability claim. Plaintiff contends that Ringler Scarsdale has this authority even though he has provided no evidence that Ringler Scarsdale ever fulfilled the responsibilities of the "Employer" by, for example, ascertaining the numbers of covered employees; calculating premium payments; transmitting premium payments to Hartford Life; engaging in discussions regarding Policy renewals or Policy terms; determining which classes of employees should be covered, *etc.*

39.    The Policy states that the "Employer" is located at a single address in Aliso Viejo, California, which is the address of Ringler Associates, *i.e.* the "home office" referenced in Ms.

28

A143

Ferrari's February 16 email. AR68. Ringler Associates' address is also listed in the Policy as the Plan Sponsor's exclusive address, and the Plan's exclusive address for service of legal process. AR68-98. The Policy identifies the Employer Identification Number for Ringler Associates (95-3862316). AR68

40.     The plain reason that the Policy was written this way was to provide that people like plaintiff could be *eligible for coverage* under the Plan, despite the fact that – as he admitted – he was not an employee of Ringler Associates. *See* AR528 ("Ringler Associates Scarsdale, Inc. is an independent contractor of Ringler Associates. Ringler Associates Scarsdale, Inc. is the employer of Gregory J. Mayer."). If not for the inclusion of "affiliates" of Ringler Associates, plaintiff would not be eligible for coverage under the Plan, by his own description of his relationship with Ringler Associates. As noted above, the Plan documents provide for coverage for Participant Employers, and states that employees of Participant Employers will be considered employees of Ringler Associates, rather than employees of the "affiliate." AR113.

41.     Moreover, interpreting the Policy as plaintiff contends it should be interpreted would lead to legal and logical flaws in the Plan. For example, ERISA provides that a plan have a single plan administrator (either a person or a single entity). 29 U.S.C. § 1002(16)(A) ("The term 'administrator' means … the person specifically so designated by the terms of the instrument under which the plan is operated[.]"). The Plan Administrator has a number of obligations in connection with the operation of the Plan. The Plan documents state that the Plan Administrator is Ringler Associates Incorporated and Affiliates, which would, if construed as plaintiff argues, make an amorphous and unspecified group of entities responsible for the operation of the Plan.

29

A144

42.     Likewise, the Policy instructs that "[t]he Employer pays the premium for the insurance, but may allocate part of the cost to the employee. The Employer determines the portion of the cost to be paid by the employee." AR69. To this end, Ms. Ferrari explained to plaintiff in her February 16, 2016 email: "The premium payments are our [Ringler Associates'] responsibility and the calculations are based on payroll activity through our ADP payroll system which we keep for all Associates[.]" AR1404-05.

43.     Further – and separate and apart from who is an "Employer" under the Plan – the real issue is whether Hartford reasonably can rely on documentation and information regarding a claimant's earnings from the entity with whom it exclusively dealt regarding Plan administration – Ringler Associates. Courts have found it reasonable for claim fiduciaries to do so. *See, e.g.*, *Sanford v. Life Ins. Co. of N. Am.*, 1 F. Supp. 3d 829, 835 (M.D. Tenn. 2014), *aff'd*, 591 Fed.Appx. 511 (6th Cir. 2015) (reasonable for third party administrator "to rely on representations made by the employer" that claimant was on Paid Time Off rather than vacation at time of injury); *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 569 (6th Cir. 2013) ("LINA reasonably consulted with Publishers [the employer] to ascertain [plaintiff's] job duties"); *Baker v. The Hartford Life Ins. Co.*, No. 08-CV-6382FLW, 2010 WL 2179150, at *16, *aff'd*, 440 Fed. Appx. 66 (3d Cir. 2011) ("Hartford is entitled to credit [the employer's] representation" regarding workplace accommodations). Such reliance is more appropriate when the Plan is self-administered like this one is, because it is Ringler Associates that has the records regarding who is eligible, who has elected coverage, what they are paid.

### A.     Hartford Life Did Not Change Its Rationale

44.     Plaintiff argues that Hartford Life "initially refused to include the SEP-IRA contribution because 'Ringler [Associates] doesn't show any SEP in 2013 and 2014,' but later

claimed that it could not count Mr. Mayer's SEP-IRA contributions because a SEP IRA was not one of the specifically identified retirement vehicles in the list in the Monthly Rate of Basic Earnings definition." Plaintiff mischaracterizes the evidence of record. Plaintiff cites AR159 as the source of the quote that "Ringler doesn't show any SEP in 2013 and 2014[.]" But plaintiff deleted the rest of the sentence; the full quote reads: "Ringler doesn't show any SEP in 2013 and 2014 – explained that since *the SEP plan is not listed in the MRBE definition and we will not be considering it.*" AR159 (emphasis added). Thus, Hartford Life asserted from the outset that plaintiff's SEP-IRA was not one of the specifically identified retirement vehicles that the Policy permits to be included in calculating the Monthly Rate of Basic Earnings.

### B. Hartford Life's Determination of Plaintiff's Pre-Disability Earnings was Within Its Discretion

45.    Plaintiff contends that Hartford Life was precluded from accepting information regarding his Pre-disability Earnings provided by Ringler Associates, despite the fact that Ringler Associates was the entity that administered the Plan. Instead, plaintiff asserts that Hartford Life was obligated to accept Plaintiff's own assertions about what his Pre-disability Earnings were for 2013 and 2014, even though: those assertions increased during the course of his claim and the documentation he provided was entirely within his personal control. Plaintiff is wrong.

46.    Plaintiff's contention regarding the calculation of his Pre-disability Earnings centers on the fact that the Policy defines "Employer" as the "Policyholder," and identifies the Policyholder as Ringler Associates Incorporated and Affiliates. Thus, plaintiff apparently contends that Ringler Scarsdale has the power to calculate and report his Pre-disability Earnings after he submits a disability claim. Plaintiff contends that Ringler Scarsdale has this authority even though he has provided no evidence that Ringler Scarsdale ever fulfilled the responsibilities

31

A146

of the "Employer" by, for example, ascertaining the numbers of covered employees; calculating premium payments; transmitting premium payments to Hartford Life; engaging in discussions regarding Policy renewals or Policy terms; determining which classes of employees should be covered, *etc.*

47.     The plain reason that the Policy was written this way was to provide that people like plaintiff could be *eligible for coverage* under the Plan, despite the fact that – as he admitted – he was not an employee of Ringler Associates. *See* AR528 ("Ringler Associates Scarsdale, Inc. is an independent contractor of Ringler Associates. Ringler Associates Scarsdale, Inc. is the employer of Gregory J. Mayer."). If not for the inclusion of "affiliates" of Ringler Associates, plaintiff would not be eligible for coverage under the Plan, by his own description of his relationship with Ringler Associates. As noted above, the Plan documents provide for coverage for Participant Employers, and states that employees of Participant Employers will be considered employees of Ringler Associates, rather than employees of the "affiliate." AR113.

48.     Plaintiff acknowledges that neither he nor Ringler Scarsdale generated or maintained records of his enrollment in the Plan, which records he asserts are critical to his claim. The Policy states that "Eligible Persons will be enrolled automatically by the Employer." AR46. If Ringler Scarsdale had been plaintiff's "Employer" under the Policy, then Ringler Scarsdale would have the records of that enrollment. But plaintiff has not come forward with any such records. Plaintiff attempts to shift the blame for the insufficiency of enrollment records, Pl. Br., pp. 12-13 (challenging explanation of change in record-keeping), but in doing so concedes that it was Ringler Associates – not Ringler Scarsdale – that "clearly bore the burden to maintain" those records. Thus, plaintiff concedes that Ringler Associates was responsible for the Employer function of enrolling Eligible Persons. Consistent with this, plaintiff continued to

32

A147

acknowledge Ringler Associates as his Employer for purposes of LTD benefit administration matters, even during his claim, as discussed at length *supra*.

49.   Moreover, interpreting the Policy as plaintiff contends it should be interpreted would lead to legal and logical flaws in the Plan. For example, ERISA provides that a plan have a single plan administrator (either a person or a single entity). 29 U.S.C. § 1002(16)(A) ("The term 'administrator'' means … the person specifically so designated by the terms of the instrument under which the plan is operated[.]"). The Plan Administrator has a number of obligations in connection with the operation of the Plan. The Plan documents state that the Plan Administrator is Ringler Associates Incorporated and Affiliates, which would, if construed as plaintiff argues, make an amorphous and unspecified group of entities responsible for the operation of the Plan.

50.   Likewise, the Policy instructs that "[t]he Employer pays the premium for the insurance, but may allocate part of the cost to the employee. The Employer determines the portion of the cost to be paid by the employee." AR69. To this end, Ms. Ferrari explained to plaintiff in her February 16, 2016 email: "The premium payments are our [Ringler Associates'] responsibility and the calculations are based on payroll activity through our ADP payroll system which we keep for all Associates[.]" AR1404-05.

51.   Hartford's decision to rely on the information that Ringler Associates provided was plainly reasonable. Moreover – even if the Court were to review Hartford Life's determination under a *de novo* standard – plaintiff cannot establish that Hartford Life was incorrect in giving priority to the information provided by Ringler Associates under the facts of this case.

33

A148

**C.**     **Hartford Life's Determination was Not Affected By Any Structural Conflict**

52.     Plaintiff asserts that the Court must also weigh Hartford Life's financial self-interest along with procedural and substantive defects in its decision-making, relying upon *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117-19, 128 S. Ct. 2343, 2351 (2008)). Under *Glenn*, the existence of a structural conflict of interest – arising where a claim administrator determines claims and pays benefits – is "but one factor among many that a reviewing judge must take into account" in determining whether a claim decision is arbitrary and capricious. *Glenn*, 554 U.S. at 116-17, 128 S. Ct. 2343 at 2351.

53.     Where a structural conflict exists, the question under *Glenn* is how much, if any, weight to give to the conflict factor. One answer is that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010); *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009). This is consistent with *Glenn*'s statement that the conflict should "prove less important (perhaps to the vanishing point)" where the "administrator has taken active steps to reduce potential bias and to promote accuracy[.]" *Glenn*, 554 U.S. at 117, 128 S. Ct. at 2351.

54.     The bases on which a purported conflict exist show that there is, in fact, no evidence that any structural conflict influenced Hartford Life's determination. For example, plaintiff argues that evidence of Hartford Life's conflict rests in various aspects of his appeal of Hartford Life's initial determination that he was not disabled under the terms and conditions of the Policy. That conflict clearly did not influence Hartford Life's determination, because Hartford Life determined that plaintiff was, in fact, disabled through the administrative process.

34

A149

AR254-59. Indeed, plaintiff's disabled status is not even at issue in this litigation, as Hartford Life continues to pay LTD benefits to plaintiff.

55.     Similarly, plaintiff contends that Hartford Life "engaged in willfully inaccurate cherry-picking … to prove that the 'company' that paid the premiums for Mr. Mayer's coverage" was Ringler Associates. This is a remarkable argument given that plaintiff himself *admits* that Ringler Assocates "paid premiums for Mr. Mayer's coverage" in his Proposed Findings of Fact and Conclusions of Law. Pl. PFF ¶ 44. Hartford Life's decisions cannot be deemed defective or conflicted where plaintiff himself concedes they are accurate and correct.

56.     Plaintiff also proffers that evidence of a conflict may be found in the fact that some confusion existed early in plaintiff's claim regarding which Booklet governed his claim. But here again, plaintiff's contention is defeated by his own Proposed Finding of Fact and Conclusion of Law that "[t]he LTD Booklet-Certificates are largely identical in term of the relevant benefit and administration provisions." Pl. PFF. ¶ 15 n.2.

57.     In addition, plaintiff recycles prior arguments as evidence of a conflict. He argues a conflict is evident because Hartford Life "missed appeal-level notification and decision deadline procedures – all while providing false information about the reasons for its delays." Plaintiff offers no explanation as to why Hartford's extension need was allegedly "false," and, as discussed *supra*, the extension notification was neither late nor deficient. He similarly finds evidence of a purported conflict because Hartford Life allegedly "withheld relevant documents requested." But as discussed *supra*, it did not.

58.     Plaintiff also attacks Hartford Life's use of surveillance in determining whether plaintiff met the Policy's definition of disabled, but provides no authority to suggest that mere use of surveillance alone is evidence of conflict and no factual predicate to deduce a purported

35

A150

conflict, since Hartford Life ultimately determined that plaintiff is, in fact, disabled. Moreover, the use of surveillance is a well-established investigatory tool. *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003), *aff'd* 124 Fed. Appx. 669 (2d Cir. 2005), *cert. denied*, 546 U.S. 843 (2005) ("Defendant was permitted to evaluate plaintiff's complaints of pain in light of the totality of her behavior, including the activity on the surveillance tape"); *Ingravallo v. Hartford Life Ins. Co.*, 563 Fed. Appx. 796, 800 (2d Cir. Apr. 24, 2014) ("Hartford stated that it utilized 'clinical information and the video surveillance' in its determination"); *Rotondi v. Hartford Life & Accident Grp.*, 2010 U.S. Dist. LEXIS 99502, at *31-32 (S.D.N.Y. Sep. 22, 2010) ("Hartford, in its discretion, decided that the medical evidence … along with the videotaped surveillance footage of Plaintiff provided it with sufficient information to evaluate Plaintiff's LTD claim.").

59.     Finally, plaintiff contends that Hartford Life "ignored evidence and argument submitted by [him]." This argument is not only contradicted by the contents of the Administrative Record, it is disproven by plaintiff's own Proposed Findings of Fact and Conclusions of Law, which confirm that Hartford Life fully evaluated plaintiff's submissions.

60.     Plaintiff cites to a series of cases in support of his contention that Hartford Life refused to consider evidence he submitted, but each is inapposite. If anything, the contrast between this case and the cited cases confirms the extent of Hartford Life's evaluation:

   a.  In *Ricciardi v. Metro. Life Ins. Co.*, No. 16-CV-3805(CM), 2019 WL 652883 (S.D.N.Y. Feb. 15, 2019), an banker's employer provided a shockingly low Eligible Pay figure of 34,527.20 per year without any documentation or explanation whatsoever. The Court itself recognized: "there is absolutely no indication in the record that Morgan Stanley explained to MetLife the information and procedures it used to determine the $34,527.20 number, such as what Ricciardi's base salary was, what his W-2 earnings were, what deductions were appropriately made from those earnings, and how it arrived at the Eligible Pay number that it had to compare to his base salary per the formula in the Plan." *Id.* at *2. The administrative record in that case contained no indication "that MetLife performed any independent calculation of Ricciardi's [Benefits Eligible Earnings] – or that it was given the data that would have allowed it to do so." *Id.* at *5.

36

A151

b. *Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669 (10th Cir. 2019), was a *sui generis* matter in which the dispute was whether the claimant's job, which required some sales work, placed him in a class covering non-salespeople or a class covering salespeople. The Tenth Circuit concluded that plaintiff's job entailed sufficient sales to be included in the class covering salespeople.

c. In *Schewitz v. Aetna Life Ins. Co.*, No. 18-CV-6119, 2019 WL 2189263 (N.D. Ill. May 21, 2019), the Court found that Aetna erroneously determined that the plaintiff's annual predisability earnings were $156,011 (as reported by the employer without providing W-2s or other documentation), rather than $322,689 documented in a contract between the claimant and the employer.

d. In *MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia*, 32 F. Supp. 2d 600, 607–08 (W.D.N.Y. 1999), the court found "no language in the plan that support[ed] … exclusion of … [the] earnings" that Unum had excluded based upon an unsubstantiated statement from the employer.

61.     In each of these cases, the claim administrator erred by accepting an *unsubstantiated* statement from an employer, which was contradicted either by documentation or by logic. In contrast, Hartford Life obtained documentation from Ringler Associates confirming plaintiff's earnings, including tax withholding records and three years of bi-weekly pay records. AR696-771. Hartford Life also communicated repeatedly with Ringler Associates regarding plaintiff's assertions, and Hartford Life also received (from plaintiff) records of some of his own communications with Ringler Associates about these issues. Hartford Life did not ignore plaintiff's submissions, and it did not accept without question or verification what Ringler Associates reported. Hartford Life gathered all information available to it, and then made a reasoned determination.

62.     Plaintiff has not established that Hartford Life's actions were affected by any structural conflict. Further, even if the Court were to determine that Hartford Life's structural conflict warranted some weight, the function of the conflict factor is to "act as a tiebreaker when the other factors are closely balanced." *Glenn*, 128 S.Ct. at 2351. *See also*, *Hines v. First Unum*

*Life Ins. Co.*, 2016 U.S. Dist. LEXIS 37766, at \*58 (S.D.N.Y. Mar. 23, 2016) ("Even were the Court to weigh the structural conflict present here in Plaintiff's favor, First Unum's overall determination was not so unreasonable or unsupported by substantial evidence as to render that conflict outcome determinative."); *Schrom v. Guardian Life Ins. Co. of Am.*, 2013 U.S. Dist. LEXIS 38039, at \*29 (S.D.N.Y. Mar. 19, 2013) ("Assuming arguendo there were an actual conflict, this is not a case in which the factors are so closely balanced that a tiebreaker is required"). Here, like *Hines* and *Schrom*, the substantive factors regarding the merits of plaintiff's claim are not closely balanced, and the conflict factor is immaterial.

63. Accordingly, the alleged structural conflict shall be given no weight in the Court's review, and does not change the outcome.

**D.     Hartford Life Reasonably Determined that Plaintiff's Benefits Are Taxable**

64. The question whether plaintiff's benefits are taxable or not is between plaintiff and the Internal Revenue Service. *See, e.g.*, *Frequently Asked Questions – Life Insurance & Disability Insurance Proceeds 1*, Internal Revenue Service, https://www.irs.gov/faqs/interest-dividends-other-types-of-income/life-insurance-disability-insurance-proceeds/life-insurance-disability-insurance-proceeds-1 (last updated Mar. 8, 2019).

65. In any event, plaintiff does not dispute that his disability benefit is taxable if premiums are paid by the employer, not the employee. Plaintiff merely contends that Ringler Associates somehow charged Ringler Scarsdale for its share of those premiums after Ringler Associates paid Hartford. *See* AR159. Given that plaintiff contends that Ringler Scarsdale is his employer, it is not clear how he claims that his benefits would be tax-free if he established that Ringler Scarsdale paid the premiums.

38

A153

66.    Accordingly, the Court finds that plaintiff is not entitled to a judgment in this action holding that benefits are not taxable.

Dated: July 9, 2019

                              DEFENDANTS,

                              By: /s/ *Patrick W. Begos*
                               Patrick W. Begos
                               Gregory J. Bennici
                               ROBINSON & COLE LLP
                               1055 Washington Boulevard
                               Stamford, CT 06901
                               Tel. No.: (203) 462-7500
                               Fax No.: (203) 462-7599
                               E-mail: pbegos@rc.com
                               E-mail: gbennici@rc.com

A154

The Court deems Doc. #30 plaintiff's Proposed Findings
of Fact and Conclusions of Law. By 7/2/19,
defendants shall file Proposed Findings of Fact and
Conclusions of Law. The parties' oppositions to the
pending cross-motions remain due **7/2/2019**.

SO ORDERED.

_Vincent L. Briccetti_

**Vincent L. Briccetti, USDJ, 6/21/2019**

PATRICK W. BEGOS

1055 Washington Boulevard
Stamford, CT 06901-2249
Main (203) 462-7500
Fax (203) 462-7599
pbegos@rc.com
Direct (203) 462-7550

Also admitted in New York

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/21/19

June 21, 2019

Hon. Vincent L. Briccetti
United States District Court
300 Quarropas Street, Room 620
White Plains, New York 10601-4150

Re: **Gregory Mayer v. Ringler Associates Inc. and Affiliates Long Term Disability Plan
and Hartford Life and Accident Insurance Company; Case No. 7:18-cv-02789**

Dear Judge Briccetti:

This firm represents defendants in this action. I write on behalf of all parties.

As the Court is aware, the parties are in the process of briefing the merits of this action as part of
a bench trial on a stipulated record (Doc. 32). The parties have filed their opening submissions.
Docs. 27-31. One of plaintiff's submissions is titled "Plaintiff's FRCP Rule 56.1 Statement of
Facts (To Be Treated as Rule 52 Proposed Findings of Fact and Conclusions of Law)." Doc. 30.
Defendants did not file a similar document, as our experience in other bench trials on stipulated
records in ERISA matters is that courts typically do not require them, while plaintiff understood
the Court's individual rules to require detailed Proposed Findings for trial.

Counsel for all parties have conferred, and we agree that, because the court is conducting a bench
trial on a stipulated record pursuant to Rule 52, neither Rule 56 nor Local Rule 56.1 apply.
Accordingly, neither party was required to file a Local Rule 56.1(a) Statement, and defendant is
not required to file a formal response to Doc. 30 pursuant to Local Rule 56.1(b). The parties
further agree that the Court can and should consider Doc. 30 as part of plaintiff's trial
submission, and defendants will respond to the assertions made in that document as necessary
and appropriate. Documents filed by either party in response to facts asserted by the other party
may be considered as well.

If the Court disagrees with the parties' agreement, if the Court would like defendants to prepare
and file Proposed Findings of Fact and Conclusions of Law in addition to its trial briefs, or if the
Court would like formal responses to Proposed Findings of Fact, the parties request that the
Court advise the parties how it would like us to proceed.

Respectfully submitted,

/s/ *Patrick W. Begos*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GREGORY MAYER,                                            :

                   Plaintiff,             :        18 CV 2789 (VB)

    -against-                                         :        **STIPULATION AND ORDER REGARDING
                              :        TRIAL RECORD**

RINGLER ASSOCIATES INC. AND AFFILIATES
LONG TERM DISABILITY PLAN                                 :
and HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,                                        :

              Defendants.                         :
-----------------------------------------------------------X

       IT IS STIPULATED by and between the parties hereto that:

1.   The Court shall conduct a bench trial on the following record:

    (a)  Mayer v Hartford 0001 through Mayer v Hartford 001618, to be filed in hard copy as

        an Administrative Record, excluding documents withheld as privileged;

    (b)  Mayer v Hartford Add. 1619 – Mayer v Hartford Add. 1763

    (c)  Privilege Log, Mayer v. Hartford Add 1764

2.   Hartford does not dispute plaintiff's assertion that:

    (a)  Plaintiff received Certificate 216897(GLT) 1.32 (Mayer v. Hartford 75-111) with the

        letter denying his claim dated May 13, 2016 (Mayer v Hartford 269-272), sent with

        Tonya Martinez's email dated May 13, 2016 (Add. 1739), and with the documents

        produced to Mr. Mayer's counsel under cover of a letter from Tonya Martinez dated

        May 26, 2016.  (Mayer v. Hartford 268)

    (b)  Plaintiff received Certificate 216897(GLT) 4.5 (Mayer v. Hartford 38-74) with the

        documents produced to Mr. Mayer's counsel under cover of Tonya Martinez's letter



A0156

dated February 10, 2017 (Mayer v Hartford 248). The documents produced to counsel under that letter did not include any records from Hartford's Summary Detail Report.

(c) Plaintiff received Certificate GLT878315, issued to Harbor HRK Sales with the documents produced to Mr. Mayer's counsel under cover of Ms. Martinez's letter dated December 18, 2017. (Mayer v Hartford 232)

(d) The Amendment to Group Policy appearing in the Administrative Record at Mayer v Hartford 112-123 was not presented to Mr. Mayer or his counsel prior to the initiation of this action and the production of the Administrative Record in discovery.

2. The inclusion of any Policy, Amendment or Certificate in the Stipulated Record is not an admission by either party as to whether it is a plan document governing Mr. Mayer's coverage.

3. Neither party will seek to introduce evidence, including testimony, outside the Stipulated Record in connection with the bench trial of this action on the Administrative Record.

SO ORDERED:

Hon. Vincent L. Briccetti    6/3/2019
United States District Judge

Dated:      New York, New York
              May 31, 2019

MARK SCHERZER, ESQ. (MS-2622)
Law Office of Mark Scherzer
Attorney for Plaintiff
49 Nassau Street, Fourth Floor
New York, New York 10038
Tel: (212) 406-9606
Email: markscherzerlaw@verizon.net

ROBINSON & COLE LLP

By: _____
Patrick Begos, Esq.
Attorneys for Defendants
1055 Washington Boulevard,
Stamford, CT 06901
Tel: 203-462-7500
Email: pbegos@rc.com

| Beginning Bates No. | Ending Bates No. | Date | To | From |
|---|---|---|---|---|
| Mayer v. Hartford 0377 | Mayer v. Hartford 0378 | 10/18/2017 | Sauerhoff, Cheryl A (GB and WC Claims); Solem, Erik M (GB and WC Claims) | Johnson, Stephanie A (Talcott + Group Benefits Law) |
| Mayer v. Hartford 0378 | Mayer v. Hartford 0379 | 10/18/2017 | Johnson, Stephanie A (Talcott + Group Benefits Law) | Sauerhoff, Cheryl A (GB and WC Claims) |
| Mayer v. Hartford 0379 | Mayer v. Hartford 0379 | 9/20/2017 | Solem, Erik M (GB and WC Claims); Sauerhoff, Cheryl A (GB and WC Claims) | Johnson, Stephanie A (Talcott + Group Benefits Law) |
| Mayer v. Hartford 0380 | Mayer v. Hartford 0381 | 9/19/2017 | Johnson, Stephanie A (Talcott + Group Benefits Law) | Solem, Erik M (GB and WC Claims) |
| Mayer v. Hartford 0381 | Mayer v. Hartford 0383 | 9/14/2017 | Solem, Erik M (GB and WC Claims) | Johnson, Stephanie A (Talcott + Group Benefits Law) |
| Mayer v. Hartford 0385 | Mayer v. Hartford 0385 | 10/6/2017 | Solem, Erik M (GB and WC Claims) | Johnson, Stephanie A (Talcott + Group Benefits Law) |
| Mayer v. Hartford 0386 | Mayer v. Hartford 0386 | 10/4/2017 | Johnson, Stephanie A (Talcott + Group Benefits Law) | Solem, Erik M (GB and WC Claims) |
| Mayer v. Hartford 0389 | Mayer v. Hartford 0391 | 9/14/2017 | Johnson, Stephanie A (Talcott + Group Benefits Law) | Solem, Erik M (GB and WC Claims) |
| Mayer v. Hartford 0785 | Mayer v. Hartford 0785 | 12/9/2016 | Robin Rupert | Stephanie Johnson |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Copy To | Description | Privilege Type | Redacted/Withheld |
|---|---|---|---|
| lsr171015335@thehartford.app.onit.com; Conway, Ellen A (Talcott + Group Benefits Law) | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com; Conway, Ellen A (Talcott + Group Benefits Law) | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| Sauerhoff, Cheryl A (GB and WC Claims) | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr171015335@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| lsr161005774@thehartford.app.onit.com | Attorney-client communication re Mayer appeal | Attorney-client privilege; work product | Redacted |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |